1  LAW OFFICES OF DANIEL B. SPITZER
   DANIEL B. SPITZER State Bar No. 121752
2  16311 Ventura Boulevard Suite 1200
   Encino, California 91436-2152
3  Telephone: 818-990-9700
   Facsimile: 818-990-9705
4  Email: dspitzer@spitzeresq.com

5  Attorneys for Plaintiff Ilan Peker

6

7

8                    UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11
   ILAN PEKER, an individual          )   CASE NO. _____
12                                     )
                Plaintiff,             )
13                                     )   **COMPLAINT FOR:**
         vs.                           )   1.  **Dissolution of Limited**
14                                     )       **Partnership**
                                       )   2.  **Securities Fraud - Cal. Corp. C.**
15  DISTNCT REAL ESTATE USA 2, L.P., a )       **§§25400 et seq.**
   Delaware limited partnership; DISTINCT REAL )  3.  **Securities Fraud - 15 USC §78j**
16  ESTATE USA GP 2, INC., a Delaware  )       **and 17 CFR §240.10b-5**
   corporation; PHILLIP LOUIS WAZONEK, an )   4.  **Fraud and Deceit**
17  individual; GORDON BERGER, an individual; )  5.  **Breach of Written Contract**
   and DOES 1 through 10, Inclusive,   )   6.  **Breach of Fiduciary Duties**
18                                     )   7.  **Declaratory Relief**
                Defendants.            )   8.  **Negligence**
19                                     )
                                       )   **DEMAND FOR JURY TRIAL**
20  _____  )

21

22      Plaintiff Ilan Peker, by and through his attorneys, hereby alleges the following:

23                            **PARTIES**

24  1.   At all material times, plaintiff **Ilan Peker** ("**Peker**") was and is a resident of Calabasas,

25       California, in the Central District of California. At all material times from and after March

26       2, 2021, Peker was a limited partner of the Crane Manor Limited Partnership, holding 150

27       Class A Units, having invested the sum of $150,000.

28
                                      1
                                 COMPLAINT

2.   Plaintiff is informed and believes and thereon alleges that at all material times from and after in or about February 2021, defendant **Distinct Real Estate USA 2, L.P.** (the "**Limited Partnership**" or "**Crane Manor Limited Partnership**") was and is a limited partnership organized and existing under the laws of the State of Delaware, with its principal place of business at 6000 Poplar Avenue, Suite 250, Memphis, Tennessee.

3.   Plaintiff is informed and believes and thereon alleges that at all material times from and after March 24, 2021, defendant **Distinct Real Estate USA 2 GP, Inc.** (the "**General Partner**") was and is a corporation organized and existing under the laws of the State of Delaware, with its registered office located at 16192 Coastal Highway, Lewes, Delaware 19958.

4.   Plaintiff is informed and believes and thereon alleges that at all material times, defendant **Phillip Louis Wazonek** ("**Wazonek**") was and is an individual over the age of eighteen years, and a citizen of Canada residing in Calgary, Canada. Plaintiff is further informed and believes and thereon alleges that at all material times, Wazonek was one of two shareholders of the corporate General Partner, the other shareholder and director being Marcin Drozdz ("**Drozdz**").

5.   Plaintiff is informed and believes and thereon alleges that at all material times, defendant **Gordon Berger** ("**Berger**") was and is an individual over the age of eighteen years, and a citizen of Canada residing in Toronto, Ontario with his principal place of business at 21 Tregellis Rd, M3H 1K3, Toronto, Ontario, Canada. Plaintiff is further informed and believes and thereon alleges that Berger has never been a shareholder, director or officer of the General Partner, but in spite of that fact has purported to act as a "Managing Director" of the Limited Partnership.

6.   Plaintiff is ignorant of the true names and capacities of defendants sued herein as **DOES 1 through 10, inclusive**, and therefore sues these defendants by such fictitious names. Plaintiff will amend this complaint to allege their true names and capacities when such names and capacities have been ascertained.

7.   Plaintiff is informed and believes and thereon alleges that at all material times, each defendant was the agent, representative, or employee of each and all of the other defendants, and was acting within the course and scope of such agency, representation and/or employment. Plaintiff is further informed and believes and thereon alleges that all of the wrongful acts and omissions alleged herein by each of the defendants was ratified by each of the other defendants. (The named defendants and Does 1 through 10, inclusive are collectively referred to herein as "**defendants**").

## JURISDICTION AND VENUE

8.   This court has jurisdiction over this action based on diversity of citizenship under 28 USC §1332(a), in that the amount in controversy is in excess of $75,000, exclusive of interest and costs, and the action is between: (a) citizens of different states, pitting plaintiff, a California resident, against the General Partner, a Delaware corporation and the Crane Manor Limited Partnership, a Delaware limited partnership (28 USC §1332(a)(1); and (b) a citizen of a State and citizens or subjects of a foreign state, pitting plaintiff, a citizen of California, against defendants Wazonek and Berger who, on information and belief, are citizens of Canada (28 USC §1332(a)(2)).

9.   As to the claims arising under 15 USC §78j and 17 CFR §240.10b-5, this court has jurisdiction over this action based on 28 USC §1331.

10.  Ancillary jurisdiction over the state law claims is proper under 28 USC §1367 because they arise under a common nucleus of operative facts as the federal claims alleged herein.

11.  Venue is proper in this district pursuant to 28 USC §1391(b)(1) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district. The solicitations of plaintiff's investment in the Crane Manor Limited Partnership were all directed to plaintiff in California who, at all times, resided in and did business in the County of Los Angeles, State of California. Furthermore, the damages suffered by the plaintiff were suffered by him, a California resident, in the County of Los Angeles, State of California.

**ALLEGATIONS OF FACT COMMON TO ALL CLAIMS FOR RELIEF**

12.  Commencing in or about February 2021, Drozdz, a shareholder, director and officer of the General Partnership, who is also identified as a "Managing Partner" in the Crane Manor Limited Partnership promotional materials, directly or indirectly, by means of the instrumentalities of interstate commerce, internet, telephone and/or the mails, solicited a number of investors, including plaintiff, with the intent and for the purpose of inducing them to invest in the Limited Partnership. On behalf of the General Partner, Drozdz, directly or indirectly, made specific representations to plaintiff by telephone and internet communications, including sending plaintiff by email copies of an "Executive Summary" relating to Crane Manor Apartments ("**Executive Summary**") and monthly updates as to the progress of the Crane Manor project, and providing access to an "investor portal" (https://investorportal.distinctrealestatelp.com/offerings/crane-manor-apartments/register) designed to provide information to potential investors ("**Investor Portal**"). A true and correct copy of the Executive Summary is attached as **Exhibit 1** hereto and incorporated herein by this reference. Among other things, the Executive Summary states that the acquisition cost of the Crane Manor property was $3,850,000, a representation which plaintiff later learned was knowingly false at the time of its making.

13.  Plaintiff is informed and believes and thereon alleges that on or about February 9, 2021, Drozdz, acting on behalf of the General Partner, made contact for the first time with a group of investors with whom plaintiff is affiliated. On February 15, 2021, plaintiff received an email directly from Drozdz, in which Drozdz described the overal parameters of the Crane Manor project as follows:

- ***We will renovate and release the units at market rent.*** (average $650 for 2bd/1ba)
- ***Once renovated and rented*** we anticipate the building to be worth $11,000,000+.
- Cash flow to investors will likely begin after 12 months
- We plan to refinance the property between 24- 36 months from time of purchase
- The refinance should allow us to give investors their initial

investment back (and still own the building)

- We will relook at selling the building in year 5 (we can vote on it) or we can just keep it and collect the cash flow until we ultimately decide to sell it
- If we keep it beyond 5 years we could look at refinancing it again with investors as there will likely be a lot more equity there.

(Emphasis added.) It was therefore clear, from the very first communication from the General Partner to plaintiff, that the renovation of the Crane Manor apartments was a key element in achieving the overall purpose of this investment.

14.    On February 17, 2021, by email of the same date, Drozdz sent to plaintiff a series of promotional materials, including among other things the Executive Summary, the operating agreement of the Limited Partnership ("**Operating Agreement**") (a true and correct copy of which is attached as **Exhibit 2** hereto and incorporated herein by this reference), a subscription agreement, a link to the investor portal and a link to a Dropbox folder containing additional promotional materials and a series of before-and-after photos purporting to show renovations already completed. In their promotional materials, the General Partner thus represented that their intention was to renovate the Crane Manor Apartments to bring them up to market rents and full occupancy.

15.    In reliance on the representations made to him by Drozdz, on behalf of the General Partner, on or about February 23, 2021, plaintiff agreed to invest the sum of $150,000 in the Limited Partnership and paid the sum of $150,000 to the General Partner, in consideration of his receipt of 150 Class A limited partnership units in the Crane Manor Limited Partnership.

16.    On March 2, 2021, plaintiff received an email and accompanying "welcome letter" from the General Partner's Investor Relations Department, confirming receipt of his investment and attaching a copy of an electronically executed signature page from the Operating Agreement, a true and correct copy of which is attached as **Exhibit 3** hereto and incorporated herein by this reference. Attached to the same email was a fully executed copy of the Subscription Agreement ("**Subscription Agreement**"), a true and correct copy of which is attached as

**Exhibit 4** hereto and incorporated herein by this reference. The Subscription Agreement provides in relevant part, at ¶9(b): "This Agreement shall be deemed to be made under, and shall be construed in accordance with and shall be governed by, the laws of the State of Arizona."

17. Plaintiff is informed and believes and thereon alleges that, by means of these communications, the General Partner represented, and intended that the prospective investors, including plaintiff, would believe, that the Crane Manor Limited Partnership and the General Partner were already existing entities before he made his investment. In fact, the General Partner was not incorporated until March 24, 2021 and the Limited Partnership was not actually formed until March 26, 2021. Plaintiff is further informed and believes and thereon alleges that, in order to induce him and other investors to invest in the Crane Manor Limited Partnership, the General Partner represented, and intended that the prospective investors, including plaintiff, would believe, that the Crane Manor property had already been purchased. Plaintiff later learned that these representations were false. In or about April 2021, through the Investor Portal, the General Partner circulated a document entitled "Announcement," which announced the fact that the Crane Manor Limited Partnership had just then completed its acquisition of the Crane Manor Apartments.

18. Plaintiff is informed and believes and thereon alleges that on or about June 2021, the General Partner commissioned an appraisal report to be prepared by Valbridge Property Advisors. The Appraisal Report, dated June 17, 2021, appraised the value of the Crane Manor property at $3,550,000 – ***$250,000 less*** than the purchase price for the Crane Manor property ($3,800,000) stated in the Executive Summary. In relevant part, the Appraisal Report also notes that the Crane Manor Limited Partnership "acquired the subject property on March 31, 2021 for a recorded consideration of $3,470,000." Since the General Partner, through Drozdz, had earlier represented that the purchase price of the Crane Manor property was below market, a number of the limited partners, including plaintiff, began raising questions

about the finances of the limited partnership with the General Partner. Plaintiff is informed and believes and thereon alleges that, at or about the same time, Wazonek and Berger, identified as "Managing Partners" of the General Partner in the Executive Summary, contacted a number of the limited partners, including plaintiff, and informed them that the General Partner was unable to proceed with any renovations because they were unable to obtain financing. According to Wazonek and Berger, Drozdz had become embroiled in litigation over other business ventures and his involvement in the Crane Manor project was "poison" to any lenders. Wazonek and Berger informed the limited partners that the lender was insisting, as a precondition to financing, that Drozdz resign his position with the General Partner and dissociate from the project altogether. They sought the help of the limited partners, including plaintiff, to pressure Drozdz to resign from his position with the General Partner so that the financing for the renovations could go forward. In these same communications, Wazonek and Berger alluded to other financial irregularities. They informed the limited partners, including plaintiff, that Drozdz had allegedly taken $50,000 without authorization from the partnership's bank accounts; they also made oblique reference to a priority "lien" of $1,350,000 against the Crane Manor property and that legal action had been commenced to challenge that lien. Plaintiff is informed and believes and thereon alleges that until that point, in or about September 2021, none of the limited partners had been informed by the General Partner of: (a) the existence of the "lien" claim against the Crane Manor property; (b) the fact that there was pending legal action involving the lien claim; or (c) the potential cost to the Crane Manor Limited Partnership of the pending legal action.

19. In late August 2021, plaintiff and the other limited partners were furnished by Berger with a copy of a letter dated August 23, 2021 from Mark W. Krochak of Peterson Krochak, a Canadian law firm, directed to Drozdz, concerning the General Partner (referred to as "GP 2") and the general partner of Whispering Pines (referred to as "GP"). In his letter, in relevant part, Mr. Krochak states:

> I am advised that the GP and GP 2 corporations must raise funds for the renovation and improvement purposes originally intended for increasing value and equity for the unit holders in the Limited Partnerships. I am also informed that you and/or your corporation ("1990781") are unwilling or unable to provide the funding or financing requirements for the purposes of the General Partnership role with respect to the limited partnerships.
>
> It is my opinion that under the terms of Article V of the Unanimous Shareholders Agreements for both GP and GP 2, you are in breach of the obligations to provide either the requisite funding or the financing guarantees and covenants required for the General Partnership to obtain the funds required for the purposes intended.
>
> As a result, I have been instructed to begin action in the Court of Queen's Bench using all remedies at my clients' disposal including the terms of the Agreements, remedies available at Common Law and under the Alberta Business Incorporations Act to end your involvement in both GP and GP 2.

A true and correct copy of the Krochak letter of August 23, 2021 is attached as **Exhibit 5** hereto and incorporated herein by this reference. Based on this communication and other communications from Wazonek, Berger and Drozdz, plaintiff believed that the General Partner was unable to function, to obtain financing or to proceed with the renovations which were and are at the heart of the Crane Manor Limited Partnership's financial objectives.

20.   In light of these troubling communications and revelations, the limited partners collectively began to demand information concerning the finances and operations of the Crane Manor Limited Partnership. By email to Wazonek, Berger and Drozdz dated September 26, 2021, Gerson, whom the limited partners (including plaintiff) had nominated as spokesman, demanded as follows:

> In the meantime, we are collectively demanding that the General Partner immediately make available to the Partners and turn over copies of all books and records of the Partnership, including without limitation the following: (a) all rent rolls; (b) all bank statements; (c) all checks; (d) records of all disbursements by the Partnership; (e) any electronic records of the Partnership's finances (for example, Quickbooks); (f) any agreements entered into on behalf of, or binding upon, the Partnership; and (g) the names, contact information (telephone, facsimile, email addresses) and Interests held of all Partners.

The General Partner refused to furnish *any* of the information requested. By that point, the limited partners had had enough. They had learned that the General Partners misrepresented

the financials of the Crane Manor project in order to induce them to invest. They had learned that the General Partners omitted key, material facts, such as the true value of the property, the existence of a $1,350,000 priority lien against the Crane Manor property and the lawsuit commenced by the General Partner which, on information and belief, was being litigated at the expense of the Crane Manor Limited Partnership. They had been informed that the General Partner was now incapable of fulfilling its obligations under the Operating Agreement, including obtaining financing and renovating the apartment units, due to infighting among Wazonek, Berger and Drozdz. They had been informed of questionable financial transactions involving their invested capital, had requested information, and had been rebuffed.

21.     As a consequence, on September 27, 2021, the limited partners convened a meeting of the Crane Manor Limited Partnership. At that time, in accordance with the Operating Agreement, a quorum of limited partners, who had waived notice of the meeting, was present and passed a series of resolutions (a) declaring the General Partner in material breach of the Operating Agreement for its failure and inability to proceed with renovations of the Crane Manor property, (b) voting to remove the General Partner and (c) voting to dissolve the Crane Manor Limited Partnership. Later that same day, Peker's counsel, by email, gave notice of the enactment of these resolutions to all limited partners and the General Partner of the Crane Manor Limited Partnership. A true and correct copy of this email including its attachment, the September 27, 2021 resolution, is attached as **Exhibit 6** hereto and incorporated herein by this reference.

22.     On October 11, 2021, the limited partners convened a second meeting of the Crane Manor Limited Partnership. At that time, in accordance with the Operating Agreement, a quorum of limited partners, who had waived notice of the meeting, was present and passed an amended resolution to remove the General Partner, setting the effective date for its removal on December 28, 2021 and, on the same date, a meeting for the election of a new General

Partner. A true and correct copy of the Amended Resolutions for Removal of General Partner is attached as **Exhibit 7** hereto and incorporated herein by this reference.

23. Both Wazonek and Berger have informed the Limited Partners, including plaintiff, orally and in writing, that they will not honor the resolutions for removal of the General Partner or for the dissolution of the Limited Partnership.

24. Plaintiff is informed and believes and thereon alleges that on October 7, 2021, the "Investor Relations" Department of the General Partner directed an email to all limited partners and, as an attachment thereto, sent a copy of what was described as an "updated financial report" for the Crane Manor Limited Partnership. This financial report consisted of a balance sheet, monthly profit-and-loss statement and year-to-date cash-flow report, current through August 31, 2021. A true and correct copy of this "financial report," which is the only financial report ever received from the General Partner in connection with the Crane Manor project, is attached as **Exhibit 8** hereto and incorporated herein by this reference. Among other things, the financial report reflects a receivable "from USA LP" of $164,866 which, on information and belief, is a loan made by the General Partner, without the consent of knowledge of the Crane Manor limited partners, to the Whispering Pines limited partnership ("**Whispering Pines**"). Plaintiff is informed and believes and thereon alleges that Whispering Pines is a companion project to Crane Manor (featured together with Crane Manor in the Crane Manor promotional materials), which is also formed as a limited partnership and is controlled by a corporate general partner (referred to as "GP" in the Krochak letter of August 23, 2021, as above) owned and operated by Wazonek and Berger as part of their "Distinct Real Estate Group."

25. The group of limited partners, including plaintiff, continued to press Wazonek and Berger for further information concerning the operations and finances of the Crane Manor project. Wazonek responded by email to plaintiff's counsel on October 13, 2021. In that email, for the very first time, Wazonek informed the limited partners that the true purchase price for

the Crane Manor property was $3,150,000 (not $3,800,000, as stated in the Executive Summary), subject to an existing lien, which they referred to as a "lis pendens" of "up to" $1,350,000, and provided a copy of the Purchase and Agreement dated January 21, 2021. A true and correct copy of Wazonek's October 13, 2021 email, together with the attached Purchase and Sale Agreement, is attached as **Exhibit 9** hereto and incorporated herein by this reference. Wazonek also confirmed that the General Partner had commenced legal action, on behalf of the Crane Manor Limited Partnership, to challenge the lien. The limited partners, including plaintiff, attempted to obtain additional information concerning the priority lien claim and the legal action, but the General Partner failed and refused even to give them the case name or caption information.

26. On October 27, 2021, the General Partner gave (untimely) notice of a meeting of the Crane Manor Limited Partnership, with the agenda items to include, among other things: (a) a project update; (b) review of the Purchase and Sale Agreement; and (c) clarification of issues of mortgage on property and litigation. The meeting took place via Zoom on November 4, 2021. Wazonek and Berger reported as follows:

    a.    <u>Project Update</u>. The General Partner reported that due to its own internal squabbling, which Wazonek and Berger blamed on Drozdz, they had been unable to obtain financing for the promised renovations, as a result of which only a handful of the apartment units had been renovated and no further renovations were being performed. Wazonek and Berger reported that they had secured a "term sheet" for financing in June 2021, which they flashed for a few seconds but refused to disseminate to the limited partners. (Significantly, this "term sheet" did not require the resignation of Drozdz, which Wazonek and Berger had previously informed the limited partners was a condition imposed by the lender.) Wazonek and Berger were forced to admit, however, that a precondition of this financing was the lender's insistence that the disputed lien of $1,350,000 be removed from the Crane Manor

property and the litigation concluded. They also did not address the question of why, if this loan "commitment" had been received in June 2021, the financing had not been concluded as of the time of the meeting on November 4, 2021 so that the renovations could proceed.

b.   Review of Purchase and Sale Agreement and Clarification of Mortgage. Wazonek and Berger reported that the Purchase and Sale Agreement provides, in relevant part, that the property was purchased subject to a potential lien claim of up to $1,350,000. They refused to elaborate on the nature of the lien, whether it was a mortgage and why it did not appear in the chain of title. They further reported that they had commenced litigation to challenge the lien claim. Wazonek and Berger acknowledged that the Purchase and Sale Agreement had not been made available to potential investors, nor had the potential lien claim or litigation challenging it been disclosed to the limited partners, prior to the time they made their investments. They refused to disclose any further information concerning the litigation, including basic identifying information (title of the action, court, case name or case number).

c.   Request by Limited Partners to Inspect and Copy Books and Records. At the meeting, Wazonek and Berger made clear that while they would permit the limited partners to inspect certain selected documents at the Memphis office of the Crane Manor Limited Partnership, they would not permit copying of any documents or computerized financial data.

27.   Plaintiff is informed and believes and thereon alleges that on November 12, 2021, by email of the same date, limited partner Anna Ostrovsky (with copies to all limited partners) sent an email to Gordon Berger, at his request, detailing the financial documents being requested by the limited partners, including plaintiff. In relevant part, Ostrovsky's email states as follows:

\\\

We are specifically looking for:
    1. The documentation for the $1.35mm liability
    2. The documentation for the lawsuit to reduce the $1.35mm liability
    3. Any updates to the purchase agreement - the purchase agreement shared with us has an old date and a purchase price different from what was disclosed to us
    4. A copy of the proposed $3mm financing term sheet
    5. What is the status of the renovation? How many units have been renovated? How many of the total units are occupied? What is the timeline for completing the renovation
    6. We have additional specific questions including transfer of funds out of Crane Manor to other projects, very high professional fees, etc. but if that is too difficult to address by email, we can wait to examine the books ourselves.

A true and correct copy of Ostrovsky's November 12, 2021 email is attached as **Exhibit 10** hereto and incorporated herein by this reference.

28.   Berger responded by email on November 12, 2021, a true and correct copy of which is attached as **Exhibit 11** hereto and incorporated herein by this reference. In his email, among other things, Berger refused to furnish any information about the purported loan commitment and stated "We covered the fact, that without financial [financing], it was impossible to start the renovations of Crane Manor," thereby admitting that the General Partner is presently incapable of proceeding with the renovations of the Crane Manor property. In addition, Berger made clear that although he would be "very willing to have you or any other investor come to sunny Memphis and check the books," he was unwilling to make the full array of documents sought by the Limited Partners available for inspection and copying.

29.   In order to force the General Partner to permit copying of documents, the Limited Partners prepared, circulated and obtained signatures from a majority of the Limited Partners on an Action By Consent in Lieu of Meeting to Permit Copying of Partnership Books, Records and Financial Statements ("**Resolution to Permit Copying**"), a true and correct copy of which is attached as **Exhibit 12** hereto and incorporated herein by this reference. In material part, the Resolution to Permit Copying instructs the General Partner that "any Limited Partner or its authorized representative shall, as part of the examination of the books, records, and financial statements provided for in [Operating Agreement ¶10.1], be permitted to copy or

1   scan the Partnership's documents and things enumerated therein."

2   30.   Plaintiff is informed and believes and thereon alleges, based on an examination of the Crane

3   Manor Limited Partnership bank statements from Wells Fargo Bank, that a sum of between

4   $10,000 to $20,000 has been paid via Automated Clearing House (ACH) payments to the

5   bank account of Whispering Pines since at least July 2021, and continuing through

6   November 30, 2021.

7   31.   Plaintiff has made repeated demand for the return of his investment but defendants have

8   failed and refused, and continue to fail and refuse, to pay the sums due him.

9   32.   As a proximate result of the wrongful conduct of defendants and each of them alleged herein,

10   plaintiff has been damaged in a sum in excess of $75,000, according to proof at time of trial,

11   together with prejudgment interest, costs of suit and attorney fees, both under the written

12   agreements alleged herein or as otherwise may be provided by law.

13   33.   In performing the wrongful acts alleged herein, defendants and each of them acted with

14   malice, oppression and fraud, without regard to safeguarding the investment of plaintiff or

15   acting toward him as appropriate for a fiduciary. As a consequence thereof, plaintiff is

16   entitled to an award of punitive damages under California Civil Code §3294 in the minimum

17   sum of $1,000,000, according to proof at time of trial.

18   **FIRST CLAIM FOR RELIEF**

19   **For Judicial Dissolution of Limited Partnership and Accounting, as Against All**

20   **Named Defendants and Does 1 Through 10, Inclusive ("Defendants")**

21   **[A.R.S. §29-345]**

22   34.   Plaintiff re-alleges and incorporates hereby the allegations of paragraphs 1 through 33,

23   inclusive, above, as though fully set forth herein.

24   35.   At all material times from and after March 2, 2021, Plaintiff has been a partner in the Crane

25   Manor Limited Partnership.

26   36.   As a result of the errors, omissions and wrongful actions of each of the defendants, it is not

27

28

reasonably practicable to carry on the business of the Crane Manor Limited Partnership in conformity with the Operating Agreement and the purposes enunciated therein and in the promotional materials used to induce plaintiff's investment. These errors, omissions and wrongful actions include, without limitation:

a. Falsely misrepresenting to the Limited Partners, including plaintiff, that the purchase price of the Crane Manor property was $3,800,000, when in fact the true purchase price was $3,150,000.

b. Falsely misrepresenting to the Limited Partners, including plaintiff, that the Crane Manor property had already been acquired at the time the General Partner solicited their investments.

c. Fraudulently omitting to disclose to the Limited Partners, including plaintiff, that a lien of up to $1,350,000 burdened the Crane Manor property as of the time of their investment in the Crane Manor Limited Partnership.

d. Fraudulently omitting to disclose to the Limited Partners, including plaintiff, that the General Partner had commenced litigation to challenge the lien of up to $1,350,000 burdening the Crane Manor property at the expense, on information and belief, of the Crane Manor Limited Partnership.

e. Falsely omitting to disclose to the Limited Partners, including plaintiff, that the General Partner could not proceed with renovations of the Crane Manor property due to, among other things, the internal squabbling and dysfunction within the General Partner and its inability to obtain financing for the anticipated renovations.

f. Causing an undisclosed and unauthorized "loan" in excess of $160,000 to be made to Whispering Pines, a companion development project operated and owned in part by the principals of the General Partner, at a time when the General Partner was claiming it could not fund the renovations of the Crane Manor property, thereby violating the principle that a general partner of a limited partnership may not possess

1        or assign the rights to partnership property other than for a partnership purpose.

2    g.    Causing a sum of between $10,000 to $20,000 to be paid via Automated Clearing

3         House (ACH) payments to the bank account of Whispering Pines since at least July

4         2021, and continuing through November 30, 2021.

5    h.    Refusing, in bad faith, to permit the Limited Partners to inspect and copy the books

6         and records of the Crane Manor Limited Partnership, in violation of the Operating

7         Agreement, at ¶10.2 and A.R.S. §29-305(a)(8).

8    37.    Plaintiff is entitled to dissolution of the limited partnership, an accounting, a winding up of

9        its affairs, and distribution of the partnership assets pursuant to A.R.S. §§29-344 et seq.

10   38.    Plaintiff is informed and believes and thereon alleges that the defendants have refused to

11        consent to dissolution of the Crane Manor Limited Partnership, to facilitate an accounting

12        of its affairs, or to a winding up of its affairs. Plaintiff is further informed and believes and

13        thereon alleges that the General Partner, through Wazonek and Berger, have indicated orally

14        and in writing that they will refuse to comply with the resolutions for removal of the General

15        Partner and for dissolution of the Limited Partnership enacted by the Limited Partners.

16   39.    Due to the fact that the defendants, and each of them, have wrongfully caused dissolution of

17        the Crane Manor Limited Partnership and frustration of its purpose by their errors, omissions

18        and wrongful conduct, as alleged herein, they are not entitled to wind up the affairs of the

19        Limited Partnership, oversee an accounting or manage the distribution of the partnership

20        assets.

21   40.    Unless the court appoints a receiver to take over the business affairs of the Crane Manor

22        Limited Partnership while this action is pending, the interests of both the Limited Partnership

23        and its shareholders will suffer further damage due to the facts set forth above.

24   \\\

25   \\\

26   \\\

27

28

## SECOND CLAIM FOR RELIEF

**For Rescission and Damages Resulting from Purchase of Securities, as Against All Named Defendants and Does 1 Through 10, Inclusive ("Defendants")**

**[California Corp. C. §§25401, 25501]**

41. Plaintiff re-alleges and incorporates hereby the allegations of paragraphs 1 through 40, inclusive, above, as though fully set forth herein.

42. On March 2, 2021, plaintiff purchased from defendants Wazonek, Berger and the General Partner 150 limited partnership units in the Crane Manor Limited Partnership for $150,000.

43. Defendants offered to sell, and did sell to plaintiff, the securities described above by means of oral and written communications, using the instrumentalities of interstate commerce, specifically telephone and internet. These communications contained false, misleading statements and material omissions of fact, including among others the following:

    a. Defendants misrepresented to the Limited Partners, including plaintiff, that the purchase price of the Crane Manor property was $3,800,000, when in fact the true purchase price was $3,150,000.

    b. Defendants misrepresented to the Limited Partners, including plaintiff, that the Crane Manor property had already been acquired at the time the General Partner solicited their investments.

    c. Defendants fraudulently failed to disclose to the Limited Partners, including plaintiff, that a lien of up to $1,350,000 burdened the Crane Manor property as of the time of their investment in the Crane Manor Limited Partnership.

    d. Defendants fraudulently omitted to disclose to the Limited Partners, including plaintiff, that the General Partner had commenced litigation to challenge the lien of up to $1,350,000 burdening the Crane Manor property at the expense, on information and belief, of the Crane Manor Limited Partnership.

    e. Defendants fraudulently omitted to disclose to the Limited Partners, including

plaintiff, that the General Partner could not proceed with renovations of the Crane Manor property due to, among other things, the internal squabbling and dysfunction within the General Partner and its inability to obtain financing for the anticipated renovations.

44.  These misrepresentations and omissions by defendants and each of them were untrue in that (a) the true purchase price of the Crane Manor property was $3,150,000; (b) the Crane Manor property had not been acquired as of the time the limited partners, including plaintiff, made their investments; (c) there was at all material times a lien claim against the Crane Manor property of $1,350,000, a fact which was known to defendants because it was recited in the Purchase and Sale Agreement they had entered into on January 18, 2021; (d) on information and belief, the defendants had commenced litigation to challenge the lien claim; and (e) the defendants knew of the financial difficulties of, and litigation involving, Drozdz, but did not disclose these facts or the financial inability of the General Partner to obtain financing for the Crane Manor renovations to the limited partners, including plaintiff.

45.  At the time plaintiff made his investment in the Crane Manor Limited Partnership, he did not know that the statements of defendants and each of them, as related above, were untrue, or that the defendants had omitted to disclose to him material facts in connection with his purchase of limited partnership units in the Crane Manor Limited Partnership. Had plaintiff known of these untrue statements and material omissions, he would not have purchased these securities from the defendants.

46.  At all material times, each of the defendants Wazonek and Berger were listed in the promotional materials for the Crane Manor Limited Partnership, specifically the Executive Summary, as a "Managing Partner." As a Managing Partner, each of Wazonek and Berger controlled the General Partner, which, by the misrepresentations and material omissions detailed above, violated the provisions of California Corp. C. §25401. As a result, defendants Wazonek and Berger, as control persons, are jointly and severally liable with, and to the

1   same extent as, the General Partner for the violations of California Corp. C. §25401

2   described in this complaint.

3   47.   At all material times, plaintiff was and is a resident of the State of California, County of Los

4   Angeles. The misrepresentations and material omissions detailed above by defendants and

5   each of them were made to plaintiff in California, the consideration paid for purchase of the

6   securities was paid from California and the damages suffered by plaintiff were suffered in

7   California.

8   48.   Pursuant to the provisions of California Corp. C. §25501, plaintiff is entitled to rescind the

9   purchase of the securities, the 150 limited partnership units in the Crane Manor Limited

10   Partnership, and is entitled to receive from defendants and each of them the consideration

11   paid for the limited partnership units ($150,000), plus interest at the maximum legal rate, less

12   the amount of any income received on the securities.

13   49.   Prior to entry of judgment in this action, plaintiff will tender to defendants the 150 limited

14   partnership units in the Crane Manor Limited Partnership purchased from defendants.

15   ## THIRD CLAIM FOR RELIEF

16   ### For Fraud in the Sale of a Security, as Against All

17   ### Named Defendants and Does 1 Through 10, Inclusive ("Defendants")

18   ### [15 USC §78j(b); 17 CFR §240.10b-5]

19   50.   Plaintiff re-alleges and incorporates hereby the allegations of paragraphs 1 through 49,

20   inclusive, above, as though fully set forth herein.

21   51.   Beginning in or about February 2021, and continuing through March 2, 2021, defendants and

22   each of them offered to sell, and did sell to plaintiff, the securities described above by means

23   of oral and written communications, using the instrumentalities of interstate commerce,

24   specifically telephone and internet. These communications contained materially false

25   representations, misleading statements and material omissions of fact, including among

26   others the following:

27

28

a. Defendants misrepresented to the Limited Partners, including plaintiff, that the purchase price of the Crane Manor property was $3,800,000, when in fact the true purchase price was $3,150,000.

b. Defendants misrepresented to the Limited Partners, including plaintiff, that the Crane Manor property had already been acquired at the time the General Partner solicited their investments.

c. Defendants fraudulently failed to disclose to the Limited Partners, including plaintiff, that a lien of up to $1,350,000 burdened the Crane Manor property as of the time of their investment in the Crane Manor Limited Partnership.

d. Defendants fraudulently omitted to disclose to the Limited Partners, including plaintiff, that the General Partner had commenced litigation to challenge the lien of up to $1,350,000 burdening the Crane Manor property at the expense, on information and belief, of the Crane Manor Limited Partnership.

e. Defendants fraudulently omitted to disclose to the Limited Partners, including plaintiff, that the General Partner could not proceed with renovations of the Crane Manor property due to, among other things, the internal squabbling and dysfunction within the General Partner and its inability to obtain financing for the anticipated renovations.

52. These misrepresentations and omissions by defendants and each of them were untrue in that (a) the true purchase price of the Crane Manor property was $3,150,000; (b) the Crane Manor property had not been acquired as of the time the limited partners, including plaintiff, made their investments; (c) there was at all material times a lien claim against the Crane Manor property of $1,350,000, a fact which was known to defendants because it was recited in the Purchase and Sale Agreement they had entered into on January 18, 2021; (d) on information and belief, the defendants had commenced litigation to challenge the lien claim; and (e) the defendants knew of the financial difficulties of, and litigation involving, Drozdz, but did not

1   disclose these facts or the financial inability of the General Partner to obtain financing for

2   the Crane Manor renovations to the limited partners, including plaintiff.

3   53.   In making these false and misleading misrepresentations, defendants also suppressed material

4   facts which, had they been known to plaintiff, would have dissuaded him from investing with

5   defendants at all.

6   54.   On March 2, 2021, plaintiff purchased from defendants Wazonek, Berger and the General

7   Partner 150 limited partnership units in the Crane Manor Limited Partnership for $150,000.

8   55.   In agreeing to purchase these limited partnership units, plaintiff relied on the

9   misrepresentations and misleading statements made by defendants and each of them.

10   Plaintiff's reliance was reasonable because the defendants, through Drozdz, represented

11   themselves as experienced developers in projects such as the Crane Manor project, and they

12   further disseminated promotional materials, both directly and through the investor portal, that

13   misrepresented the finances of the project and omitted material facts (such as, among others,

14   the true purchase price of the Crane Manor property, the existence of a disputed lien of up

15   to $1,350,000 burdening the property and the filing of a lawsuit by the General Partner at the

16   expense of the Crane Manor Limited Partnership to challenge that lien).

17   56.   At the time plaintiff made his investment in the Crane Manor Limited Partnership, he did not

18   know that the statements of defendants and each of them, as related above, were untrue, or

19   that the defendants had omitted to disclose to him material facts in connection with his

20   purchase of limited partnership units in the Crane Manor Limited Partnership. Had plaintiff

21   known of these untrue statements and material omissions, he would not have purchased these

22   securities from the defendants. As a consequence, plaintiff's reliance on the

23   misrepresentations and omissions of material fact were and are the proximate cause of

24   plaintiff's damages.

25   57.   Plaintiff is informed and believes and thereon alleges that each of the individual defendants,

26   Wazonek and Berger, was and is a control person of the General Partner who aided and

27

28

1    abetted the wrongful acts alleged herein on the part of the General Partner.

2    58.   At all material times, plaintiff was and is a resident of the State of California, County of Los

3          Angeles. The misrepresentations and material omissions detailed above by defendants and

4          each of them were made to plaintiff in California, the consideration paid for purchase of the

5          securities was paid from California and the damages suffered by plaintiff were suffered in

6          California.

7    59.   As a proximate result of the wrongful acts alleged herein, plaintiff has suffered damages, the

8          full nature and extent of which have not yet been ascertained. Plaintiff is informed and

9          believes and thereon alleges, however, that said damages are in the minimum sum of his

10         investment of $150,000, together with costs and attorney fees incurred in the prosecution of

11         this action.

12   60.   Plaintiff is informed and believes and thereon alleges that at all times material hereto,

13         defendants and each of them knew that the representations they made to the limited partners,

14         including plaintiff, were knowingly false at the time of their making, and that they were

15         withholding from plaintiff material information, to wit, the true purchase price of the Crane

16         Manor property, the existence of a lien of up to $1,350,000 burdening the property, the

17         existence of a lawsuit brought on behalf of the Limited Partnership (and at its expense) to

18         challenge the lien and, most critically, that the General Partner was incapable of performing

19         its function of facilitating renovations and resale of the Crane Manor property due to its

20         internal squabbling and dysfunction. Plaintiff is further informed and believes and thereon

21         alleges that defendants and each of them intentionally, wilfully, fraudulently, maliciously and

22         in conscious disregard for the rights of plaintiff, took the actions alleged herein, knowing full

23         well that plaintiff was certain to suffer damages as a result of the wrongful conduct of

24         defendants and each of them. Plaintiff is therefore entitled to an award of punitive damages

25         against each of the defendants in an amount according to proof at the time of trial.

26   \\\

27

28

## FOURTH CLAIM FOR RELIEF

### For Fraud and Deceit, as Against All

### Named Defendants and Does 1 Through 10, Inclusive ("Defendants")

### [California Civil C. §§1572, 1710, 3294]

61.   Plaintiff re-alleges and incorporates hereby the allegations of paragraphs 1 through 60, inclusive, above, as though fully set forth herein.

62.   Beginning in or about February 2021, and continuing through March 2, 2021, defendants and each of them offered to sell, and did sell to plaintiff, the securities described above by means of oral and written communications, specifically telephone and internet. These communications contained materially false representations, misleading statements and material omissions of fact, including among others the following:

   a.   Defendants misrepresented to the Limited Partners, including plaintiff, that the purchase price of the Crane Manor property was $3,800,000, when in fact the true purchase price was $3,150,000.

   b.   Defendants misrepresented to the Limited Partners, including plaintiff, that the Crane Manor property had already been acquired at the time the General Partner solicited their investments.

   c.   Defendants fraudulently failed to disclose to the Limited Partners, including plaintiff, that a lien of up to $1,350,000 burdened the Crane Manor property as of the time of their investment in the Crane Manor Limited Partnership.

   d.   Defendants fraudulently omitted to disclose to the Limited Partners, including plaintiff, that the General Partner had commenced litigation to challenge the lien of up to $1,350,000 burdening the Crane Manor property at the expense, on information and belief, of the Crane Manor Limited Partnership.

   e.   Defendants fraudulently omitted to disclose to the Limited Partners, including plaintiff, that the General Partner could not proceed with renovations of the Crane

Manor property due to, among other things, the internal squabbling and dysfunction within the General Partner and its inability to obtain financing for the anticipated renovations.

63. These misrepresentations and omissions by defendants and each of them were untrue in that (a) the true purchase price of the Crane Manor property was $3,150,000; (b) the Crane Manor property had not been acquired as of the time the limited partners, including plaintiff, made their investments; (c) there was at all material times a lien claim against the Crane Manor property of $1,350,000, a fact which was known to defendants because it was recited in the Purchase and Sale Agreement they had entered into on January 18, 2021; (d) on information and belief, the defendants had commenced litigation to challenge the lien claim; and (e) the defendants knew of the financial difficulties of, and litigation involving, Drozdz, but did not disclose these facts or the financial inability of the General Partner to obtain financing for the Crane Manor renovations to the limited partners, including plaintiff.

64. In making these false and misleading misrepresentations, defendants also suppressed material facts which, had they been known to plaintiff, would have dissuaded him from investing with defendants at all.

65. On March 2, 2021, plaintiff purchased from defendants Wazonek, Berger and the General Partner 150 limited partnership units in the Crane Manor Limited Partnership for $150,000.

66. In agreeing to purchase these limited partnership units, plaintiff relied on the misrepresentations and misleading statements made by defendants and each of them. Plaintiff's reliance was reasonable because the defendants, through Drozdz, represented themselves as experienced developers in project such as the Crane Manor project, and they further disseminated promotional materials, both directly and through the investor portal, that misrepresented the finances of the project and omitted material facts (such as, among others, the true purchase price of the Crane Manor property, the existence of a disputed lien of up to $1,350,000 burdening the property and the filing of a lawsuit by the General Partner to

1  challenge that lien).

2  67.  At the time plaintiff made his investment in the Crane Manor Limited Partnership, he did not

3  know that the statements of defendants and each of them, as related above, were untrue, or

4  that the defendants had omitted to disclose to him material facts in connection with his

5  purchase of limited partnership units in the Crane Manor Limited Partnership. Had plaintiff

6  known of these untrue statements and material omissions, he would not have purchased these

7  securities from the defendants.

8  68.  Plaintiff is informed and believes and thereon alleges that each of the individual defendants,

9  Wazonek and Berger, was and is a control person and alter ego of the General Partner.

10  Plaintiff is further informed and believes and thereon alleges that there is a unity of interest

11  and ownership among Wazonek, Berger and the General Partner, such that they do not have

12  a separate existence; that the General Partner is insufficiently capitalized; that the General

13  Partner does not maintain its separateness as a distinct legal entity from, among others,

14  Wazonek and Berger; and that the General Partner is a mere shell, instrumentality and

15  conduit for the business transactions and schemes of Wazonek and Berger. As a result,

16  Wazonek, Berger and the General Partner should be deemed jointly and severally liable for

17  the actions of each and each other.

18  69.  At all material times, plaintiff was and is a resident of the State of California, County of Los

19  Angeles. The misrepresentations and material omissions detailed above by defendants and

20  each of them were made to plaintiff in California, the consideration paid for purchase of the

21  securities was paid from California and the damages suffered by plaintiff were suffered in

22  California.

23  70.  As a proximate result of the wrongful acts alleged herein, plaintiff has suffered damages, the

24  full nature and extent of which have not yet been ascertained. Plaintiff is informed and

25  believes and thereon alleges, however, that said damages are in the minimum sum of his

26  investment of $150,000, together with costs and attorney fees incurred in the prosecution of

27

28

1    this action.

2    71.   Plaintiff is informed and believes and thereon alleges that at all times material hereto,

3          defendants and each of them knew that the representations they made to the limited partners,

4          including plaintiff, were knowingly false at the time of their making, and that they were

5          withholding from plaintiff material information, to wit, the true purchase price of the Crane

6          Manor property, the existence of a lien of up to $1,350,000 burdening the property, the

7          existence of a lawsuit brought on behalf of the Limited Partnership (and at its expense) to

8          challenge the lien and, most critically, that the General Partner was incapable of performing

9          its function of facilitating renovations and resale of the Crane Manor property due to its

10         internal squabbling and dysfunction. Plaintiff is further informed and believes and thereon

11         alleges that defendants and each of them intentionally, wilfully, fraudulently, maliciously and

12         in conscious disregard for the rights of plaintiff, took the actions alleged herein, knowing full

13         well that plaintiff was certain to suffer damages as a result of the wrongful conduct of

14         defendants and each of them. Plaintiff is therefore entitled to an award of punitive damages

15         against each of the defendants in an amount according to proof at the time of trial.

16                              **FIFTH CLAIM FOR RELIEF**

17                        **For Breach of Written Contract, as Against the**

18              **General Partner and Does 1 Through 10, Inclusive ("Defendants")**

19   72.   Plaintiff re-alleges and incorporates hereby the allegations of paragraphs 1 through 71,

20         inclusive, above, as though fully set forth herein.

21   73.   On or about March 2, 2021, plaintiff, on the one hand, and the General Partner, on the other

22         hand, entered into two written agreements, the Operating Agreement and the Subscription

23         Agreement.

24   74.   Plaintiff has performed all things required of him under the Operating Agreement and the

25         Subscription Agreement, specifically by paying to the General Partner the sum of $150,000

26         in order to obtain 150 limited partnership units in the Crane Manor General Partnership.

27

28                                        26
                                      COMPLAINT

75.   The General Partner has breached the express and implied terms of the Operating Agreement and Subscription Agreement by, among other things, the following wrongful acts:

a.   Defendants fraudulently failed to disclose to the Limited Partners, including plaintiff, that a lien of up to $1,350,000 burdened the Crane Manor property as of the time of their investment in the Crane Manor Limited Partnership. Defendants have furthermore failed and refused, and continue to fail and refuse, to provide to the Limited Partners access to inspect and copy any documents relating to the existence of this lien claim against the Crane Manor Limited Partnership property.

b.   Defendants fraudulently omitted to disclose to the Limited Partners, including plaintiff, that the General Partner had commenced litigation to challenge the lien of up to $1,350,000 burdening the Crane Manor property at the expense, on information and belief, of the Crane Manor Limited Partnership. Defendants have furthermore failed and refused, and continue to fail and refuse, to provide to the Limited Partners access to inspect and copy any documents relating to the legal action challenging this lien claim against the Crane Manor Limited Partnership property, even to the extent of refusing to provide basic identifying information (case name, case number, title of court) as to the pending legal action.

c.   Defendants fraudulently omitted to disclose to the Limited Partners, including plaintiff, that the General Partner could not proceed with renovations of the Crane Manor property due to, among other things, the internal squabbling and dysfunction within the General Partner and its inability to obtain financing for the anticipated renovations. In so doing, the General Partner has frustrated the "Purpose of the Partnership," as defined in Operating Agreement, §2.4.

d.   Defendants have failed and refused, and continue to fail and refuse, to recognize the actions of the Limited Partners under Sections 3.5, 4.1 and 4.2 of the Operating Agreement in dissolving the Crane Manor Limited Partnership and removing the

27
COMPLAINT

General Partner, by resolutions dated September 27, 2021 and October 11, 2021, and have further stated that they have no intention of acting in accordance with these duly-enacted resolutions.

e.  Defendants have failed and refused, and continue to fail and refuse, to recognize the actions of the Limited Partners under Sections 3.5, 4.1, 4.2, 4.2 and 10.2 of the Operating Agreement in enacting the Resolution to Permit Copying of the Crane Manor Limited Partnership's books, records and financial statements.

f.  On information and belief, defendants have failed to maintain the Crane Manor Limited Partnership's books, records and financial statements at its principal office, as required by Sections 3.3(g), 10.1.

g.  Defendants have refused to permit the Limited Partners to inspect and copy the books, records and financial statements of the Crane Manor Limited Partnership, in violation of Section 10.2 of the Operating Agreement, and the Resolution to Permit Copying.

76.  As a direct and proximate result of the aforesaid breaches of written contract by the General Partner, plaintiff has suffered damages in the sum of the minimum sum of his investment of $150,000, together with costs and attorney fees incurred in the prosecution of this action.

77.  Plaintiff is also entitled to rescission of these agreements as ancillary to his claim for damages.

## SIXTH CLAIM FOR RELIEF

### For Breach of Fiduciary Duties, as Against All Named Defendants
### and Does 1 Through 10, Inclusive ("Defendants")

78.  Plaintiff re-alleges and incorporates hereby the allegations of paragraphs 1 through 77, inclusive, above, as though fully set forth herein.

79.  At all material times from and after March 2, 2021, plaintiff has been the record holder of 150 limited partnership units of the Crane Manor Limited Partnership.

80. By virtue of its position as General Partner, the General Partner has undertaken, by operation of law, a duty to act with loyalty, equitably and as a fiduciary for the benefit of all of the Limited Partners, including plaintiff.

81. By virtue of their positions as control persons of the General Partner, and as "Managing Directors" of the Limited Partnership, Wazonek and Berger have similarly undertaken, by operation of law, the duty to act with loyalty, equitably and as a fiduciary for the benefit of all Limited Partners, including plaintiff.

82. A specific feature, express and implied, of that special relationship between defendants, on the one hand, and the Limited Partners, including plaintiff, on the other hand, was plaintiff's reasonable reliance upon defendants to be truthful in their statements to him; and to conduct themselves in accordance with established ethical standards, custom and practice of partners, including the obligation to be forthright, honest and equitable in their dealings with the Limited Partners of the Crane Manor Limited Partnership, including plaintiff.

83. Plaintiff is informed and believes and thereon alleges that, among other acts and omissions, defendants and each of them have breached the fiduciary duties owing to the Limited Partners, including plaintiff, by, among others, the following actions:

    a. Defendants fraudulently failed to disclose to the Limited Partners, including plaintiff, that a lien of up to $1,350,000 burdened the Crane Manor property as of the time of their investment in the Crane Manor Limited Partnership. Defendants have furthermore failed and refused, and continue to fail and refuse, to provide to the Limited Partners access to inspect and copy any documents relating to the existence of this lien claim against the Crane Manor Limited Partnership property.

    b. Defendants fraudulently omitted to disclose to the Limited Partners, including plaintiff, that the General Partner could not proceed with renovations of the Crane Manor property due to, among other things, the internal squabbling and dysfunction within the General Partner and its inability to obtain financing for the anticipated

renovations. In so doing, the General Partner has frustrated the "Purpose of the Partnership," as defined in Operating Agreement, §2.4.

c.  Defendants fraudulently omitted to disclose to the Limited Partners, including plaintiff, that the General Partner had commenced litigation to challenge the lien of up to $1,350,000 burdening the Crane Manor property at the expense, on information and belief, of the Crane Manor Limited Partnership. Defendants have furthermore failed and refused, and continue to fail and refuse, to provide to the Limited Partners access to inspect and copy any documents relating to the legal action challenging this lien claim against the Crane Manor Limited Partnership property, even to the extent of refusing to provide basic identifying information (case name, case number, title of court) as to the pending legal action.

d.  Defendants have failed and refused, and continue to fail and refuse, to recognize the actions of the Limited Partners under Sections 3.5, 4.1 and 4.2 of the Operating Agreement in dissolving the Crane Manor Limited Partnership and removing the General Partner, by resolutions dated September 27, 2021 and October 11, 2021, and have further stated that they have no intention of acting in accordance with these duly-enacted resolutions.

e.  Defendants have failed and refused, and continue to fail and refuse, to recognize the actions of the Limited Partners under Sections 3.5, 4.1, 4.2, 4.2 and 10.2 of the Operating Agreement in enacting the Resolution to Permit Copying of the Crane Manor Limited Partnership's books, records and financial statements.

f.  On information and belief, defendants have failed to maintain the Crane Manor Limited Partnership's books, records and financial statements at its principal office, as required by Sections 3.3(g), 10.1.

g.  Defendants have refused to permit the Limited Partners to inspect and copy the books, records and financial statements of the Crane Manor Limited Partnership, in

violation of Section 10.2 of the Operating Agreement, and the Resolution to Permit Copying.

h.    On information and belief, defendants have made diverted from the Crane Manor Limited Partnership and have paid those funds to other entities in which defendants own an interest, for their sole benefit.

84.    As a proximate result of the foregoing wrongful conduct of defendants and each of them, plaintiff has suffered general, special and consequential damages in an amount according to proof at time of trial.

85.    In doing the acts and engaging in the course of conduct alleged herein, each of the defendants has acted with oppression, fraud, and malice within the meanings assigned to those terms under Civil Code §3294. Plaintiff is thereby entitled to punitive and exemplary damages in a sum to be determined by the trier of fact, according to proof at time of trial.

## SEVENTH CLAIM FOR RELIEF

### (For Declaratory Relief, As Against All Named Defendants and DOES 1 Through 100, Inclusive ("defendants"))

86.    Plaintiff re-alleges and incorporates hereby the allegations of paragraphs 1 through 85, inclusive, above, as though fully set forth herein.

87.    An actual controversy has arisen between plaintiff on the one hand and defendants and each of them on the other hand with respect to the legal rights and duties of said parties in that, among other things:

a.    Plaintiff contends and, on information and belief, defendants and each of them dispute, that the September 27, 2021 and October 11, 2021 resolutions of the Limited Partners are valid enactments of the Crane Manor Limited Partnership and binding on the General Partner.

b.    Plaintiff contends and, on information and belief, defendants and each of them dispute, that by virtue of the September 27, 2021 and October 11, 2021 resolutions

of the Limited Partners, the Crane Manor Limited Partnership has been dissolved.

c.   Plaintiff contends and, on information and belief, defendants and each of them dispute, that by virtue of the September 27, 2021 and October 11, 2021 resolutions of the Limited Partners, the General Partner has been duly removed from its position as General Partner, effective as of December 28, 2021.

d.   Plaintiff contends and, on information and belief, defendants and each of them dispute, that by virtue of the September 27, 2021 and October 11, 2021 resolutions of the Limited Partners, the General Partner has been divested of authority to act on behalf of the Crane Manor Limited Partnership until its removal becomes final on December 28, 2021.

e.   Plaintiff contends and, on information and belief, defendants and each of them dispute, that the Resolution to Permit Copying is a valid enactment of the Crane Manor Limited Partnership and is binding on the General Partner.

f.   Plaintiff contends and, on information and belief, defendants and each of them dispute, that plaintiff is entitled to injunctive relief in order to prevent the General Partner from violating the terms of the September 27, 2021 and October 11, 2021 resolutions of the Limited Partners.

g.   Plaintiff contends and, on information and belief, defendants and each of them dispute, that plaintiff is entitled to, and has shown good cause for, appointment of a receiver to take charge of the business and affairs of the Crane Manor Limited Partnership and to preserve its property pending the disposition of this action.

88.   No adequate remedy other than that prayed for herein, specifically declaratory relief as to the legal rights and obligations of the parties named herein, exists by which the rights of plaintiff and defendants and each of them may be determined.

89.   By reason of the facts alleged herein, plaintiff has suffered damages according to proof at time of trial.

90.    A judicial declaration is necessary and appropriate at this time under the circumstances in order that plaintiff may ascertain the rights and obligations of the parties so that the business and financial affairs of the Crane Manor Limited Partnership may be conducted for the benefit of all holders of beneficial interests, and not just for the benefit of the defendants.

## EIGHTH CLAIM FOR RELIEF

### (For Negligence, Against All Named Defendants and
### DOES 1 through 100, Inclusive ("defendants")

91.    Plaintiff re-alleges and incorporates hereby the allegations of paragraphs 1 through 90, inclusive, above, as though fully set forth herein.

92.    In inducing plaintiff to enter into the Operating Agreement and Subscription Agreement and to perform thereunder, including without limitation paying $150,000 for 150 limited partnership units in the Crane Manor Limited Partnership, defendants and each of them undertook a duty of care to be truthful in their dealings with plaintiff, to avoid making representations that were false, and to disclose all facts known to them or within their diligent attention and observation which might materially affect the value of the Crane Manor Limited Partnership.

93.    During the course of this transaction, plaintiff informed defendants, through Drozdz, that he was relying on them and their expertise in making an investment in the Crane Manor Limited Partnership. Plaintiff's reliance was reasonable based on the representations of the defendants regarding their experience and the quality of the Crane Manor project.

94.    Defendants and each of them breached their duties owing to plaintiff by, among other things, making misrepresentations and omissions as to material facts, as aforesaid.

95.    As a proximate result of the wrongful acts alleged herein, plaintiff has suffered damages, the full nature and extent of which have not yet been ascertained. Plaintiff is informed and believes and thereon alleges, however, that said damages are in the minimum amount of his original investment of $150,000, attorney fees incurred herein if permitted by law,

1    prejudgment interest from and after March 2, 2021, and costs of suit herein.

2  96.   The breaches of duty by defendants and each of them were a substantial factor in causing

3        plaintiff's damages, which would not have been suffered but for the wrongful conduct of

4        defendants and each of them.

5

6        WHEREFORE, plaintiff prays for judgment as follows:

7  **AS TO THE FIRST CLAIM FOR RELIEF:**

8  1.    For an order dissolving the Crane Manor Limited Partnership.

9  2.    For an order appointing a receiver to take charge of the business and affairs of the Crane

10        Manor Limited Partnership and to preserve its property pending this Court's ruling on this

11        complaint for judicial dissolution.

12  3.    For an order appointing a receiver to wind up the affairs of the Crane Manor Limited

13        Partnership under the supervision of the Court; or, alternatively, requiring the General

14        Partner to wind up the affairs of the Crane Manor Limited Partnership under the supervision

15        of the Court.

16  4.    For an accounting of the business and affairs of the Crane Manor Limited Partnership in aid

17        of the dissolution and winding up process.

18  5.    For injunctive relief to prevent defendants from looting the Crane Manor Limited Partnership

19        by diverting funds to any other entity or paying salaries, dividends, commissions and other

20        payments, to the detriment of plaintiff and the other Limited Partners, in furtherance of the

21        winding up of the corporation.

22  **AS TO THE SECOND CLAIM FOR RELIEF:**

23  6.    Rescinding the sale of the 150 limited partnership units in the Crane Manor Limited

24        Partnership purchased by plaintiff on or about March 2, 2021.

25  7.    Ordering defendants and each of them to pay to plaintiff the sum of $150,000, together with

26        interest at the maximum legal rate, less the amount of any income received by plaintiff as

27

28

1  derived from the securities.

2  **AS TO THE SECOND, THIRD, FOURTH AND SIXTH CLAIMS FOR RELIEF:**

3  8.      For general damages, in the minimum sum of $150,000.

4  9.      For special damages, in the minimum sum of $150,000.

5  10.     For punitive damages, according to proof at time of trial.

6  **AS TO THE FIFTH CLAIM FOR RELIEF:**

7  11.     For compensatory damages, in the minimum sum of $150,000.

8  12.     For further consequential damages, according to proof at time of trial.

9  **AS TO THE SEVENTH CLAIM FOR RELIEF:**

10 13.     For a declaration of the rights and obligations of the parties as follows:

11         a.      That the September 27, 2021 and October 11, 2021 resolutions of the Limited
12                 Partners are valid enactments of the Crane Manor Limited Partnership and binding
13                 on the General Partner.

14         b.      That by virtue of the September 27, 2021 and October 11, 2021 resolutions of the
15                 Limited Partners, the Crane Manor Limited Partnership has been dissolved.

16         c.      That by virtue of the September 27, 2021 and October 11, 2021 resolutions of the
17                 Limited Partners, the General Partner has been duly removed from its position as
18                 General Partner, effective as of December 28, 2021.

19         d.      That by virtue of the September 27, 2021 and October 11, 2021 resolutions of the
20                 Limited Partners, the General Partner has been divested of authority to act on behalf
21                 of the Crane Manor Limited Partnership until its removal becomes final on December
22                 28, 2021.

23         e.      That the Resolution to Permit Copying is a valid enactment of the Crane Manor
24                 Limited Partnership and is binding on the General Partner.

25         f.      That plaintiff is entitled to injunctive relief in order to prevent the General Partner
26                 from violating the terms of the September 27, 2021 and October 11, 2021 resolutions

27

28

of the Limited Partners.

g.     That plaintiff is entitled to, and has shown good cause for, appointment of a receiver to take charge of the business and affairs of the Crane Manor Limited Partnership and to preserve its property pending the disposition of this action.

14.   For appointment of a receiver to assume management and control of the affairs of the Crane Manor Limited Partnership as well as the other named defendants, and their respective books, records, and assets.

15.   For appropriate orders to effectuate turnover of the assets of the Crane Manor Limited Partnership a receiver and to enjoin and restrain defendants and each of them, and their agents, representatives, successors, and assigns, from interfering with the receiver from the exercise of his or her duties as ordered by this court.

**AS TO THE EIGHTH CLAIM FOR RELIEF:**

16.   For general damages, in the minimum sum of $150,000.

17.   For special damages, in the minimum sum of $150,000.

**AS TO ALL CLAIMS FOR RELIEF:**

18.   For costs of suit in this action.

19.   For attorneys fees incurred in this action, as permitted by law.

20.   For such other and further relief as this court deems just and appropriate

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury on all issued which may be heard by a jury.

Dated:         December 6, 2021          LAW OFFICES OF DANIEL B. SPITZER

By: _____
        Daniel B. Spitzer
        Attorneys for Plaintiff

36
COMPLAINT

# <u>VERIFICATION</u>

STATE OF CALIFORNIA
COUNTY OF LOS ANGELES


   I have read the foregoing **Complaint For: (1) Dissolution of Limited Partnership, (2) Securities Fraud - Cal. Corp. C. §§25400 et seq., (3) Securities Fraud - 15 USC §78j and 17 CFR §240.10b-5, (4) Fraud and Deceit, (5) Breach of Written Contract, (6) Breach of Fiduciary Duties, (7) Declaratory Relief, (8) Negligence** and know its contents.

<div align="center">☐ CHECK APPLICABLE PARAGRAPHS</div>

   ☒  I am a party to this action.  The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

   ☐  I am an Authorized Representative of _____, a party to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason.  ☒  I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.  ☐  The matters stated in the foregoing document are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

   ☐  I am one of the attorneys for _____, a party to this action.  Such party is absent from the county of aforesaid where such attorneys have their offices, and I make this verification for and on behalf of that party for that reason.  I am informed and believe and on that ground allege that the matters stated in the foregoing document are true.

   Executed on December   6  , 2021, at   Calabasas  , California.

   I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


          *Ilan Peker*
          Ilan Peker

# EXHIBIT 1

DISTINCT
REAL ESTATE GROUP

# CRANE MANOR APARTMENTS

## MEMPHIS, TENNESSEE

MULTIFAMILY WORKFORCE HOUSING

## DISCLAIMER, FORWARD-LOOKING STATEMENTS AND PREFERRED RETURN DISCLAIMER

*The information contained herein is proprietary and strictly confidential. It is intended to be reviewed only by the party receiving it and should not be made available  to any other person or entity without the written consent of the Distinct Real Estate LP 2 (the "Partnership"). The material contained herein  is for information purposes only and does not constitute an offer to sell nor a solicitation of an offer to buy the securities. An offer to purchase securities may only be  made via the appropriate offering documents being provided by the Issuer or Partnership to prospective purchasers. This information is inherently limited in scope and does not  contain all of the applicable terms, conditions, limitations and exclusions of the investments described herein. Prospective investors should be aware of the risk of this  investment and seek appropriate advice as required before making an investment. This material is in no way a complete description of the proposed investment. This  Offering may be subject to potential risks associated with the investment, including market, liquidity and investment return risk. Please consult your professional advisor  regarding these potential risks. Using borrowed money to finance the purchase of securities involves greater risk than a purchase using cash resources only. If you  borrow money to purchase securities, your responsibility to repay the loan and pay interest as required by its terms remain the same even if the value of the securities  purchased declines. In order to be eligible for subscription in this Offering, individuals must meet the requirements as outlined in the Subscription Agreement.*

## FORWARD-LOOKING STATEMENTS

*This Term Sheet contains forward-looking statements. These statements relate to future events or the future performance of the Partnership. All statements  other than statements of historical fact are forward-looking statements. Forward-looking statements are often, but not always, identified by the use of words such as "may", "will", "should", "expect", "plan", "anticipate", "believe", "estimate", "predict", "potential", "targeting", "intend", "could", "might", "continue", or the negative of  these terms or other comparable terminology. These statements are only predictions. In addition, this Term Sheet may contain forward-looking statements attributed to  third party industry sources. Undue reliance should not be placed on these forward-looking statements as there can be no assurance that the plans, intentions or  expectations upon which they are based will occur. By its nature, forward looking information involves numerous assumptions, known and unknown risks and  uncertainties, both general and specific, that contribute to the possibility that the predictions, forecasts, projections and other forward-looking statements will not occur  and may cause actual results or events to differ materially from those anticipated in such forward-looking statements. The forward-looking statements contained in this  Term Sheet are expressly qualified by this cautionary statement. The Partnership are not under any duty to update any of the forward-looking  statements after the date of this Term Sheet to conform such statements to actual results or to changes in the Partnership's expectations except as otherwise  required by applicable securities laws.*

## PREFERRED RETURN

*The Preferred Return associated with the securities ("Securities") being offered through this Term Sheet is a preferred return but is not guaranteed and may not be  paid on a current basis in each year or at all. The return on an investment in the Securities is not comparable to the return on an investment in a fixed income security.  Cash distributions, including a return of a Unitholder's original investment, are not guaranteed and the anticipated return on investment is based upon many  performance assumptions. Although the Partnership intends to distribute their respective available cash to their respective Security holders such cash  distributions may be reduced or suspended in the sole discretion of the general partner of the Partnership. The ability of the  Partnership to make cash distributions and the actual amount distributed will depend on the ability of Partnership to successfully operate its  business and will be subject to various factors beyond control of the Partnership.*

# CRANE MANOR APARTMENTS





# EXECUTIVE SUMMARY

## PROPERTY HIGHLIGHTS

- Acquisition cost of $21,600 per unit (USD).
- Comparable properties trade for $45,000 - $55,000 per unit (USD).
- Good workforce housing neighborhood central to major employers.

## VALUE ADD STRATEGY

- Current rents are 20-25% below market.
- Current occupancy is ~35%. Market occupancy is over 90%.
- Bring rents and occupancy levels to market by renovating units and providing quality property management.

## INVESTMENT RATIONALE

- Market is in dire need for additional workforce housing options.
- Maximize property value by creating a turnkey multifamily operation.
- Create an exit for investors by refinancing or selling the property.

## VALUE ADD OPPORTUNITY

| | |
|---|---|
| Acquisition Cost  (USD): | $3,850,000 |
| Est. Renovation Costs: | $2,200,000 |
| Total: | $6,050,000 |
| # of Units: | 178 |
| (Acq + Est Reno)/Unit: | $34,000 |
| Current Rents: | $450-$550 /Month |
| Market Rent | $650 /Month |
| Estimated Value | $10,890,000* |

*Based on $762,000 NOI at Year 5 @ 7.00 Capitalization Rate
Note - All  financial references are  in USD unless otherwise outlined.



# INVESTMENT TERMS

**The Offering**
- $5,000,000 CAD
  Limited Partnership Units

**Minimum Investment**
- $50,000 CAD

**Preferred Return***
- 7.00% Per Annum

**Profit Participation***
- 50.00%
  Class A Units
  < 250K Investment
- 60.00%
  Class B Units
  250K+ Investment

**Targeted Investor Return***
- 19.00% IRR
- 21.00% IRR

**Targeted Return Of Capital Period****
- 36 Months

**Investment Closing Deadline**
- February 26th 2021

✓ No US tax filings for Canadian Investors
✓ Limited to Accredited Investors***
✓ Investors accepted on a "first to fund basis"

*The preferred return is not guaranteed and may not be achieved on a current basis in each year of the Partnership or at all. The return on an investment in the Partnership is not comparable to the return on an investment in a fixed income security. Cash distributions, including a return of a Unitholder's original investment, are not guaranteed and the anticipated return on investment is based upon many performance assumptions, many of which are beyond the control of the Partnership. **Targeted Return of Capital to investors as a result of anticipated refinancing of the property. Return of Capital proceeds may represent a portion or the entirety of an investor's initial investment. Return of Capital amounts and associated timelines are subject to (amongst other things) the performance of the property and available financing options. ***As defined by section 2.3 of National Instruments 45-706 Prospectus Exemptions

# CRANE MANOR APARTMENTS – PROJECTIONS*

| | Renovation & Stabilization Period | | Holding Period | | |
|---|---|---|---|---|---|
| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
| Rental Income[1] | $ 1,068,000 | $ 1,326,800 | $ 1,437,460 | $ 1,473,397 | $ 1,510,231 |
| Write Offs[2] | $ (13,884) | $ (17,066) | $ (18,500) | $ (18,963) | $ (19,437) |
| Vacancy[3] | $ (694,200) | $ (328,200) | $ (99,619) | $ (65,641) | $ (67,282) |
| Effective Gross Income | $ 387,684 | $ 981,534 | $ 1,319,342 | $ 1,388,793 | $ 1,423,512 |
| Total Expenses[4] | $ 323,259 | $ 401,277 | $ 592,678 | $ 647,572 | $ 661,009 |
| NOI | $ 64,425 | $ 580,257 | $ 726,664 | $ 741,221 | $ 762,503 |
| Market Value[5] | | $ 8,280,000 | $ 10,380,000 | $ 10,580,000 | $ 10,890,000 |

1. Year 1 based on $500 per unit/per month rent potential. Year 2 based on mix of $500 per unit/per month and $650 per unit/per month. Year 3 building stabilized at market rent and includes 2.5% annual growth thereafter . Does not include potential income from (but not limited to) administrative, laundry, storage, pet deposits, lease cancellations, etc.

2. 1.3% per annum of gross rents.
3. Assume 65% vacancy in Year 1. 25% in Year 2. 7% vacancy in Year 3 and 4.5%  per annum thereafter.
4. Includes  projected operating expenses. 2% annual increase per annum upon stabilization.
5. Based on a 7.00% capitalization rate against NOI (Net Operating Income).

*The information contained herein has been prepared solely for assisting interested parties in making their own evaluation of this opportunity. The offering to which this presentation relates involves a high degree of risk, conflicts of interest and compensation to management. You should participate only if you can afford a loss. This presentation does not constitute an offer to sell or solicitation of an offer to buy any securities or interests. The information contained herein is Privileged and Confidential and may not be distributed or reproduced for any party other than the intended recipient without the express written permission of Distinct Real Estate.  Opinions, projections, forward valuations and estimates reflect a judgment at original date of publication and are subject to change based upon economic market conditions or any other unforeseen factors. Subscribers should note that actual results may vary from the above forward-looking information outlined above. Undue reliance by Subscribers should not be placed on this forward-looking information as there can be no assurance that the expectations upon which they are based will occur. By its nature, forward-looking information involves numerous assumptions, known and unknown risks and uncertainties, both general and specific, that contribute to the possibility that the matters underlying this forward-looking information will not occur and may cause actual results or events to differ materially from those anticipated in this forward-looking information.  Some of the material risk factors that may cause actual results or events to differ materially from those anticipated in the above forward-looking information are set forth in the heading "Risk Factors" in the Term Sheet associated with this presentation.



**Crane Manor**
2271 Airways Blvd

**Legend**
- 2271 Airways Blvd
- 2271 Airways Blvd
- Feature 1
- Memphis Police Dept

2271 Airways Blvd
2271 Airways Blvd

Google Earth

300 ft



178 Units consists of
Townhouses & Apartments



Large Lot – 8.70 Acres





# LOCATION HIGHLIGHTS

## PROXIMITY TO MAJOR EMPLOYERS
- ✓ FedEx 2.7mi from property. Employs 30,000.
- ✓ Int Airport 5 min away and employs 1 in 3 Memphians.

## TRANSPORTATION
- ✓ Next to major highway I240 & Airways Blvd
- ✓ Multiple bus stops 5 min. walk from apartments.

## RETAIL & SHOPPING
- ✓ Grocery stores, restaurants, banking and consumer goods within 10 min. drive.

## SCHOOLS, PARKS & RECREATION
- ✓ 12+ schools and colleges within 15 min. drive.
- ✓ Museums, parks and Memphis Zoo within 15 min. drive



The Neighbourhood

Memphis International Airport

FedEx Global HQ

# 42%

## OF MEMPHIS RESIDENTS ARE RENTERS

# 2ND

## MOST POPULATED METRO AREA IN TN

# 15%

## LOWER COST OF LIVING THAN NATIONAL AVERAGE

# 4TH

## TOP CITY WHERE MILLENIALS ARE MOVING

Source: Memphis Overview Report, Woodyard Realty Corp., July 2020



# MAJOR EMPLOYMENT CENTRES

## EASY ACCESS TO MAJOR ROUTES & HIGHWAYS CONNECT RENTERS TO THE JOB MARKET.



- 11,400+ jobs.
- $275M expansion.



- Global Headquarters
- 30,000+ jobs.
- $1B expansion.

St. Jude Children's Research Hospital

- 4300+ jobs.
- $9B expansion.



- 2,400+ jobs.
- 2.8M Sq. Ft. Facility

amazon

- 1,000+ jobs.
- $124M Expansion.



In the last four years, Memphis has seen **over $13 billion in 250+ revitalization projects** that have reshaped the city.

Source: Memphis Overview Report, Woodyard Realty Corp., July 2020

# POTENTIAL TAX INCENTIVES

There are various tax incentive programs (municipal, state and federal) that we are exploring and applying for. **Tax incentives have not been factored into any investment return projections.**

| CORONAVIRUS AID, RELIEF, AND ECONOMIC SECURITY (CARES) | OPPORTUNITY ZONES (OZ) | PAYMENT IN LIEU OF TAXES PROGRAM (PILOT) |
|---|---|---|
| ✓ Amendment to the 2017 Tax Act to allow property owners to **claim 100% bonus depreciation** for qualified improvement properties. | ✓ Federal program to spur investment in economically distressed communities<br><br>✓ **Drastically reduced capital gain taxes** for long term holds | ✓ State run program where qualified property owners can **freeze property taxes for up to 15 years.** |

# HOW WE TARGET PROPERTIES & MARKETS

 **MISMANAGED OR DISTRESSED.**

We seek out distressed properties that have been mismanaged and are performing well below the market's potential.

 **LANDLORD FRIENDLY.**

No rent controls and tax incentives align us with local communities to bring desperately needed affordable housing options back to the market.

 **BUY + RENOVATE FOR MUCH LESS THAN BUILDING NEW.**

We acquire and renovate units for less than ½ of what it costs to build new.

 **STABLE JOB MARKETS + PROMISING GROWTH TRENDS.**

Established Fortune 500 companies, growing businesses and long-term public sector Investment are all factors that drive employment opportunities and sustained rental housing demand.

# EXECUTIVE TEAM

## PHILLIP WAZONEK

### MANAGING PARTNER

- 30 Years Commercial Real Estate Experience.
- Over $1 Billion in Real Estate Transactions.
- US/International Investor of the Year by Canadian Real Estate Wealth Magazine (2015).

## MARCIN DROZDZ

### MANAGING PARTNER

- Private Capital Markets Professional.
- Helped Companies Secure Over $100MM
- Former Director - National Exempt Market Association (NEMA).

## RON LOVE, CA

### CHIEF FINANCIAL OFFICER

- Past CFO of Fast-Growing Public & Private Companies (CAD & US).
- 25 Years of Finance & Accounting Experience (GAAP, IFRS).
- M&A, Public Reporting, Financial Reporting Integration, Regulatory Compliance.

## GORDON BERGER

### MANAGING PARTNER

- 50 Years of Finance & Accounting Experience.
- 40 Years of Real Estate Investing Experience (General Partner and/or Investor).
- Past President of an Industrial/Commercial Builder & Developer.

# SECURE INVESTOR PORTAL

Distinct investors can login into our secure portal where they can find updates on their existing holdings, download tax related documents and review upcoming opportunities.

**New To Distinct Real Estate? Register For Access To Review Crane Manor Apartments:**
https://investorportal.distinctrealestatelp.com/offerings/crane-manor-apartments/register





# CONTRACT US

## DISTINCT REAL ESTATE GROUP

Suite 200
60 Atlantic Avenue
Toronto, ON
M6K 1X9, Canada

Suite 250
6000 Poplar Avenue
Memphis, TN
38119, USA

Suite 2500
500 – 4th Avenue SW
Calgary, AB
T2P 2V6, Canada

Tel:1-833-247-3687

Investors@distinctrealestatelp.com

www.distinctrealestatelp.com





# EXHIBIT 2

---

**AGREEMENT OF LIMITED PARTNERSHIP**

**OF**

**DISTINCT REAL ESTATE USA 2, L.P.**

As of March 26, 2021

The limited partnership interests in DISTINCT REAL ESTATE USA 2, L.P. have not been registered under the Securities Act of 1933, as amended (the "Securities Act"), or under the securities or "Blue Sky" laws of any state or any other jurisdiction within the United States and may not be offered or sold except pursuant to an exemption from, or in a transaction not subject to, the registration requirements the Securities Act and applicable state securities or "Blue Sky" laws. In addition, the limited partnership interests in DISTINCT REAL ESTATE USA 2, L.P. are subject to significant restrictions on transferability as set forth herein.

---

## TABLE OF CONTENTS

**Page**

ARTICLE I  DEFINITIONS ...................................................................................................... 1

    1.1    Defined Terms ............................................................................................... 1

    1.2    Interpretation ................................................................................................. 7

ARTICLE II  ORGANIZATION AND POWERS ..................................................................... 7

    2.1    Formation ....................................................................................................... 7

    2.2    Term of the Partnership ................................................................................. 8

    2.3    Partnership Office ........................................................................................... 8

    2.4    Purpose of the Partnership ............................................................................ 8

ARTICLE III  GENERAL PARTNER AND PARTNERSHIP MANAGEMENT ...................... 9

    3.1    Designation of the General Partner ............................................................... 9

    3.2    General Powers of the General Partner ......................................................... 9

    3.3    Partnership Offices, Employees, Expenses and Administrative Matters .............. 10

    3.4    Reliance by Third Parties ............................................................................. 11

    3.5    Resignation, Removal and Replacement of General Partner ................................ 11

    3.6    Interest of Bankrupt General Partner…………………………………….......... 12

    3.7    Partnership Expenses .................................................................................... 12

    3.8    General Partner Fees ……………………………………………………………12

ARTICLE IV  MEETINGS ...................................................................................................... 13

    4.1    Meetings of the Partners ............................................................................... 13

    4.2    Partner Action by Consent in Lieu of Meeting ............................................. 13

    4.3    Notice of Meetings ....................................................................................... 13

    4.4    Waiver of Notice .......................................................................................... 13

    4.5    Presiding Officials ........................................................................................ 14

    4.6    Quorum; Partnership Action ........................................................................ 14

    4.7    Method of Voting; Proxies ........................................................................... 14

    4.8    Partners Entitled to Vote .............................................................................. 14

    4.9    Distribution of Minutes and Resolutions ..................................................... 14

ARTICLE V  PARTNERS ....................................................................................................... 14

    5.1    Control by General Partner ........................................................................... 14

    5.2    Interest of Limited Partners…………………………………………….......... 14

## TABLE OF CONTENTS
(continued)

**Page**

5.3    Rights of Limited Partners................................................................15
5.4    Withdrawal of Limited Partners....................................................15

ARTICLE VI  LIABILITY: EXCULPATION: INDEMNIFICATION......................15

6.1    Limitation of Liability....................................................................15

6.2    Exculpation....................................................................................16

6.3    Fiduciary Duty and Standard of Care............................................16

6.4    Indemnification of the General Partners, Officers, Employees, and Agents........16

ARTICLE VII  CAPITAL COMMITMENTS............................................................17

7.1    Capital Contributions of Partners..................................................17

7.2    Defaulting Limited Partners...........................................................17

7.3    Redemption of Interests.................................................................18

7.4    Distributions of Distributable Cash from Operations.....................18

7.5    Distributions of Distributable Cash from Capital Transactions.............20

7.6    Withholding....................................................................................20

7.7    Transfer of Interests......................................................................21

ARTICLE VIII  ALLOCATIONS.............................................................................21

8.1    Allocations For Capital Account Purposes....................................21

8.2    Tax Allocations..............................................................................22

ARTICLE IX  DISSOLUTION, LIQUIDATION AND TERMINATION.................22

9.1    No Dissolution...............................................................................22

9.2    Events Causing Dissolution...........................................................22

9.3    Liquidation.....................................................................................23

9.4    Certificate of Cancellation.............................................................23

9.5    Termination....................................................................................24

ARTICLE X  BOOKS AND RECORDS................................................................24

10.1    Books, Records and Financial Statements......................................24

10.2    Reports/Annual General Meeting..................................................24

10.3    Fiscal and Tax Year.......................................................................24

ARTICLE XI  MISCELLANEOUS.......................................................................24

11.1    Amendment....................................................................................25

## TABLE OF CONTENTS
(continued)

**Page**

| | | |
|---|---|---|
| 11.2 | Power of Attorney | 25 |
| 11.3 | Governing Law, Waiver of Jury Trial | 26 |
| 11.4 | Severability | 26 |
| 11.5 | Sections, Articles and Schedules | 26 |
| 11.6 | Section Headings; Interpretation | 26 |
| 11.7 | Notices | 26 |
| 11.8 | Failure to Pursue Remedies | 27 |
| 11.9 | Cumulative Remedies | 27 |
| 11.10 | Binding | 27 |
| 11.11 | Counterparts | 27 |
| SCHEDULE A INITIAL GP PARTNERSHIP REGISTER | | 30 |
| SCHEDULE B INITIAL LP PARTNERSHIP REGISTER | | 31 |
| SCHEDULE C SPECIAL ALLOCATION RULES | | 32 |

**AGREEMENT OF LIMITED PARTNERSHIP OF**
**DISTINCT REAL ESTATE USA 2, L.P.**


This Agreement of Limited Partnership of Distinct Real Estate USA 2, L.P. (the "Partnership") is made as of March 26, 2021, by and among Distinct Real Estate USA GP 2, Inc., a corporation formed under the laws of the State of Delaware ("Holding") as the "General Partner"; and Distinct Real Estate L.P. 2, a limited partnership formed under the laws of the Province of Alberta, Canada and [*United States Investors), L.P.* a limited partnership formed under the laws of the state of Delaware (collectively the "Limited Partners"), (the Limited Partners and the General Partner maybe referred to collectively as the "Partners").

RECITALS:

WHEREAS, the Partnership has been formed as a limited partnership in accordance with the Title 6, Chapter 17 of the Delaware Code, as amended from time to time (the "Act"), by the filing of the Certificate on March 26, 2021; and

WHEREAS, the Partners desire to set out their respective rights, obligations and duties of the Partnership and determine the business and activities of the Partnership.

NOW, THEREFORE, in consideration of the agreements and obligations set forth herein and the contributions to the Partnership as hereinafter set forth, the Partners hereby agree as follows:

**ARTICLE I**
**DEFINITIONS**

1.1    Defined Terms. Unless the context otherwise requires, the terms defined in this Article I shall, for the purposes of this Agreement, have the meanings herein specified (each such meaning to be equally applicable to both the singular and plural forms of the respective terms so defined).

"Act" shall have the meaning set forth in the first Recital.

"Adjusted Capital Account Deficit" shall mean, with respect to any Partner, the deficit balance, if any, in such Partner's Capital Account as of the end of the relevant Partnership taxable year (after the allocations and adjustments contemplated by Schedule C hereto).

"Adjusted Capital Contribution" shall mean, as of a specified date, the aggregate Capital Contributions theretofore made by a Partner minus all distributions of Capital Proceeds or distributions in return of capital made by the Partnership to such Partner resulting from the disposition in whole but not in part of any Partnership Assets. For the avoidance of doubt, principal repayments with respect to a Partnership Asset still held by the Partnership shall not reduce the Adjusted Capital Contribution of the Partners.

"Affiliate" shall mean, with respect to a specified Person, any Person that directly or indirectly controls, is controlled by or is under common control with, the specified Person, any

-1-

Person owning or controlling ten percent (10%) or more of the outstanding voting interest of such Person (excluding for these purposes voting interests owned or controlled by a Person in a fiduciary capacity), or any officer; director or general partner of such Person.  As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting interests, by contract or otherwise.

"Agreement" shall mean this Agreement of Limited Partnership, as amended, modified, supplemented or restated from time to time.

"Bankruptcy" shall mean, with respect to a Person, that either (i) an involuntary petition under any federal, state or foreign bankruptcy, insolvency, receivership or similar law has been filed with respect to such Person or a receiver or other similar official has been appointed for a substantial portion of the assets of such Person without the acquiescence of such Person, which petition or appointment remains undischarged for an aggregate period of thirty days (whether or not consecutive) or (ii) a voluntary petition under any federal, state or foreign bankruptcy, insolvency, receivership or similar law has been filed by such Person, a voluntary assignment of such Person's property for the benefit of creditors has been made, such Person shall become unable, admit in writing their inability or fail generally to pay their debts as they become due, or a receiver or other similar official has been appointed for a substantial portion of the assets of such Person with the acquiescence of such Person.

 "Business Day" shall mean any day or part of a day on which the New York Stock Exchange and the General Partner are open for business.

 "Capital Account" shall mean the capital account established for each Partner maintained by the Partnership pursuant to Schedule B attached hereto.

"Capital Commitment" shall mean, with respect to any Partner, the total amount of cash agreed to be paid to the Partnership (whether or not yet paid) by each Partner pursuant to the terms of its Subscription Agreement and the terms hereof.

"Capital Contribution" shall mean, with respect to any Partner, the aggregate amount of cash actually contributed to the Partnership by such Partner.

"Capital Proceeds" shall mean any proceeds from a Capital Transaction, including without limitation any proceeds derived by the Partnership in connection with winding up or liquidation.  In no event shall the term Capital Proceeds be deemed to include any funds provided by any Partner pursuant to any Capital Contribution.

"Capital Transaction" shall mean any principal payments made or repayments received by the Partnership with respect to any sale or other disposition of any real property or other material asset of the Partnership.

"Carrying Value" shall mean, with respect to any Partnership Asset, the value of such Partnership Asset as reflected on the books of the Partnership as adjusted in accordance with Schedule C.

"Certificate" shall mean the Certificate of Limited Partnership and any and all amendments thereto and restatements thereof filed on behalf of the Partnership with the State of Delaware Division of Corporations pursuant to the Act.

"Class A Units" shall mean the Class A limited partnership units of the Partnership issued to [US Investment Entity] and which shall receive a Preferred Return (as defined below) and a sixty percent (60%) profit allocation from Distributable Cash as defined under Sections 7.4 and 7.5 below.

"Class D Units" shall mean the Class D limited partnership units of the Partnership and issued to Distinct Real Estate L.P. 2, and which shall receive a Preferred Return (as defined below) and a one hundred percent (100%) profit allocation from Distributable Cash as defined under Sections 7.4 and 7.5 below. [1]

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Consent of Limited Partners" shall mean the consent of Limited Partners owning at least the percentage of Interests required to take or consent to various actions hereunder, without taking into account any Interests held by Defaulting Limited Partners. Such consent or approval shall be deemed to have been received from a particular Limited Partner if (a) written consent or approval from such Limited Partner has been received by the Partnership or (b) such consent or approval is given at a meeting held in accordance with Article IV.

"Contribution Call" shall have the meaning set forth in Section 7.1(a).

"Covered Person" shall mean any Limited Partner, the General Partner, any Affiliate of any of the foregoing, any officers, directors, shareholders, partners, employees, representative or agents of any Limited Partner, the General Partner, or their respective Affiliates, or any officer, employee, director, shareholder, representative or agent of the Partnership or its Affiliates.

"Cumulative Preferred Return" shall mean, with respect to a Limited Partner holding Class A LP Units and at any time of determination, the sum of the Preferred Return earned by such Limited Partner under the terms of this Agreement prior to such date of determination.

"Cumulative Preferred Return Deficiency" shall mean, with respect to a Limited Partner holding Class A LP Units and at any time of determination, an amount which equals the excess, if any, of (i) the Cumulative Preferred Return earned by such Limited Partner as of such date less (ii) the cumulative amount of cash distributed to such Limited Partners pursuant to Section 7.4.

---

[1] The Partnership is comprised of Class A Unit and Class D Unit Holders. Distinct Real Estate LP 2 is the sole Class D Unit Holder and is considered as one investor in the Partnership and hence, receives 100% of its pro-rata investment. All Class A and Class D Unit Holders ultimately receive returns based on their respective investments within their investment class in accordance with Sections 7.4 and 7.5 below, and the illustrative chart provided therein. Total Distributions to Class D Unit Holders will be further allocated based on investments made within that class but is done outside of this Agreement. All Unit Holders are treated equally based on their proportionate investment.

"Defaulting Limited Partner" shall have the meaning set forth in Section 7.2.

"Distributable Cash" means with respect to a particular period, the amount by which the Partnership's cash on hand or to be received in respect of that period (excluding any proceeds from any Financing) exceeds:

a)  unpaid administration expenses of the Partnership;

b)  amounts required for the business and operations of the Partnership, including operating

expenses and capital expenditures;

c)  amounts required in order to meet all debts, liabilities and obligations in respect of any Financing, including reserves to ensure compliance with agreements to which the Partnership is subject; and

d)  any amounts which the General Partner in its Discretion determines is necessary to satisfy

the Partnership's current and anticipated debts, liabilities and obligations and to comply with applicable laws;

"Extraordinary Partnership Expenses" shall mean any Partnership Expenses that exceed, in any Partnership accounting year, an amount equal to the Annual Operating Budget for such accounting year.

"General Partner" shall have the meaning given to such term in the introductory paragraph of this Agreement.

"Interest" shall mean a Partner's economic interest in the Partnership expressed as a percentage equal to (i) the then balance in the Capital Account of such Partner divided by (ii) the aggregate balance in the Capital Accounts of all the Partners, as reflected on Schedule C (as supplemented or amended by the Partnership Register).

"Limited Partner" shall mean any Person admitted to the Partnership pursuant to the provisions of this Agreement as a Limited Partner by subscription for or by succession to or as the transferee of LP Units as reflected in the Partnership Register, as amended from time to time.

"Liquidating Trustee" shall have the meaning set forth in Section 9.3.

"Liquidation Fee" shall have the meaning set forth in Section 9.3.

"LP Units" shall mean collectively, the Class A LP Units and the Class D Units of the Partnership having the rights as provided for in this Agreement.

"Net Capital Proceeds" shall mean the Capital Proceeds from any Capital Transaction less any fees applicable to Capital Transactions and third-party fees, costs and charges, actually incurred by or on behalf of the Partnership in connection with such Capital Transaction.

"Net Income" shall mean, for any period, the excess, if any, of the Partnership's items of income and gain for such period over the Partnership's items of loss and deduction for such period.  The items included in the calculation of Net Income shall be determined in accordance with federal income tax accounting principles, subject to the specific adjustments provided for in Schedule C.

"Net Loss" shall mean, for any period, the excess, if any, of the Partnership's items of loss and deduction for such period over the Partnership's items of income and gain for such period. The items included in the calculation of Net Loss shall be determined in accordance with federal income tax accounting principles, subject to the specific adjustments provided for in Schedule B.

"Net Operating Income" shall mean, for any applicable period, the excess, if any, of the Partnership's income received during such period over the Partnership's operating expenses for such period.  The items included in the calculation of Net Operating Income shall be determined in accordance with generally accepted accounting principles.  Notwithstanding the foregoing, Net Operating Income shall not include Net Capital Proceeds.

"Ordinary Partnership Expenses" means Partnership Expenses incurred in the ordinary course of the Partnership's business and contemplated in the Annual Operating Budget, provided, however, that "Ordinary Partnership Expenses" shall not include Extraordinary Partnership Expenses or Organizational Expenses.

"Organizational Expenses" means, without limitation, legal, accounting, escrow, printing, travel, marketing, registration, qualification, distribution, filing, finder's fees as reasonably required and other expenses in connection with the organization of the Partnership, including subscriptions of Interests.

"Partner" shall mean the General Partner or a Limited Partner of the Partnership.

"Partnership" shall mean Distinct Real Estate USA 2, L.P., the limited partnership formed under and pursuant to the Act and as further described and regulated by this Agreement.

"Partnership Asset" shall mean the Property (as defined below) which is owned or held by or for the account of or in trust for the Partnership.

"Partnership Expenses" shall mean all reasonable out-of-pocket costs and expenses of every kind and character incurred by or on behalf of the Partnership in connection with the business and ongoing operations of the Partnership, including but not limited to, any third party management Persons providing services to the Partnership or Property.

"Partnership Register" shall mean the schedule (which shall form a part of the books and records of the Partnership) listing the names and addresses of all Partners, together with the amounts of their respective Capital Commitments, Capital Contributions and the amount of the Interests held by them, which schedule shall be maintained by the General Partners and held in the principal office of the Partnership in accordance with this Agreement.

"Person" shall mean an individual, corporation, association, partnership (general or limited), joint venture, trust, unincorporated organization, limited liability Partnership, any other entity or organization of any kind or a government or any department, agency, authority, instrumentality or political subdivision thereof.

"Preferred Return" shall mean with respect to a Limited Partner Holding Class A LP Units with respect to those periods during the term of the Partnership that the Limited Partner's Capital Contribution is outstanding, an amount equal to seven percent (7%) per annum, of such Limited Partner's Capital Contribution from the first day of the month immediately following the month in which such Capital Contribution is made until the date such Limited Partner's has been returned through distributions of Distributable Cash made by the Partnership to the Limited Partner. The Preferred Return shall be calculated on the basis of a year of 365 days and the actual number o days (including the first day, but excluding the last day) occurring in the period for which the Preferred Return is being calculated.

"Property" shall mean the real property, buildings and all improvements located at 2295 Candlewyck Circle, Memphis, TN, 38114 as the General Partner shall determine.

"Proportionate Share of Distributable Cash" of each of the Class A LP Units and the Class D LP Units as the case may be, is the sum determined by multiplying the aggregate amount of Distributable Cash which the General Partner wishes to distribute by the fraction in which the numerator is the number of LP Units issued and outstanding in any one of the classes of LP Units on the date of the proposed distribution and the denominator is the aggregate number of all all issued and outstanding LP Units in the above Classes at that time.

"Quarterly Distribution Date" shall have the meaning set forth in Section 7.4.

"Reserve Amount" shall mean, on any date of determination, an amount equal the estimated costs and expenses of the Partnership for the two (2) calendar months immediately succeeding such date of determination.

"Securities" shall mean securities of every kind and description in which the Partnership is permitted to invest in accordance with applicable law, including, without limitation, capital stock;

notes, bonds, debentures and other evidence of indebtedness, including mortgage and other real estate loans; interests in joint ventures; beneficial interests in trusts; collateral-trust certificates; pre-organization certificates or subscriptions; transferable units; investment contracts; voting trust certificates; certificates of deposit for securities; certificates of interest or participation in, temporary or interim certificates for, and receipts for or warrants or rights or options to subscribe to or purchase or sell, any of the foregoing; and any other items commonly referred to as "securities".

"Securities Act" shall mean the Securities Act of 1933, as amended from time to time, together with any successor statute, and the rules and regulations promulgated thereunder.

"Transfer" shall mean any sale, assignment, transfer, exchange, charge, pledge, gift, hypothecation, conveyance or encumbrance.

"Treasury Regulations" shall mean the income tax regulations, including temporary regulations, promulgated under the Code, as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"Unfunded Capital Commitment" shall mean, with respect to a Partner as of any date, such Partner's Capital Commitment, less the aggregate amount of such Partner's Capital Contributions made prior to such date.

"Units" shall mean the number of Class A Units and Class D Units issued in the Partnership of which there shall be an aggregate initial number of 4,000 and each valued at $1,000.00 per Unit, as may be adjusted by the General Partner from time to time

"Unrealized Gain" attributable to the Partnership Asset shall mean, as of any date of determination, the excess, if any, of (i) the fair market value of such Partnership Asset (as determined under Schedule C) as of such date; over (ii) the Carrying Value of such Partnership Asset (prior to any adjustment to be made pursuant to Schedule C) as of such date.

"Unrealized Loss" attributable to the Partnership Asset shall mean, as of any date of determination, the excess, if any, of (i) the Carrying Value of such Partnership Asset (prior to any adjustment to be made pursuant to Schedule C) as of such date; over (ii) the fair market value of such Partnership Asset (as determined under Schedule C) as of such date.

"US$" shall mean the lawful currency of the United States of America.

1.2     Interpretation.

(a)     In this Agreement, unless a clear contrary intention appears:

(i)     the singular number includes the plural number and vice versa;

(ii)     reference to any gender includes the other gender;

(iii)     the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision;

(iv)     reference to any Person includes such Person's successors and assigns but, if applicable, only if such successors and assigns are permitted by this Agreement, and reference to a Person in a particular capacity excludes such Person in any other capacity or individually, provided that nothing in this clause (iv) is intended to authorize any assignment not otherwise permitted by this Agreement;

(v)     reference to any agreement (including this Agreement), document or instrument means such agreement, document or instrument as amended, supplemented or modified and in effect from time to time in accordance with the terms thereof and, if applicable, the terms hereof, and reference to any Note includes any note issued pursuant hereto in extension or renewal thereof and in substitution or replacement heretofore;

(vi)     unless the context indicates otherwise, reference to any Article, Section, Schedule or Exhibit means such Article or Section hereof or such Schedule or Exhibit hereto;

(vii)     the word "including" (and with correlative meaning "include") means including, without limiting the generality of any description preceding such term;

(viii)    with respect to the determination of any period of time, the word "from" means "from and including" and the word "to" means "to but excluding"; and,

(ix)     reference to any law means such law as amended, modified, codified or reenacted, in whole or in part, and in effect from time to time.

(b)     The Article and Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof.

(c)     No provision of this Agreement shall be interpreted or construed against any Person solely because that Person or its legal representative drafted such provision.

## ARTICLE II
## ORGANIZATION AND POWERS

2.1     Formation.  The parties hereto have formed a limited partnership by the filing of the Certificate pursuant to the Act.  The business of the limited partnership shall be conducted

under the name "Distinct Real Estate USA 2, L.P.".  The Certificate of the Partnership may be amended or restated by the General Partner as provided in the Act or under this Agreement.

2.2      Term of the Partnership.  The Partnership shall be perpetual, unless sooner terminated pursuant to this Agreement.

2.3      Partnership Office.  The principal office of the Partnership in the State of Tennessee shall be at 6000 Poplar Avenue, Suite 250, or at such other location in Memphis as the General Partner may hereafter designate by notice to the Limited Partner.

2.4      Purpose of the Partnership.  The primary purpose of the Partnership shall be to purchase, renovate, rent, hold or sell, the Property. The Partnership may engage in all such activities and transactions as the General Partner deems necessary, appropriate, proper, advisable, incidental or convenient to or in connection therewith, including without limitation:

(a)      to purchase, acquire, renovate, lease, sell, exchange and/or otherwise deal with the Property;

(b)      to own, operate and profit from the Property as acquired by the Partnership;

(c)      to have and exercise any and all powers granted to a limited partnership pursuant to the Act;

(d)      to incur and assume indebtedness and to grant such security interests in, execute deeds of trusts and/or mortgages pertaining to the Property to secure the repayment of such indebtedness;

(e)      to establish and maintain bank, brokerage, and other similar accounts, to enter into agreements in connection therewith, to deposit cash, securities or other partnership assets in such accounts, as necessary, and to pay the commissions, fees and other charges applicable to transactions in all such accounts as related to the Property;

(f)      to convert or exchange Property for other properties, or to otherwise dispose of any Properties or other property at any time held by the Partnership;

(g)      to appoint and terminate or otherwise contract with agents and consultants, including, without limitation, originators, custodians, depositories, real estate agents, accountants, attorneys, underwriters, consultants, appraisers, engineers, and other independent contractors or agents of the Partnership (which may be Affiliates of the Partnership or any Partner) as the General Partner may deem desirable for the transaction of the business of the Partnership, and to provide for the reasonable compensation and reimbursement of reasonable expenses associated with the foregoing as Partnership Expenses;

(h)      to have and maintain an office within the State of Tennessee, and in connection therewith to rent, lease or sublet office space, facilities and equipment, to engage and pay personnel and do such other acts and things and incur such other expenses on its behalf as may be necessary or advisable in connection with the maintenance of such office or offices and the conduct of the business of the Partnership;

(i)      to enter into, make and perform all contracts, agreements and undertakings, pay all costs and expenses and engage in all activities and transactions as may be necessary or advisable to the carrying out of the foregoing objects and purposes of the Partnership;

(j)      to create or designate a subsidiary of the Partnership or designate a Partner to do any of the foregoing on behalf of the Partnership; and

(k)      to carry on any other activities incidental to, or in support of the activities of the Partnership, to do everything necessary, suitable or proper for the accomplishment of any purpose or the furtherance of any power herein set forth, either alone or in association with others, which is incidental to or in support of the activities of the Partnership.

<div align="center">

**ARTICLE III**
**GENERAL PARTNER AND PARTNERSHIP MANAGEMENT**

</div>

3.1      <u>Designation of the General Partner</u>. Holding hereby accepts and agrees to serve as the General Partner of the Partnership and to be bound by the terms and conditions of this Agreement.

3.2      <u>General Powers of the General Partner</u>.

(a)      the General Partner shall have the power and authority on behalf of and in the name of the Partnership to take any and all actions in the best interest of the Partnership required to serve the purpose and power of the Partnership set forth in <u>Section 2.4</u> hereof and to perform all acts and enter into and perform all contracts and other undertakings which they may deem necessary or advisable or incidental thereto, and to have and possess the same rights and powers as any general partners in a partnership formed under the laws of the State of Delaware, including without limitation, to:

(i)      purchase, hold, service, sell, exchange, receive and otherwise acquire and dispose of the Property;

(ii)      expend Partnership funds in furtherance of the purpose of the Partnership;

(iii)      incur obligations for and on behalf of the Partnership in connection with its operations;

(iv)      qualify the Partnership to do business in any state, territory, district or possession of the United States that may be necessary, convenient or incidental to the accomplishment of the purposes of the Partnership set forth herein;

(v)      bring an action on behalf of or litigate, arbitrate, negotiate or otherwise dispose of claims against the Partnership as the General Partner may deem necessary;

(vi)      open, maintain and close bank accounts and draw checks or other orders for the payment of moneys;

(vii)   acquire and enter into any contract of insurance which the General Partner deem necessary or appropriate for the protection of the Partnership and the General Partner, for the conservation of the Property, or for any purpose convenient or beneficial to the Partnership;

(viii)  admit additional Partners in accordance with this Agreement;

(ix)   do all such things and take all necessary actions as required to operate the Partnership in conformity to applicable law;

(x)   engage or employ and compensate on behalf of the Partnership, such Persons as it shall deem advisable in the organization, operation and management of the business of the Partnership, on such terms and for such compensation as the General Partner in its sole and exclusive judgment shall determine, including any lawyers, accountants, investment advisors, investment bankers, underwriters, engineers, consultants, appraisers, market analysts, property management personel, managers or other service providers as the General Partner shall deem advisable; and

(xi)   to make, execute, deliver, acknowledge and file, as the General Partner hereunder, any and all instruments in writing, necessary or proper for the accomplishment of any of the powers referred to in Section 2.4, including without limitation all necessary documents as required by the Act or other applicable law;

(b)   Notwithstanding the foregoing, the General Partner may not, without first receiving the consent of the Partners holding not less than a majority of the then outstanding Interests of the Partnership in attendance (in person or by proxy) at a meeting of Limited Partners called for the purpose and entitled to vote at the meeting, take any actions which are not specifically permitted by Section 3.2 (a), including but not limited to the following:

(i)   enter into any merger, consolidation or restructuring of the Partnership;

(ii)   file any voluntary petition for the Partnership under the federal Bankruptcy Code, or seek the protection of any bankruptcy or insolvency law or debtor relief statute of the United States, any other country, or any state or other political subdivision thereof;

(iii)   cause or permit the Partnership to redeem or repurchase all or any portion of the Interests of a Limited Partner, except to the extent that a Limited Partner becomes a Defaulting Limited Partner; and,

(iv)   sell all or substantially all of the Properties of the Partnership.

3.3   Partnership Offices, Employees, Expenses and Administrative Matters.   The General Partner shall:

(a)   maintain for the conduct of Partnership affairs one or more offices and in connection therewith rent office space, engage personnel, whether part time or full time, and do

-11-

such other acts as may be necessary or advisable in connection with the maintenance and administration of such office or offices;

(b)     select and engage independent attorneys, accountants, securities brokers, servicers or such other persons on such terms and for such compensation as it may deem necessary or advisable;

(c)     incur such other expenses on behalf of the Partnership as it may, in its discretion, deem necessary or appropriate for the conduct of Partnership affairs;

(d)     determine and change the fiscal year of the Partnership;

(e)     deliver a copy of the Certificate and any restatement or amendment thereto to any Partner within fifteen (15) days after requested by a Partner;

(f)     maintain the Partnership Register;

(g)     maintain all books, records and accounts of the Partnership in the Partnership Office available for inspection by any Partner during usual business hours;

(h)     adopt a seal for the Partnership (however, the absence of such seal shall not impair the validity of any instrument executed on behalf of the Partnership); and

(i)     file any and all tax and similar returns and reports required by law and hire accountants, lawyers or other necessary professionals to prepare and assist with the foregoing.

3.4     <u>Reliance by Third Parties</u>.  Persons dealing with the Partnership are entitled to rely conclusively upon the certificate of the General Partner to the effect that it is then acting as a General Partner and upon the power and authority as herein set forth.  Nothing herein contained shall impose any obligation on any bank, lessor, lessee, mortgagee, grantee or other person or firm doing business with the Partnership to inquire as to whether or not written approval of the Limited Partners or the assignee of a Limited Partner has been obtained, and any stock power, lease, mortgage, deed, contract or other instrument executed by either General Partner as herein authorized shall be valid, sufficient and binding.

3.5     <u>Resignation, Removal and Replacement of General Partner</u>.

(a)     A General Partner shall not resign or withdraw from the Partnership without the prior written consent of the Limited Partner representing a majority of Interests in attendance (in person or by proxy) at a meeting of Limited Partners called for the purpose and entitled to vote at the meeting.  Upon the effective date of the resignation of a General Partner, a successor General Partner shall be elected by vote of the remaining Partners holding not less than a majority of the then outstanding Interests of the Partnership (subject to the acceptance of the position and the terms of this Agreement by such successor General Partner).

(b)     The General Partner shall serve as such until the earliest of (i) resignation of a General Partner pursuant to <u>paragraph (a)</u> above; (ii) dissolution of the Partnership and

completion of the liquidation contemplated by Article IX, (iii) the Bankruptcy or dissolution of a General Partner, or (iv) the removal of a General Partner pursuant to paragraph (c) below.

(c)     A General Partner shall not be subject to removal by the Limited Partners, provided, however, that in the event that the General Partner materially breaches any provision of this Agreement, which breach is not cured within ninety (90) days of the date of notice by the Partnership of such breach to the Partners, Limited Partners holding not less than a majority of the then outstanding Interests of the Partnership [in attendance (in person or by proxy) at a meeting of Limited Partners called for the purpose and entitled to vote at the meeting] may remove a General Partner, effective upon thirty (30) days' written advance notice to such breaching General Partner, provided further that the Partners shall elect a successor General Partner pursuant to paragraph (a) above.

3.6     Interest of Bankrupt General Partner.  Upon the Bankruptcy of a General Partner, the executor, administrator, guardian, trustee or other personal representative (the "Representative") of such General Partner, if any is appointed, shall be deemed to be the assignee of the General Partner's interest, which interest shall continue until the end of the fiscal year in which such Bankruptcy takes place or at such earlier time as the remaining General Partner(s) may determine.  If the Partnership is continued after the expiration of such fiscal year or earlier period, the bankrupt General Partner or its Representative shall be entitled to receive the remaining balance in the General Partner's Capital Account and any distributions due with respect with such Partner's Interest as of the end of the fiscal year or earlier period.  Upon the Bankruptcy of a General Partner, neither such General Partner nor its Representative shall have any right to take part in the management of the Partnership.

3.7     Partnership Expenses.  All Partnership Expenses, including Extraordinary Partnership Expenses and costs and expenses determined by agreement of the General Partner to have been incurred for the organization of the Partnership, shall be paid by the Partnership from Partnership Assets, as the General Partner shall determine.

3.8     General Partner Fees.  The following are fees which the General Partner (or its designee(s)) shall be paid upon the occurrence of events as described below as well as all taxes applicable thereto.  By execution of this Agreement, the Limited Partners grant approval the payment of said fees:

(a)     Acquisition Fee.  The Partnership shall pay the General Partner (or its designee(s)) an acquisition fee in an amount of three percent (3%) of the gross purchase price for the Property which fee shall be due and payable upon the final closing for the acquisition of the Property;

(b)     Asset Management Fee.  The Partnership shall pay an annual asset management fee in an amount equal to two percent (2%) of the gross collected receivables to the General Partner (or its designee(s)) for the management of the Property which fee shall be paid upon the first anniversary of the date of acquisition of the Property and each consecutive year thereafter;

(c)  Financing Fee. The Partnership shall pay the General Partner (or its designee(s)) a financing fee equal three percent (3%) of the principal loan amount which fee shall paid upon the funding of the financing, the Financing Fee will be a one-time fee based on the total financing of a project. For greater clarity any subsequent refinancing's done will not be subject to any General Partner fees if the refinancing amount does not increase the total financing already in place.

(d)  Loan Guaranty Fee: In the event that the principals of General Partner are required to provide a personal guarantee to obtain any financing a loan guarantee fee equal three percent (3%) of the principal loan amount which fee shall paid upon the funding of the financing to the General Partner (or its designee(s));

(e)  Disposition Fee. The Partnership shall pay the General Partner (or its designee(s)) a disposition fee in an amount of three percent (3%) of the gross sales price which shall be due and payable upon the final closing for the sale of the Property.

## ARTICLE IV
## MEETINGS

4.1  Meetings of the Partners.  Any action required to be taken by vote of the Limited Partners pursuant to applicable law or this Agreement shall be taken by the vote of the Limited Partners and a duly convened meeting of the Partners.  Meetings of the Partners can be called by either General Partner or by Limited Partners at any time.   All meetings shall be held at the principal offices of the Partnership or such other location as the General Partners shall determine in their discretion.

4.2  Partner Action by Consent in Lieu of Meeting.  Any action required to be taken by vote of the Limited Partners pursuant to applicable law or this Agreement, may be taken without a meeting, without prior notice and without a vote (provided that the General Partner first determine in their discretion that the action cannot be delayed until the following meeting), if a consent in writing, setting forth the action so taken, shall be signed by Partners holding Interests representing not less than the minimum votes required to authorize such action at a meeting at which all Interests entitled to vote thereon were present and voted.  Prompt notice of such action taken shall be provided to those Partners who did not consent in writing.

4.3  Notice of Meetings. Notice of any (i) action proposed to be taken without a meeting or (ii) duly convened meeting of the Partners called by the General Partner, shall be sent no less than fifteen (15) and no more than sixty (60) Business Days prior to the date of such action or meeting to each Partner (and, in the case of a meeting called upon request of the requisite Limited Partners, notice of the meeting must be delivered to each Partners by the Partnership within fifteen (15) days of such request).  When a meeting is adjourned to another place or time not later than five (5) days after such adjournment, notice of the adjourned meeting need not be given if the time and place thereof are announced at the meeting at which the adjournment is taken.

4.4  Waiver of Notice. Any notice required to be given pursuant to applicable law or this Agreement may be waived in writing and signed by the person entitled to such notice,

whether before, at, or after the time stated therein, and such waiver shall be deemed equivalent to notice.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened.

4.5     Presiding Officials.  Each meeting of the Partners shall be convened by a General Partner, or by any of the Limited Partners who called the meeting; provided, however, that the General Partner may, notwithstanding anything herein to the contrary, select any person to preside at a meeting and any person to act as the secretary of such meeting.

4.6     Quorum; Partnership Action.  Except as may otherwise be provided herein, Partners holding a majority of the Interests in the Partnership entitled to vote at any meeting of the Partners, present at the meeting in person or by proxy, shall constitute a quorum.  Every decision of those Partners holding a majority of the total Interests in the Partnership having voting power among the Partners shall be valid as the act of the Partnership, except in those specific instances in which a larger vote is required by the Act, the Certificate, or this Agreement.  If a quorum is not present at any meeting, the Partners present shall have the right successively to adjourn the meeting to a specified date not later than five (5) days after such adjournment.  At such meeting at which a quorum is present, any business may be transacted that might have been transacted at the meeting that was adjourned, without further notice.

4.7     Method of Voting; Proxies.  At a meeting of the Partners, each Partner shall be entitled to vote or to express its written consent or dissent in person or by proxy executed in writing by such Partner.  No proxy shall be voted or acted upon after three (3) years from the date of its execution.

4.8     Partners Entitled to Vote.  All Partners shall be entitled to vote at meetings or to express consent to Partnership actions in writing, unless otherwise restricted by this Agreement or the Act.

4.9     Distribution of Minutes and Resolutions.  The General Partner shall be responsible to record and distribute the minutes of any meeting of the Partners or any resolution or actions taken by the Partners (at a meeting or by written consent) to the Limited Partners within thirty (30) Business Days of such meeting or effective date of such written consent.  Any Partner wishing to challenge the validity or accuracy of the minutes or written consent distributed by the General Partners, must deliver such challenge in writing to the principal office of the Partnership within five (5) Business Days of receipt.

## ARTICLE V
## PARTNERS

5.1     Control by General Partner.  Except as otherwise expressly provided in this Agreement, the day-to-day management and control of the Partnership shall be vested exclusively in the General Partner.

5.2     Interest of Limited Partners. The interests of the Limited Partners shall be divided into and represented by Class A LP Units and Class D Units, each having the rights, privileges, restrictions and conditions as provided for herein.

5.3     Rights of the Limited Partners.

(a)     The Limited Partners shall have no authority to act on behalf of the Partnership in connection with any matter, except as specifically provided in this Agreement.

(b)     Except as otherwise provided in this Agreement, no Limited Partner shall have any right to amend or terminate this Agreement or to exercise voting rights or otherwise control or participate in any manner in the control of the Partnership or its business.

(c)     The Limited Partner interests in the Partnership shall be limited to the beneficial interest conferred by this Agreement represented by the Interests. The Interests shall be deemed to be personal property giving only the rights ascribed to such under this Agreement. Ownership of the Interests shall not entitle any Limited Partner to any title in or direct ownership of Partnership Assets or confer upon any Limited Partner the right to call for a partition or division of the same or for an accounting.

(d)     Each Limited Partner by virtue of having become a Partner shall be held to have expressly assented and agreed to the terms of this Agreement and shall be deemed a party hereto.

5.4     Withdrawal of a Limited Partner.

(a)     Except as provided in Sections 5.4(b), no Limited Partner may withdraw from the Partnership without the written consent of the General Partner.

(b)     Any Limited Partner may withdraw from the Partnership by giving written notice to the General Partner at least ninety (90) days prior to the withdrawal effective date, except that this notice requirement may be waived by the General Partner in its sole discretion.  The General Partner shall liquidate a portion of the Partnership Assets equal to the proportion that the Capital Account of the withdrawing Limited Partner represents of the total of all Capital Accounts for the Partners of the same classification.  The General Partner shall use its reasonable best efforts to maximize the purchase price proceeds that may be obtained for the transfer of the related Partnership Assets.

**ARTICLE VI**
**LIABILITY: EXCULPATION: INDEMNIFICATION**

6.1     Limitation of Liability

(a)     Except as otherwise provided by the Act, the debts, obligations and liabilities of the Partnership, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Partnership and no Covered Person (other than the General Partner) shall be obligated personally or have any obligation to indemnify the Partnership for any such debt, obligation or liability of the Partnership other than as set forth in this Section 6.1.

-16-

(b)      No Limited Partner shall be personally liable for the repayment and discharge of any debts, liabilities and obligations of the Partnership in excess of (i) its share of any assets and undistributed profits of the Partnership, (ii) amount in its Capital Account (including deduction calculated in accordance with <u>Schedule C</u> and (iii) to the extent required by law, amounts of any distributions wrongfully distributed to such Limited Partner.

(c)      Without limiting the generality of the foregoing clauses (a) and (b), the General Partner shall not be liable for the return of Capital Contributions of the Partners or any other amounts outstanding in the Partners' Capital Accounts.

(d)      The provisions of this <u>Section 6.1</u> shall survive the termination of this Agreement.

6.2      <u>Exculpation</u>

(a)      No Covered Person shall be liable to the Partnership for any debt, expense, claim, action, demand, suit, proceeding, judgment, decree, liability or obligation of any kind (collectively, "Liabilities") against or with respect to the Partnership arising out of any action taken or omitted by, for or on behalf of the Partnership unless such Liabilities are caused by the bad faith, willful misconduct, gross negligence or reckless disregard of such Covered Person.

(b)      The General Partner (and its principals, employees and agents) shall not be liable to any other Partner or the Partnership for any loss suffered by the Partnership unless such loss is caused by its negligence or willful misconduct of the General Partner (or that of such principals, employees and agents).  The General Partner may consult with counsel and accountants in respect of Partnership affairs and, in acting in accordance with the written advice or opinion of such counsel or accountants, the General Partner (and its principals, employees and agents) shall not be liable for any loss suffered by the Partnership provided that such counsel or accountants shall have been selected with reasonable care and the written advice was not induced by the General Partner's negligence or willful misconduct.  The General Partner (and its principals, employees and agents) shall not be liable for errors in judgment or for any acts or omissions that do not constitute negligence or willful misconduct.

(c)      The provisions of this <u>Section 6.2</u> shall survive the termination of this Agreement.

6.3      <u>Fiduciary Duty and Standard of Care.</u> The General Partner shall have the fiduciary duty to conduct the affairs of the Partnership as contemplated by this Agreement and in the best interests of the Partnership and of the Limited Partners, including the safekeeping of the Partnership Assets and the use thereof for the exclusive benefit of the Partnership.  Nothing in this Agreement shall be construed to release the General Partner from any such fiduciary duties.

6.4      <u>Indemnification of the General Partner, Officers, Employees, and Agents</u>. Covered Persons shall be indemnified and held harmless by the Partnership from and against any losses, liabilities and expenses arising from claims, demands, investigations, actions, suits or proceedings, whether civil, criminal or administrative, in which such Covered Persons may be involved, as a party or otherwise, by reason of their management of the affairs of the Partnership, whether or not such Covered Persons continue in such management capacity at the time any such

loss, liability or expense is paid or incurred.  Covered Persons shall not be entitled to indemnification hereunder for any conduct arising from: (i) their gross negligence or willful misconduct, or (ii) any breach of this Agreement.  The rights of indemnification provided in this Section will be in addition to any rights to which the Covered Persons may otherwise be entitled by contract or as a matter of law and shall extend to their successors and assigns.  In particular, and without limitation of the foregoing, the General Partners (and their principals, employees and agents) shall be entitled to indemnification by the Partnership against reasonable expenses (as incurred), including attorneys' fees actually and necessarily incurred in connection with the defense of any action, to which the General Partners may be a party by virtue of their management of the Partnership, to the fullest extent permissible under applicable law. The indemnities contained in this <u>Section 6.4</u> shall survive the termination of this Agreement.

## ARTICLE VII
## <u>CAPITAL COMMITMENTS</u>

7.1    <u>Capital Contributions of Partners</u>

(a)    The General Partner will request (each such request referred to herein as a "Contribution Call") that the Limited Partners contribute a certain amount of cash to the capital of the Partnership as maybe reasonable and necessary to purchase and acquire and/or to protect and preserve the Partnership Asset.

(b)    Contribution Calls may, in the sole discretion of the General Partner, be amended, modified, deferred and rescinded at any time prior to a payment due date and any such actions shall not affect or abridge the right of the General Partner to call for payment of the full amount of the Partners' aggregate Capital Commitments; provided that no such amendment, modification, deferral or rescission shall have the effect of increasing the Capital Commitment of any Limited Partner.

(c)    Except as required by operation of law, no Limited Partner shall be required to make any Capital Contribution to the Partnership in excess of its Capital Commitment.  Except as otherwise provided herein and by applicable state law, no Limited Partner shall be required to lend any funds to the Partnership nor shall any Limited Partner have any personal liability for the repayment of any Capital Contribution of any other Limited Partner.

(d)    The General Partner may, in its sole discretion, extend the date upon which payments by the Limited Partners shall become due pursuant to any Contribution Call.

(e)    In the event that any Partner fails to satisfy any Contribution Call, such Partner's Interest shall be subject to dilution on a pro-rata basis amongst all contributing Partners.

7.2    <u>Defaulting Limited Partners</u>

(a)    Any Limited Partner who fails to pay any installment of its Capital Commitment when due shall be immediately notified in writing by the Partnership of such failure. If payment is not received by such Limited Partner within ten (10) Business Days of notice, such Limited Partner shall become a "Defaulting Limited Partner."  Capital Commitments not paid by the due date shall bear interest at a rate per annum equal to the higher of (i) eighteen (18) percent

or (ii) the highest rate of interest permitted by law, in either case, calculated on the basis of the actual number of days elapsed over a year of 365 or 366 days, as the case may be.  Such interest shall accrue from and including the due date until the date paid.  Payments of interest paid pursuant to this Section 7.2(a) shall not be treated as a Capital Contribution.

(b)     To the fullest extent permitted under the Act, whenever the vote, consent or decision of a Limited Partner or of the Limited Partners is required or permitted pursuant to this Agreement, no Defaulting Limited Partner shall be entitled to participate in such vote, consent, or decision nor shall such Defaulting Limited Partner be included in the number of Partners eligible to vote.

(c)     The interest payable due to the default pursuant to Paragraph (a) above, shall be set off against any distributions owing to such Defaulting Limited Partner.  At the election of the General Partners, the Partnership may either (i) apply all or part of any such withheld distribution in satisfaction of the amount then due to the Partnership from such Defaulting Limited Partner or (ii) withhold such distribution until all amounts then due are paid to the Partnership by such Defaulting Limited Partner.  Upon payment of all amounts due to the Partnership (by application of withheld distributions or otherwise), the General Partner shall distribute any amount remaining form such withheld distribution to the Defaulting Limited Partner.

(d)     The General Partner shall have the right (but shall have no obligation) to cause a Defaulting Limited Partner to sell all or any portion of the Defaulting Limited Partner's remaining Interests.

(e)     No right, power or remedy conferred upon the General Partner in this Section 7.2 shall be exclusive, and each such right, power or remedy shall be cumulative and in addition to every other right, power or remedy, whether conferred in this Section 7.2 or now or hereafter available at law or in equity or by statute or otherwise.  No course of dealing between the General Partner and a Defaulting Limited Partner and no delay in exercising any right, power or remedy conferred in this Section 7.2, or now or hereafter existing at law or in equity or by statute or otherwise shall operate as a waiver or otherwise prejudice any such right, power or remedy.

(f)     Notwithstanding anything to the contrary contained herein, the General Partner may bring an action on behalf of the Partnership in respect of the failure of any Limited Partner to make any payment required to be made hereunder and such Limited Partner shall be liable to the Partnership for any and all costs, expenses and liabilities resulting from its failure to make such payment and for the costs and expenses of collecting such payment, including attorneys' fees.

7.3     Redemption of Interests.  The Interests held by any Limited Partner shall not be redeemable, in whole or in part, except as provided in Section 5.4.

7.4     Distributions of Distributable Cash from Operations.  The General Partner shall cause the Partnership to make distributions to the Partners on the tenth (10th) Business Day following the last day of each calendar quarter during each calendar year (each, a "Quarterly Distribution Date") as provided in this Section.  Distributions made to the Partners pursuant to this Section 7.4 for such period shall be applied in the following order of priority:

(a)     First, to reserve for the payment of Partnership Expenses an amount equal to the Reserve Amount;

(b)     Second, to Limited Partners holding Class A LP Units and Class D Units, an amount equal to such Limited Partners' the Cumulative Preferred Return Deficiency, if any and thereafter any remaining distributable amount shall be distributed;

(c)     Third, to the Limited Partners in proportion to their respective positive Capital   Contribution Account balances until each Partner has received cumulative distributions equal to the positive balance in its Capital Contribution Account

(d)     Fourth, the balance of the distributions to the Limited Partners based upon the Class A Units and/or Class D Units held by each and in proportion to their respective Units issued in each such Class. Class A Units will be distributed in accordance with their proportionate share and 40% to the General Partner subject to the following: the aggregate distributions pursuant to this subparagraph (d) to the holders of Class A LP Units, inclusive of all amounts distributed pursuant to subparagraph (b) above, should not exceed 60% of the Class A Proportionate Share of Distributable Cash ; and,

(e)     Fifth, to pay to the Limited Partners an amount equal to the theoretical income tax applicable to the Limited Partner's portion of the income of the Partnership allocated to the partner for each year, based upon a fixed rate of forty percent (40%). The income tax distribution will be made by the Partnership on before April 1st of each calendar year. The obligation to make such tax distribution shall be calculated on a cumulative bases, where such income tax distribution is calculated on the cumulative net taxable income, but only after all income tax losses previously allocated to the Partners are recovered. Notwithstanding the available cash, the General Partner shall be bound to attempt to make the income tax distribution if the same may be made without violation of the loan covenants for significantly increasing the risk of Partnership operations.

For illustrative purposes only, following provides an example of application of the foregoing distribution provisions with a theoretical distribution amount of $1,000,000. This information is provided for illustrative purposes only and is not to be construed as any guaranty of profitability or financial success.

| USA "CDN LP" - Example | | | | | |
|---|---|---|---|---|---|

| Assume Distribution | | | $ | 1,000,000 | |

| | Investment in Project | | Allocation % | Allocation $ | |
|---|---|---|---|---|---|
| CDN LP | $ | 750,000 | 75% | $ | 750,000 |
| USA Investor | $ | 250,000 | 25% | $ | 250,000 |
| | $ | 1,000,000 | 100% | $ | 1,000,000 |

| Distribution | | |
|---|---|---|
| CDN LP | USA Investor (Assume 60/40 Split) | |
| Class D | Class A | Mgmt |
| 100% | 60% | 40% |
| $                 750,000 | $       150,000 | $       100,000 |

The Partnership is comprised of Class A Unit and Class D Unit Holders. Distinct Real Estate LP 2 is the sole Class D Unit Holder and is considered as one investor in the Partnership and hence, receives 100% of its pro-rata investment. All Class A and Class D Unit Holders ultimately receive returns based on their respective investments within their investment class in accordance with Sections 7.4 and 7.5 below, and the illustrative chart provided therein. Total Distributions to Class D Unit Holders will be further allocated based on investments made within that class but is done outside of this Agreement. All Unit Holders are treated equally based on their proportionate investment.

7.5     <u>Distributions of Distributable Cash from Capital Transaction</u>.  The General Partner shall cause the Partnership to make distributions to the Partners as soon as practical following a Capital Transaction but in no event later than on the 10th Business Day after receipt by the Partnership of the Distributable Cash from such Capital Transaction to the Partners in the following order of priority:

(a)     First, to the payment of all outstanding Partnership Expenses as well as such amount as the General Partner deems reasonable and necessary for expenses relating to the winding up and liquidation of the Partnership;

(b)     Second, to payment of the unpaid balance of the Preferred Return Account to the Class A Units and Class D Units held by the Limited Partners until the accrued Preferred Return Account balance for each is reduced to zero;

(c)     Third, to the Limited Partners in proportion to their respective positive Capital  Contribution Account balances until each Limited Partner has received cumulative distributions equal to the positive balance in its Capital Contribution Account;

(d)     Fourth, the balance of the distributions to the Partners shall be based upon the Class A Units and/or Class D Units held by each and in proportion to their respective Units issued in each such Class. Class A Units will be distributed in accordance with their proportionate share and 40% to the General Partner subject to the following: the aggregate distributions pursuant to this subparagraph (d) to the holders of Class A LP Units, inclusive of all amounts distributed pursuant to subparagraph (b) above, should not exceed 60% of the Class A Proportionate Share of Distributable Cash ;

7.6     <u>Withholding</u>.  The Partnership shall at all times be entitled to withhold a portion of any distribution due to a Limited Partner as necessary to satisfy applicable foreign, federal, state or local tax liability arising as a result of such Limited Partner's interest in the Partnership.  The Partnership and its Affiliates shall not be responsible for any amounts withheld and paid in satisfaction of any tax liability, provided that the payment of such amounts was based on a reasonable belief that such tax liability existed or the payment was based on a statement from the governmental authority imposing the tax.  Additionally, the Partnership shall have no obligation to increase the amount of any distribution or pay any additional amounts to any Limited Partner to reimburse amounts withheld pursuant to this Section.

7.7     <u>Transfer of Interests</u>.

(a)     No Limited Partner may Transfer its Interests, in whole or in part, directly or indirectly, by operation of law or otherwise, voluntarily or involuntarily, and no transferee of such Interest shall be admitted as a Limited Partner without the written consent of the General Partner, which consent shall not be unreasonably withheld.  Any Transfer by any Limited Partner of any Interest in the Partnership in contravention of this <u>Section 7.7(a)</u> shall be void and ineffectual, and shall not bind, or be recognized by the Partnership or any other party.  The transferee of a Transfer in contravention of this <u>Section 7.7(a)</u> shall not have any right to any profits, losses or distributions of the Partnership.

(b)     Each transferee, as a condition of becoming a Partner in the Partnership, shall execute such instrument or instruments as shall be required by the General Partner to signify such transferee's agreement to be bound by all the provisions of this Agreement.  Notwithstanding the foregoing, any transferee who acquires Interests of the Partnership shall be deemed by the acquisition of such Interests to have agreed to be bound by all the provisions of this Agreement.

(c)     Any Limited Partner who shall Transfer all of its Interest in the Partnership shall cease to be a Limited Partner of the Partnership, and shall no longer have any rights or privileges of a Limited Partner except that, unless and until the transferee of such Limited Partner is admitted as a Limited Partner in accordance with the provisions of this Section 7.7, the Limited Partner seeking to Transfer the Interest shall retain the statutory rights and obligations of an assignor limited partner under applicable law.

(d)     The pledging of the Interest or other dispositions shall be allowed with the consent of the General Partner.

**ARTICLE VIII**
**ALLOCATIONS**

8.1     Allocations For Capital Account Purposes.  Except as otherwise provided in Schedules C, for purposes of maintaining Capital Accounts for accounting purposes and in determining the rights of the Partners among themselves, the Partnership's items of income, gain, loss and deduction (computed in accordance with Schedule C) shall be allocated among the Partners in each taxable year (or portion thereof) as provided herein below:

(a)     Net Income shall be allocated to the Partners in accordance with their respective Interests.

(b)     Net Losses shall be allocated to the Partners in accordance with their respective Interests; provided, however, that Net Losses shall not be allocated to any Limited Partner pursuant to this Section 8.1(b) to the extent that such allocation would cause such Limited Partner to have an Adjusted Capital Account Deficit at the end of such taxable year (or increase any existing Adjusted Capital Account Deficit).

8.2     Tax Allocations.

(a)     In accordance with Code Section 704(c) and the Regulations there under, income, gain, loss and deduction with respect to any property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation between the adjusted basis of such property to the Partnership for federal income tax purposes and its initial book value. In the event the book value of any Partnership asset is adjusted pursuant to the Code and Regulations, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its book value in the same manner as under Code Section 704(c) and the Regulations promulgated there under. Any elections or other decisions relating to such allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intention of this Agreement.

    (b) If requested by any individual Limited Partner for any taxable year of the Partnership, the General Partner shall provide such Limited Partner with relevant information and appropriate documentation that will allow the Limited Partner to claim costs and expenses incurred by such Limited Partner in making or maintaining its Interest in the Partnership as expenses for tax purposes, provided that if any such request is made after March 31st in the year following the end of such taxable year, the General Partner will provide such information and documentation in its reasonable discretion only to the extent that the General Partner is reimbursed by such Limited Partner for the General Partner's costs and expenses incurred in providing such information and documentation.

<div align="center">

**ARTICLE IX**
**DISSOLUTION, LIQUIDATION AND TERMINATION**

</div>

   9.1 <u>No Dissolution</u>. The Partnership shall not be dissolved except as provided in <u>Section 9.2</u> or <u>Section 9.5</u>.

   9.2 <u>Events Causing Dissolution</u>. The Partnership shall be dissolved and its affairs wound up upon the occurrence of any of the following events:

    (a) the written consent of the Limited Partners at a meeting of Limited Partners called for the purpose and entitled to vote at the meeting;

    (b) sale of all or substantially all of the Partnership Assets;

    (c) the entry of a decree of judicial dissolution; or

    (d) the termination of the Partnership in accordance with <u>Section 9.5</u>.

   9.3 <u>Liquidation</u>.

    (a) Upon dissolution of the Partnership, the Liquidating Trustee shall immediately be appointed by the General Partner commence to wind up the Partnership's affairs; provided, however, that a reasonable time shall be allowed for the orderly liquidation of the assets of the Partnership and satisfaction of liabilities to creditors in an effort to minimize the losses incurred by the Partnership as a result of the liquidation. The proceeds of liquidation shall be distributed, upon receipt, in the following order and priority:

     (i) to the Liquidating Trustee to pay a reasonable fee in connection with its services as Liquidating Trustee;

     (ii) to creditors of the Partnership, including Partners who are creditors, to the extent permitted by law, in satisfaction of the liabilities of the Partnership (whether by payment or the making of reasonable provision for payment thereof), other than liabilities for distributions to Partners;

     (iii) to Partners and former Partners in satisfaction of liabilities for distributions declared pursuant to <u>Section 7.4</u>; and,

<div align="center">-24-</div>

(iv)   the remaining proceeds of liquidation shall be paid to Partners as nearly as practicable in proportion to their respective Capital Accounts after taking into account all Capital Account adjustments for the Partnership taxable year. If any Partner has a deficit balance in its Capital Account (after giving effect to all contributions, distributions and allocations for all taxable years, including the year during which such liquidation occurs), such Partner shall have no obligation to make any contribution to the capital of the Partnership with respect to such deficit, and such deficit shall not be considered a debt owed to the Partnership or to any other person for any purpose whatsoever.

(b)   Upon any dissolution of the Partnership, the Liquidating Trustee may reserve an amount adequate to assure payment of all fees and expenses of the Partnership and to provide for any other liabilities of the Partnership incurred or to be incurred, including, without limitation, contingent or anticipated liabilities, and finally shall dispose of any balance of such amount in the manner provided above.

(c)   Until final distribution, the Liquidating Trustee may continue to operate the business and properties of the Partnership with all of the power and authority of the General Partner, including paying any and all costs and expenses of the Partnership and settling any claims, liabilities or obligations of the Partnership.  As promptly as possible after dissolution and again after final liquidation, the Liquidating Trustee shall cause an accounting by an independent certified public accountant of the Partnership's assets, liabilities, operations and liquidating distributions to be given to the Partners.

9.4   <u>Certificate of Cancellation</u>.   Upon completion of the distribution of the Partnership's assets as provided in this <u>Article IX</u>, the Partnership shall be terminated and the General Partners, pursuant to the Act, shall file a Certificate of Cancellation with the Corporation Division of the State of Delaware, cancel all other filings as necessary, and take all other actions necessary to terminate the existence of the Partnership, whereupon the General Partner shall be discharged from all further liabilities and duties hereunder, and the rights and interests of the Partners shall thereupon cease.  The General Partner shall also execute and lodge with the records of the Partnership an instrument in writing setting forth the facts of such termination.

9.5   <u>Termination</u>.  The General Partner, with the Consent of the Limited Partners may terminate the Partnership at any time in accordance with this <u>Article IX</u>.

<div align="center">

**ARTICLE X**
**BOOKS AND RECORDS**

</div>

10.1   <u>Books, Records and Financial Statements</u>.  At all times during the continuance of the Partnership, the Partnership shall maintain, at its principal office, separate books of account for the Partnership that shall show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received and all income derived in connection with the operation of the Partnership business in accordance with generally accepted accounting principles consistently applied, and, to the extent inconsistent therewith, in accordance with this Agreement. Such books of account, together with an executed copy of this Agreement, the Partnership Register, a certified copy of the Certificate and all other documentation maintained by the Partnership and relevant to a Partner's review of the accuracy and correctness of the Partnership's

books, records and accounts shall at all times be maintained at the principal office of the Partnership.   Upon at least five (5) Business Days prior written notice to the General Partners, a Limited Partner or its representative shall be permitted to examine books of account, the executed copy of this Agreement, the names of all Partners and a certified copy of the Certificate, at such time as may be mutually convenient to the General Partner and such Limited Partner.  Each Limited Partner shall bear all expenses incurred in any examination made for such Limited Partner's account and shall keep all information obtained during such inspection confidential.

    10.2    Reports/Annual General Meeting.  Within one hundred-twenty (120) days after the end of each fiscal year of the Partnership, the General Partner shall cause to be prepared and sent to the Limited Partners: (i) an annual financial report of the Partnership (the "Annual Report"), including a balance sheet, (ii) a profit and loss statement and, unless the profit and loss statement is prepared on a cash basis, (iii) a statement of changes in financial position, all of which shall be certified by an independent certified public accountant and, (iv) the proposed Partnership operating budget for the upcoming fiscal year. Within one hundred-twenty (120) days after the end of each tax year of the Partnership, the General Partner shall furnish to the Limited Partner such information as may be required to enable the Limited Partner to file required income tax returns.  The cost of all reports and other information provided pursuant to this Section 10.2 shall constitute Partnership Expenses and the General Partner shall be reimbursed for any cost incurred by them in connection therewith.  In the event that a Limited Partner requires information in addition to that provided pursuant to this Section 10.2, such information shall be provided as soon as reasonably practicable by the General Partner, at such Limited Partner's expense.

    10.3    Fiscal and Tax Year.  The fiscal year and tax year of the Partnership shall end on December 31st unless the General Partner determines otherwise.

## ARTICLE XI
## MISCELLANEOUS

    11.1    Amendment.  All rights granted to the Partners under this Agreement are granted subject to the right of the General Partner to amend this Agreement, including any Schedules hereto, as provided herein.  This Agreement, including any Schedules hereto, may be amended from time to time, in whole or in part, by the General Partner and approved by the Limited Partners holding not less than a majority of the then outstanding Interests in the Partnership; provided, however, that no amendment shall be made to any provision of the Agreement that specifically requires a greater percentage of the then outstanding Interests in the Partnership, without receiving the Consent of Limited Partner.  Notwithstanding the foregoing, in the case of any amendment that the General Partner determine is necessary or appropriate to prevent the Partnership from being treated as a publicly traded partnership taxed as a corporation under Section 7704 of the Code, the Consent of Limited Partner shall not be required provided that the General Partner gives notice of such amendment to the Limited Partner prior to or promptly after execution thereof and such amendment shall be effective on the date provided in the instrument containing the terms of such amendment; provided further, that Consent of the Limited Partner shall not be required for amendments to Schedule A to reflect the admission of additional Limited Partners and the issuance of additional Interests as contemplated by this Agreement.   No amendment shall (i) reduce the Capital Commitment or Capital Account of any Partner; (ii) reduce the Interests held by any Partner; (iii) reduce any Partner's rights to distributions with

respect thereto; or (iv) otherwise disproportionately and negatively impact such Partner without, in each case, the specific written consent of such Partner. Nothing contained in this Agreement shall permit the amendment of this Agreement to impair the exemption from personal liability of the General Partner, officers, employees and agents of the Partnership or General Partner. Amendments to this Agreement may be executed solely by the General Partner; provided that the General Partner shall also execute a certificate filed in the records of the Partnership stating that the amendment required no consent of any other Partner under Section 11.1.

11.2    Power of Attorney.

(a)    The Limited Partner does hereby constitute and appoint the General Partner as such Limited Partner's true and lawful representative and attorney in fact, in its name, place and stead to make, execute and file: (i) the Certificate, (ii) any amendments thereof required to reflect any change in the Partnership of the Partnership or in the Capital Contributions of the Partners, (iii) any other amendments thereof required or permitted by law and (iv) all other instruments, documents and certificates which may be required by the laws of any jurisdiction in which the Partnership does business, or any political subdivision or agency thereof, to effectuate, implement or continue the valid and subsisting existence of the Partnership.

(b)    The foregoing grant of authority:

(i)    is a special power of attorney coupled with an interest, is irrevocable, and shall survive the death, Bankruptcy, incompetency, insolvency or dissolution of a Limited Partner;

(ii)    may be exercised by the person appointed as power of attorney for the Limited Partner by a electronic signature or by listing all of the Limited Partners executing any instrument with its single signature as attorney in fact for all of them; and,

(iii)    shall survive the delivery of an assignment by a Limited Partner of the whole or any portion of its Interest, except that where the transferee has been approved by the General Partner for admission to the Partnership, the power of attorney shall survive the delivery of such assignment for the sole purpose of enabling the General Partner to execute, acknowledge and file any instrument necessary to effect such transfer.

11.3    Governing Law, Waiver of Jury Trial.  This Agreement and the rights of the parties hereunder shall be construed in accordance with the laws of the State of Delaware and all rights and remedies shall be governed by such laws without giving effect to the conflict of laws principles thereof.

(a)    EACH PARTNER WAIVES ANY RIGHT WHICH IT MAY HAVE TO A JURY TRIAL WITH RESPECT TO ANY ACTION OR CLAIM ARISING OUT OF ANY LITIGATION OR DISPUTE DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, ANY RIGHTS OR OBLIGATIONS HEREUNDER OR THE PERFORMANCE OF ANY SUCH RIGHTS OR OBLIGATIONS. EXCEPT AS PROHIBITED BY LAW, EACH PARTNER WAIVES ANY RIGHT WHICH IT MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION OR DISPUTE REFERRED TO IN THE PRECEDING SENTENCE ANY SPECIAL, EXEMPLARY, PUNITIVE OR

CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES.

11.4    Severability.  In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.  The parties shall endeavor in good faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions, the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

11.5    Sections, Articles and Schedules.  All references herein to a "Section" or an "Article" shall refer to the Sections and Articles of this Agreement and all references to a "Schedule" shall refer to the Schedules to this Agreement, in all cases unless expressly stated to the contrary.

11.6    Section Headings; Interpretation.  Section headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning hereof.

11.7    Notices.  All notices provided for in this Agreement shall be in writing, duly signed by the party giving such notice, and shall be delivered, telecopied or mailed by registered or certified mail, as follows:

(a)    if given to the Partnership, in care of the General Partner at the Partnership's principal place of business;

(b)    if given to the General Partner, at such General Partner's mailing address set forth on Schedule A attached hereto; or

(c)    if given to the Limited Partner, at the address set forth opposite its name on Schedule A attached hereto, or at such other address as such Limited Partner may hereafter designate by written notice to the Partnership.

All notices shall be deemed delivered when: (i) mailed by certified mail, return receipt requested to any party at the address specified above, or (ii) telecopied to any party to the telecopy number given by such party and confirmed by a transmission report verifying the correct telecopier number and number of pages and that such transmission was well transmitted, or (iii) delivered personally to any party at its address specified above.

11.8    Failure to Pursue Remedies.  The failure of any party to seek redress for violation of, or to insist upon the strict performance of, any provision of this Agreement shall not constitute a waiver of such provision or such party's rights thereunder.

11.9    Cumulative Remedies.  The rights and remedies provided by this Agreement are cumulative, and the use of any one right or remedy by any party shall not preclude or waive its right to use any or all other remedies.  Said rights and remedies are given in addition to any other right the parties may have under law, statute, ordinance or otherwise.

11.10   <u>Binding</u>.  This Agreement shall be binding upon and inure to the benefit of each Partner and their respective successors and assigns.

11.11   <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts with the same effect as if all parties hereto had signed the same document.  All counterparts shall be construed together and shall constitute one instrument, binding on all the parties thereto.

IN WITNESS WHEREOF, the undersigned have executed this instrument as of the date first above written.

**GENERAL PARTNER:**

Distinct Real Estate USA GP 2, Inc.

By: _____
Its: President

**LIMITED PARTNERS**:

Distinct Real Estate L.P.2, an Alberta

limited partnership

By: _____
Its: General Partner

DISTINCT REAL ESTATE USA 2 LP

AGREEMENT OF LIMITED PARTNERSHIP

LIMITED PARTNER SIGNATURE PAGE

The undersigned hereby executes, enters into and agrees to be bound by the Agreement of Limited Partnership of Distinct Real Estate USA 2, L.P., dated March 17th _____, 2021.

<div style="margin-left:40%;">

Distinct Real Estate L.P. 2, an Alberta limited partnership

By: _Marcin Drozdz_____

Name: Marcin Drozdz

Title: Director

Date: 3/18/2021

</div>

Attested to by: _____

Name: _____

Title: _____

**US INVESTOR:**

<div style="margin-left:40%;">

Tsafrir Gerson

an Individual

By: _Tsafrir Gerson_____

Name: Tsafrir Gerson

Title: individual

Date: 3/18/2021

</div>

Attested to by: _____

Name: _____

Title: _____

## <u>SCHEDULE A</u>

## GP PARTNERSHIP REGISTER

**General Partner**

| Name and Mailing Address | Capital Commitment | Contributed Capital | Partnership Interest |
|---|---|---|---|
| **Distinct Real Estate USA GP 2, Inc**<br>**500 - 4 Avenue SW**<br>**Calgary, AB.**<br>**T2P 2V6** | $100.00 | $100.00 | 0.0005% |

## **SCHEDULE B**

### **LP PARTNERSHIP REGISTER**

**Limited Partners**

| Name | Capital Commitment | Contributed Capital | Partnership Units |
|------|--------------------|--------------------|-------------------|
| The Young Living Trust dated 12/30/2019 | 20.4917% of all Capital Commitments | $250,000.00 | 250 Class A |
| Ilan Peker | 12.295% of all Capital Commitments | $150,000.00 | 150 Class A |
| Ari Heitner | 4.0983% of all Capital Commitments | $ 50,000.00 | 50 Class A |
| Sequoia REI, Inc. | 20.4917% of all Capital Commitments | $250,000.00 | 250 Class A |
| Tsafrir Gerson | 22.1311% of all Capital Commitments | $270,000.00 | 270 Class A |
| Anna Ostrovsky and Elan Gerson | 20.4917% of all Capital Commitments | $250,000.00 | 250 Class A |

## SCHEDULE C

## ALLOCATION RULES

A.1      **Definitions.** The following terms, which are used predominantly in this **Schedule C**, shall have the meanings set forth below for all purposes under this Agreement:

*"Adjusted Capital Account Balance"* means, with respect to any Partner, the balance of such Partner's Capital Account as of the end of the relevant fiscal year, after giving effect to the following adjustments:

(a)      Credit to such Capital Account any amounts which such Partner is obligated to restore pursuant to this Agreement or as determined pursuant to Regulations Section 1.704-1(b)(2)(ii)(c), or is deemed to be obligated to restore pursuant to the penultimate sentences of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(b)      Debit to such Capital Account the items described in clauses (4), (5) and (6) of Section 1.704-1(b)(2)(ii)(d) of the Regulations.

The foregoing definition of Adjusted Capital Account Balance is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

*"Book Value"* means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)      The initial Book Value for any asset (other than money) contributed by a Partner to the Partnership shall be the gross fair market value of such asset, as determined by the General Partner at the time of such contribution;

(b)      The Book Value of all Partnership assets shall be adjusted to equal their respective gross fair market values, as reasonably determined by the Person who is the Tax Partner with the approval of the General Partner as of the following times: (i) the acquisition of an additional Interest in the Partnership by any new or existing Partner in exchange for more than a de minimis Capital Contribution; (ii) the distribution by the Partnership to a Partner of more than a de minimis amount of cash or other property as consideration for an Interest in the Partnership, if (in any such event) such adjustment is necessary or appropriate, in the reasonable judgment of the General Partners, to reflect the relative economic interests of the Partners in the Partnership; and (iii) the liquidation of the Partnership for federal income tax purposes pursuant to Regulations Section 1.704-1(b)(2)(ii)(g); provided, however, that if a Partner or former Partner whose Interest in the Partnership is being purchased or liquidated does not accept the proposed adjustment to the Book Value of any asset or assets, then such adjustment shall be determined by the following procedure: The Partners who have proposed such adjustment shall select a qualified appraiser, and the dissatisfied Partner, former Partner shall select a qualified appraiser. Unless the same person is selected as appraiser, the two appraisers shall then jointly nominate a third, neutral qualified appraiser, who shall determine the appropriate adjustment and whose determination shall be conclusive and final on the parties;

C:\Users\marci\Dropbox (Personal)\Distinct Real Estate\$$$\Dealflow #s, GP Fees, Legal\Crane Manor\Legal\USA\DISTINCT REAL ESTATE USA 2 LP LPA  (Crane Manor Apartments).doc

Partner Register                                                      33

(c)     The Book Value of any Partnership asset distributed to any Partner shall be adjusted to equal its gross fair market value on the date of distribution;

(d)     The Book Values of Partnership assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulation Section 1.704-1(b)(2)(iv)(m); provided, however, that Book Values shall not be adjusted pursuant to this subsection (d) to the extent that an adjustment pursuant to subsection (b) of this definition is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subsection (d); and

(e)     If the Book Value of an asset has been determined or adjusted pursuant to subsection (a), (b) or (d) above, such Book Value shall thereafter be adjusted by the Depreciation taken into account from time to time with respect to such asset for purposes of computing Profits and Losses.

*"Capital Account"* means, with respect to any Partner, the Capital Account maintained for such Partner in accordance with the following provisions:

(a)     To each such Partner's Capital Account there shall be credited the amount of cash and Book Value of any other property contributed by such Partner to Partnership capital, such Person's distributive share of Profits and any items in the nature of income or gain that are specially allocated pursuant to Sections A.2 and A.3 hereof, and the amount of any Partnership liabilities assumed by such Partner or encumbering any asset distributed by the Partnership to such Partner;

(b)     To each such Partner's Capital Account there shall be debited the amount of cash and the Book Value of any Partnership property distributed to such Partner pursuant to any provision of this Agreement, such Partner's distributive share of Losses, and any items in the nature of expenses or losses that are specially allocated pursuant to Sections A.2 and A.3 hereof, and the amount of any liabilities of such Partner assumed by the Partnership or encumbering any asset contributed by such person to Partnership capital;

(c)     In the event any Interest in the Partnership is transferred or assigned, the transferee or assignee shall succeed to the Capital Account of the transferor or assignor to the extent that it relates to the transferred or assigned interest;

(d)     Section 752(c) of the Code shall be applied in determining the amount of any liabilities taken into account for purposes of this definition of "Capital Account"; and

(e)     The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Sections 1.7041(b) and 1.704-2 of the Regulations and shall be interpreted and applied in a manner consistent with such Regulations. The Tax Partner may modify the manner of computing the Capital Accounts or any debits or credits thereto (including debits or credits relating to liabilities that are secured by contributed or distributed property or that are assumed by the Partnership or any Partner) in order to comply with such Regulations, provided that any such modification is not likely to have a material effect on the amounts distributable

to any Partner pursuant to Article X hereof upon the dissolution of the Partnership. Without limiting the generality of the preceding sentence, the General Partner shall make any adjustments that are necessary or appropriate to maintain equality between the aggregate sum of the Capital Accounts and the amount of capital reflected on the balance sheet of the Partnership, as determined for book purposes in accordance with Section 1.704-1(b)(2)(iv)(g) of the Regulations. The Tax Partner also shall make any appropriate modifications in the event unanticipated events (for example, the availability of investment tax credits) might otherwise cause this Agreement not to comply with Regulations Section 1.704-1(b).

*"Partnership Minimum Gain"* has the meaning set forth in Section 1.704-2(d) of the Regulations.

*"Depreciation"* means, for each fiscal year or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such year or other period, except that if the Book Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or other period, Depreciation shall be an amount that bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; provided, however, that if such depreciation, amortization or other cost recovery deductions with respect to any such asset for federal income tax purposes is zero for any fiscal year, Depreciation shall be determined with reference to the asset's Book Value at the beginning of such year using any reasonable method selected by the General Partner.

*"Partner Nonrecourse Debt"* has the meaning set forth in Section 1.704-2(b)(4) of the Regulations.

*"Partner Nonrecourse Debt Minimum Gain"* has the meaning set forth in Section 1.7042(i)(2) of the Regulations and shall be determined in accordance with Section 1.704-2(i)(3) of the Regulations.

*"Partner Nonrecourse Deductions"* has the meaning set forth for "Partner Nonrecourse Deductions" in Regulations Section 1.704-2(i)(l). The amount of Partner Nonrecourse Deductions with respect to a Partner Nonrecourse Debt for each fiscal year of the Partnership equals the excess (if any) of the net increase (if any) in the amount of Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt during such fiscal year over the aggregate amount of any distributions during such fiscal year to the Partner that bears the economic risk of loss for such Partner Nonrecourse Debt to the extent that such distributions are from the proceeds of such Partner Nonrecourse Debt which are allocable to an increase in Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Section 1.704-2(i)(2) of the Regulations.

*"Nonrecourse Debt"* or *"Nonrecourse Liability"* has the same meaning as the term *"nonrecourse liability"* under Section 1.704-2(b)(3) of the Regulations.

*"Nonrecourse Deductions"* has the meaning set forth in Section 1.704-2(b)(1) of the Regulations. The amount of Nonrecourse Deductions for a Partnership fiscal year equals the excess (if any) of the net increase (if any) in the amount of Partnership Minimum Gain during that fiscal year over the aggregate amount of any distributions during that fiscal year of proceeds of a Nonrecourse Debt that are allocable to an increase in Partnership Minimum Gain, determined according to the provisions of Section 1.704-2(c) of the Regulations.

*"Profits"* or *"Losses"* means, for each fiscal year or other period, the taxable income or taxable loss of the Partnership as determined under Code Section 703(a) (including in such taxable income or

taxable loss all items of income, gain, loss or deduction required to be stated separately pursuant to Section 703(a)(1) of the Code) with the following adjustments:

(a)     All items of gain or loss resulting from any disposition of Partnership property shall be determined upon the basis of the Book Value of such property rather than the adjusted tax basis thereof;

(b)     Any income of the Partnership that is exempt from federal income tax shall be added to such taxable income or loss;

(c)     Any expenditures of the Partnership that are described in Code Section 705(a)(2)(B), or treated as such pursuant to Regulations Section 1.7041(b)(2)(iv)(i), and that are not otherwise taken into account in the computation of taxable income or loss of the Partnership, shall be deducted in the determination of Profits or Losses;

(d)     If the Book Value of any Partnership asset is adjusted pursuant to subsection (b) or

(e)     of the definition of *"Book Value"* set forth in this **Schedule C,** the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses unless such gain or loss is specially allocated pursuant to <u>Section A.2</u> hereof;

(f)     In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in determining such taxable income or loss, there shall be deducted Depreciation, computed in accordance with the definition of such term in this **Schedule C;** and

(g)     Notwithstanding any of the foregoing provisions, any items that are specially allocated pursuant to <u>Section A.2</u> or A.3 hereof shall not be taken into account in computing Profits or Losses.

A.2     **Special Allocations.** The allocation of Profits and Losses for each fiscal year shall be subject to the following special allocations in the order set forth below:

(a)     <u>Partnership Minimum Gain Chargeback.</u> If there is a net decrease in Partnership Minimum Gain for any fiscal year, each Partner shall be specially allocated items of income and gain for such year (and, if necessary, for subsequent years) in an amount equal to such Person's share of the net decrease in Partnership Minimum Gain during such year, determined in accordance with Regulations Section 1.7042(g)(2). Allocations pursuant to the preceding sentence shall be made among the Partners in proportion to the respective amounts required to be allocated to each of them pursuant to such Regulation. The items to be so allocated shall be determined in accordance with Regulations Section 1.704-2(f)(6). Any special allocation of items of Partnership income and gain pursuant to this <u>Section A.2(a)</u> shall be made before any other allocation of Partnership items under this **Schedule C**. This <u>Section A.2(a)</u> is intended to comply with the *"minimum gain chargeback"* requirement in Regulation Section 1.704-2(f) and shall be interpreted consistently therewith.

(b)     <u>Partner Nonrecourse Debt Minimum Gain Chargeback.</u> If there is a net decrease during a Partnership fiscal year in the Partner Nonrecourse Debt Minimum Gain attributable to a Partner Nonrecourse Debt, then each Partner with a share of the Partner Nonrecourse

Debt Minimum Gain attributable to such debt, determined in accordance with Regulations Section 1.704-2(i)(5), shall be specially allocated items of Partnership income and gain for such year (and, if necessary, subsequent years) in an amount equal to such Person's share of the net decrease in the Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Regulations Section 1.7042(i)(4). Allocations pursuant to the preceding sentence shall be made among the Partners in proportion to the respective amounts to be allocated to each of them pursuant to such Regulation. Any special allocation of items of Partnership income and gain pursuant to this <u>Section A.2(b)</u> for a fiscal year shall be made before any other allocation of Partnership items under this **<u>Schedule C,</u>** except only for special allocations required under <u>Section A.2(a)</u> hereof. The items to be so allocated shall be determined in accordance with Regulations Section 1.7042(i)(4). This <u>Section A.2(b)</u> is intended to comply with the provisions of Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)   <u>Qualified Income Offset.</u> 'If any Partner unexpectedly receives any adjustments, allocations or distributions described in clauses (4), (5) or (6) of Regulations Section 1.704-1(b)(2)(ii) (d), items of Partnership income and gain shall be specially allocated to each such Person in an amount and manner sufficient to eliminate as quickly as possible, to the extent required by such Regulation, any deficit in such Partner's Adjusted Capital Account Balance, such balance to be determined after all other allocations provided for under this **<u>Schedule C</u>** have been tentatively made as if this <u>Section A.2(c)</u> were not in the Agreement.

(d)   <u>Gross Income Allocation.</u> If any Partner has a deficit balance in his, her or its Capital Account at the end of any fiscal year (determined as hereinafter provided) that is in excess of the amount such Partner is obligated to restore (or is deemed to be obligated to restore pursuant to Regulations Section 1.704-2(g)(1) or Section 1.704-2(i)(5)), each such Partner shall be specially allocated items of Partnership income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this <u>Section A.2(d)</u> shall be made only if and to the extent that such excess would exist after all other allocations provided for in this **<u>Schedule C</u>** have been tentatively made as if <u>Section A.2(c)</u> hereof and this <u>Section A.2(d)</u> were not in the Agreement.

(e)   <u>Nonrecourse Deductions.</u> Nonrecourse Deductions for any fiscal year or other period shall be specially allocated to the Partners in proportion to their Profit Percentages.

(f)   <u>Partner Nonrecourse Deductions.</u> Partner Nonrecourse Deductions for any fiscal year or other period shall be specially allocated, in accordance with Regulations Section 1.704-2 (i)(1), to the Partner or Partners who bear the economic risk of loss for the Partner Nonrecourse Debt to which such deductions are attributable.

(g)   <u>Code Section 754 Adjustments.</u> To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Code Section 734(b) or 743(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), and such gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such section of the Regulations.

A.3     **Curative Allocations.** The allocations set forth in subsections A.2(a) through (g) of __Schedule C__ hereof *("Regulatory Allocations")* are intended to comply with certain requirements of Regulations Sections 1.704-1(b) and 1.704-2. Notwithstanding any other provisions of this Agreement (other than the Regulatory Allocations and the next two following sentences), the Regulatory Allocations shall be taken into account in allocating other Profits, Losses and items of income, gain, loss and deduction among the Partners so that, to the extent possible, the net amount of such allocations of other Profits, Losses and other items and the Regulatory Allocations to each Partner shall be equal to the net amount that would have been allocated to each such Partner if the Regulatory Allocations had not occurred. For purposes of applying the preceding sentence, Regulatory Allocations of Nonrecourse Deductions and Partner Nonrecourse Deductions shall be offset by subsequent allocations of items of Partnership income and gain pursuant to this __Section A.3__ only if (and to the extent) that: (i) the General Partner reasonably determines that such Regulatory Allocations are not likely to be offset by subsequent allocations under __Section A.2(a)__ or __Section A.2(b)__ hereof, and (ii) there has been a net decrease in Partnership Minimum Gain (in the case of allocations to offset prior Nonrecourse Deductions) or a net decrease in Partner Nonrecourse Debt Minimum Gain attributable to a Partner Nonrecourse Debt (in the case of allocations to offset prior Partner Nonrecourse Deductions). The General Partner shall apply the provisions of this __Section A.3,__ and shall divide the allocations hereunder among the Partners, in such manner as the General Partner reasonably deems appropriate to minimize the economic distortions upon the distributions to the Partners that might otherwise result from the Regulatory Allocations.

# EXHIBIT 3

11.10  Binding.  This Agreement shall be binding upon and inure to the benefit of each Partner and their respective successors and assigns.

11.11  Counterparts.  This Agreement may be executed in any number of counterparts with the same effect as if all parties hereto had signed the same document.  All counterparts shall be construed together and shall constitute one instrument, binding on all the parties thereto.

IN WITNESS WHEREOF, the undersigned have executed this instrument as of the date first above written.

**GENERAL PARTNER:**

Distinct Real Estate USA GP 2, Inc.

By: _____

Its: President

**LIMITED PARTNERS:**

Distinct Real Estate L.P.2, an
Alberta limited partnership

By: _____

Its: General Partner

**US INVESTOR:**

Ilan Peker

an Individual

By: _____

Its: ip

DISTINCT REAL ESTATE USA 2 LP

AGREEMENT OF LIMITED PARTNERSHIP

LIMITED PARTNER SIGNATURE PAGE

The undersigned hereby executes, enters into and agrees to be bound by the Agreement of Limited Partnership of Distinct Real Estate USA 2, L.P., dated 2/23/_____, 2021.

> Distinct Real Estate L.P. 2, an Alberta limited partnership
>
> By: _Marcin Drozdz_
> Name: Marcin Drozdz
> Title: Director
> Date: 2/24/2021

Attested to by:
Name: Tera Patterson
Title: Administrator

**US INVESTOR:**

> Ilan Peker
> an Individual
>
> By: _Ilan peker_
> Name: Ilan Peker
> Title: owner
> Date: 2/24/2021

Attested to by:
Name:
Title:

# EXHIBIT 4

SUBSCRIPTION AGREEMENT
AND
LETTER OF INVESTMENT INTENT

TO: DISTINCT REAL ESTATE USA 2, INC., AS GENERAL PARTNER

Gentlemen:

The undersigned hereby tenders this subscription and applies for the purchase of 150
Class A Units (the "Units") in DISTINCT REAL ESTATE USA 2, LP, a Delaware limited partnership
(the "Partnership") and (the "Units") at a price of $1,000.00 per Unit in exchange for the sum of
150 Thousand and No/100 ($ 15,000,000), and upon the terms and conditions set forth below.
The undersigned understands that the Partnership may reject any subscription for Units for any reason,
and that the Partnership will promptly return the funds delivered herewith in the event this
subscription is rejected, without deduction for expenses or payment of interest. By execution below,
the undersigned acknowledges that the Partnership is relying upon the accuracy and completeness of
the representations contained herein in complying with their obligations under applicable securities
laws.

1.     The undersigned hereby confirms the undersigned's irrevocable agreement to subscribe
for the Units of the Partnership on the following terms:

(a)     Tender, in full, of the aforementioned monetary funds and an executed copy of
this Subscription Agreement shall be delivered to the Partnership at the address set forth
below:

(b)     Notwithstanding any right of revocation or termination granted to the
undersigned by this Agreement or any related agreement, or under law, and regardless of
the provisions contained herein concerning disbursement of funds or acceptance or rejection
of the undersigned's subscription, the undersigned agrees that the date of investment decision,
and the only date on which the undersigned has made such a decision for purposes of
acquiring Units in the Partnership, is the date inscribed on undersigned's signature
page for this Subscription Agreement, which shall be the date of sale of the Units to the
undersigned for all purposes under any and all applicable laws, including any statute(s) of
limitation.

2.     The undersigned acknowledges and represents as follows:

(a)     The undersigned has such knowledge and experience in financial and business
matters that the undersigned is capable of evaluating the merits and risks of the prospective
purchase of the Units.

(b)     The undersigned has obtained, to the extent the undersigned deems it necessary, personal professional advice with respect to the risks inherent in the investment in the Units, and the suitability of the investment in the Units, in light of the undersigned's financial condition and investment needs.

(c)     The undersigned believes after due deliberation that the investment in the Units is suitable for the undersigned based upon the undersigned's investment objectives and financial needs, and the undersigned has adequate means for providing for the undersigned's current financial needs and personal contingencies and has no need for liquidity of investment with respect to the Units.

(d)     The undersigned has been given access to full and complete information regarding the Partnership and has utilized such access to the undersigned's satisfaction, or waived the opportunity to do so, for the purpose of asking questions and receiving answers concerning the terms and conditions of the offering, obtaining information in addition to, or verifying information.   The undersigned has either attended or been given reasonable opportunity to attend meetings with representatives of the Partnership for the purpose of asking questions of, and receiving answers form, such representatives concerning the terms and conditions of the offering of the Units and to obtain any additional information, to the extent reasonably available.

(e)     The undersigned recognizes that the Units as an investment involve a high degree of risk including, but not limited to, the risk of economic losses from operations of the Partnership and the risks.

(f)     The undersigned realizes that (i) the purchase of the Units should be considered by the undersigned to be a long-term investment; (ii) the purchaser of the Units must bear the economic risk of investment for an indefinite period of time because the Units have not been registered under applicable securities laws pursuant to exemptions therefrom and, therefore, none of the Units may be sold unless subsequently registered under such securities laws or exempt from such registration; (iii) there is presently no public market for the Units, and accordingly, the undersigned understands that the undersigned may not be able to liquidate his investment in the event of an emergency or pledge any of the Units as collateral security for loans; (iv) a legend will be placed on each certificate representing the Units stating that such Units have not been registered under the Securities Act of 1933 and applicable state securities laws and referencing the restrictions on transferability of the Units set forth in paragraph 2 below; and (v) stop transfer instructions will be noted on the Partnership's records relating to the Units.

(g)     The undersigned had an opportunity to ask questions of and receive answers from the management and any failure to ask questions was a conscious decision on my part that reflects its conclusion that the undersigned understands all the information provided in connection with the Partnership and that the undersigned needs no additional information.

(h)     The undersigned acknowledges and is aware of the following:

i.      The Partnership has no financial or operating history and the investment contemplated hereunder is highly speculative and involves a risk of loss of the undersigned's entire investment in the Partnership;

ii.     There are substantial restrictions on the transferability of the Units; there will be no public market for an investment in the Partnership; and, accordingly, the undersigned, may have to hold such investment indefinitely and it may  not be possible for the undersigned to liquidate the undersigned's investment in the Partnership;

iii.    None of the following have ever been represented, guaranteed, or warranted to the undersigned by any broker, member of management, the Partnership or any of their respective affiliates, agents, attorneys or employees or by any other person, expressly or by implication:

(A)     The approximate or exact length of time that the undersigned will be required to remain as owner of an investment in the Partnership or when the assets of the Partnership will be sold, if ever;

(B)     The percentage of profit and/or amount of or type of consideration, profit or loss (including tax write-offs and/or tax benefits) to be realized, if any, as a result of this venture; or

(C)     The past performance or experience on the part of the management, the Partnership, or any of their respective affiliates, any securities broker or finder, their partners, salesmen, associates, agents or employees or of any other person, in any way indicates the predictable result of an investment in the Partnership; and

(D)     All projections that may have been represented to the Undersigned by the Partnership are projections only and are not in any way guarantees, representations or warranties of actual performance and that such projections are subject to so many assumptions and variables that actual results of operations may, and usually do, differ materially.

iv.     The undersigned understands that the Partnership will be managed solely by the management and that the undersigned will have limited rights in the management of the Partnership; and

v.      The undersigned has reviewed with a tax advisor and understands the federal income tax aspects of investment in the Partnership, and the undersigned has received such advice in this regard as the undersigned deems necessary from qualified sources such as an attorney, tax advisor or accountant.

(i)     The undersigned has been informed that the investment is a speculative one and involves a high degree of risk, and in evaluating such investment the undersigned has

3

consulted with investment and/or legal and/or tax advisers and has concluded that the proposed investment in the Partnership is appropriate in light of the undersigned's overall investment objectives and financial situation.

(j)     The undersigned understands that the Units of the Partnership represent a minority interest in the Partnership.

(k)     The undersigned understands that the offering of the Units by the Partnership is in no manner related to, affiliated with or otherwise supported by any investment bank or financial institutions specifically.

3.     The undersigned has been advised that the Units are not being registered under the Securities Act of 1933 (the "Act") or the relevant state securities laws, but are being offered and sold pursuant to exemptions from such registrations, and that the Partnership's reliance upon such exemptions is predicated in part on the undersigned's representations to the Partnership as contained herein. The undersigned represents and warrants that all information provided concerning the undersigned Investor, its financial position, and his knowledge of financial and business matters is correct and complete as of the date set forth at the end hereof, and if there should be a change in such information prior to this subscription being accepted, it will immediately provide such changed information. The undersigned represents and warrants that the Units are being purchased for its own account and for investment and without the intention of reselling or redistributing the same, that he or it has made no agreement with others regarding any of the Units, and that its financial condition is such that it is not likely that it will be necessary to dispose of any of the Units in the foreseeable future. The undersigned further represents that it understands that it may not dispose of or transfer any of the Units in any manner without first obtaining (i) an opinion of counsel satisfactory to the Partnership that such proposed disposition or transfer lawfully may be made without the registration of the component parts of the Units for such purpose pursuant to the Act, as then amended, and applicable state securities laws, or (ii) such registrations (it being expressly understood that the Partnership shall not have any obligations to register the component parts of the Units.

4.     The undersigned represents and warrants that it is a bona fide resident of, and is domiciled in, the State of California     and that the Units are being purchased it solely for its own beneficial interest and not as nominee for, or on behalf of, or for the beneficial interest of, or with the intention to transfer to, any other person, trust, or organization.

5.     The undersigned is informed of the significance to the Partnership of the foregoing representations, and such representations are made with the intention that the Partnership will rely on them.

6.     The undersigned, if other than an individual, makes the following additional representations and warranties that this Subscription Agreement and Letter of Investment Intent has been duly authorized by all necessary action on the part of the undersigned, has been duly executed by an authorized officer or representative of the undersigned, and is a legal, valid and binding obligation of the undersigned enforceable in accordance with its terms.

7.     Manner in Which Title to the Units is to be Held. (Check one).

|     |     |     |
| --- | --- | --- |
| a) | X | Individual Ownership |
| b) | ___ | Community Property |
| c) | ___ | Community Property with Right of Survivorship |
| d) | ___ | Joint Tenant with Right of Survivorship (both parties must sign) |
| e) | ___ | Partnership |
| f) | ___ | Tenants in Common |
| g) | ___ | Corporation |
| h) | ___ | Trust |
| i) | ___ | Limited Liability Partnership |

8.    Indemnification. The undersigned agrees to indemnify and hold harmless, on demand, the Partnership, its directors, officers, managers, members, agents (including accountants and attorneys), employees, and each of their respective controlling persons, affiliates, successors, and assigns from and against all claims, allegations, liability, damages, losses, costs, and expenses (including reasonable attorneys' fees) which any of them may incur by reason of the failure of the undersigned to fulfill any of the terms or conditions of this Agreement, or by reason of any breach of the representations and warranties made by the undersigned herein or in any document provided by the undersigned to any of them.

9.    General.

(a)    The undersigned agrees that it may not, and will not, transfer or assign or agree to transfer or assign, any interest, right, or obligation in or under this Agreement.

(b)    The undersigned agrees that the undersigned may not cancel, terminate or revoke this Agreement or any agreement of the undersigned made hereunder and that this Agreement shall survive the dissolution of the undersigned and shall be binding upon the undersigned's members, managers, administrators, successors, and assigns.

(c)    This Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof and may be amended only by a writing executed by all parties.

(d)    This Agreement shall be deemed to be made under, and shall be construed in accordance with and shall be governed by, the laws of the State of Arizona.

(e)    Within five (5) days after receipt of a written request from the Partnership, the undersigned agrees to provide such information and to execute and deliver such documents as may be reasonably necessary or helpful to comply with any and all laws and regulations to which this transaction is subject.

(f)    The undersigned agrees that the undersigned shall not cancel, terminate, or revoke this Subscription Agreement or any agreement made hereunder by the undersigned, and that this Subscription Agreement shall survive the dissolution of the undersigned.

(g)    The undersigned agrees that any controversy between the Partnership or the Management and the undersigned arising out of or related to the purchase or ownership of the units (including but not limited to any claim based upon any securities law) shall be subject to binding arbitration in accordance with the rules of the American Arbitration Association.

**FOR RESIDENTS OF ALL STATES:**

THE UNITS HAVE NOT BEEN REGISTERED UNDER THE ACT OR THE SECURITIES LAWS OF ANY STATE AND ARE BEING OFFERED AND SOLD IN RELIANCE ON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE ACT AND SUCH LAWS. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE ACT AND SUCH LAWS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. THESE SECURITIES HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION OR OTHER REGULATORY AUTHORITY, NOR HAVE ANY OF THE FOREGOING AUTHORITIES PASSED UPON OR ENDORSED THE MERITS OF THE OFFERING OR THE ACCURACY OR ADEQUACY OF THE MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

WHEN COMPLETED AND SIGNED THIS SUBSCRIPTION AGREEMENT AND LETTER OF INVESTMENT INTENT AND THE SUBSCRIBER'S CHECK PAYABLE TO: DISTINCT REAL ESTATE USA 2, LP.

ACCEPTED:

Marcin Drozdz

By: _Marcin Drozdz_    Date: 2/24/2021

Its: Director

AGREED TO AND SUBMITTED THIS 24 DAY OF 2          , 2021:

Ilan Peker
an Individual

BY: _ilan peker_

ITS: owner

# EXHIBIT 5

# Peterson Krochak

## Barristers & Solicitors

Wayne K. Peterson *(1956 – 2013)*
**Mark W. Krochak Professional Corporation\***
**Timothy D. Wallis\*\***

**MORINVILLE**
10201 – 100th Avenue
P.O. Box 3025
Morinville AB, T8R 1R9
Phone: (780) 939-2048

**EDMONTON**
**200 West Tower**
**Coronation Plaza**
**14310 - 111 Avenue**
**Edmonton, AB  T5M 3Z7**

Phone: **(780) 452-6300**
Fax: **(780) 452-4351**
Toll Free: **1-800-610-5850**
E-Mail: **_office@pkfirm.ca_**

*Please Reply to: Edmonton Office*

Our File: 101,738 MWK

August 23, 2021                    **Via Email:  md@marcindrozdz.com**

1990781 Alberta Ltd.
201, 16011 – 116 Avenue NW
Edmonton, Alberta T5M 3Y1

**Attention: Marcin Drozdz**

Re:    **Distinct Real Estate GP Inc. ("GP Corporation") and**
       **Distinct Real Estate GP 2 Inc. ("GP 2 Corporation")**

I am legal counsel to 1508632 Alberta Ltd. ("1508632") and 23044460 Ontario Limited ("23044460").

I have been retained by my clients in connection with issues that have arisen under the terms of the Unanimous Shareholders Agreements of the Corporations acting as General partners to the similarly named Limited Partnerships ("DRELP" and "DRELP2").

I am advised that the GP and GP 2 corporations must raise funds for the renovation and improvement purposes originally intended for increasing value and equity for the unit holders in the Limited Partnerships.  I am also informed that you and/or your corporation ("1990781") are unwilling or unable to provide the funding or financing requirements for the purposes of the General Partnership role with respect to the limited partnerships.

It is my opinion that under the terms of Article V of the Unanimous Shareholders Agreements for both GP and GP 2, you are in breach of the obligations to provide either the requisite funding or the financing guarantees and covenants required for the General Partnership to obtain the funds required for the purposes intended.

As a result, I have been instructed to begin action in the Court of Queen's Bench using all remedies at my clients' disposal, including the terms of the Agreements, remedies available at Common Law and under the Alberta *Business Incorporations Act* to end your involvement in both GP and GP 2.

Clearly, litigation may be an expensive process, and as a result, my client will be seeking full costs on solicitor and his own client full indemnity basis in the court proceedings.

Given your recent history involving my clients, I can advise that they would prefer an amicable and expedient resolution to the issues.  However, my clients require any resolution to be completed in short order to avoid any immediate or long-term effects to the value of the limited partnerships, or to the unit holders in those limited partnerships and the viability of the general partnership corporations.

Please have your legal counsel contact me at your earliest possible convenience to attempt a more efficient resolution of these issues.  I expect to file proceedings shortly, but have advised my clients to attempt one last effort through counsel.  I must hear from you or your counsel **within three (3) days** of the receipt of this correspondence, failing which, I expect the opportunity to proceed amicably and expeditiously to be eliminated.  I must stress the urgency with which my clients has instructed me to proceed.

I look forward to hearing from you in the time limited.

Yours truly,

**PETERSON KROCHAK**

Per:
**MARK W. KROCHAK**
MWK/mav
Encl.
cc: Client

# EXHIBIT 6

**Daniel B. Spitzer**

| | |
|---|---|
| **From:** | Daniel B. Spitzer |
| **Sent:** | Monday, September 27, 2021 1:06 PM |
| **To:** | 'phil@distinctiverealty.ca'; Gord Berger; Marcin Drozdz |
| **Cc:** | 'tzafrir.g@gmail.com' |
| **Subject:** | Distinct Real Estate USA 2, LP Resolutions for Dissolution of Limited Partnership and Removal of General Partner |
| **Attachments:** | 2021-09-27 Partners Resolution for Dissoulition + Removal.pdf |

Gentlemen –

As you are aware from prior communications with the USA partners of Distinct Real Estate USA 2, L.P., a Delaware limited partnership ("**the Partnership**"), a meeting of the partners was convened this morning to consider whether to resolve the Partnership and remove the General Partner. Although each of you was given notice of the meeting, none of you chose to attend.

In attendance at the meeting, either via Zoom or by proxy, were the following:

> Mark van Bommel of Vibe FX, Inc.
> Ilan Peker
> Tsafrir Gerson
> Eran Gurvich
> Eduardo Menendez
> Anna Ostrovsky and Elad Gerson
> Michael Gousseau

These investors, representing well in excess of 51% of the Interests held by all partners in the Partnership, voted unanimously to dissolve the Partnership and remove the General Partner.

I have been asked to forward you the attached Resolutions for Dissolution of Limited Partnership and Removal of General Partner ("**the Resolutions**"), which will take effect as of 12:01 a.m. on October 12, 2021. Please note that the Resolutions also impose immediate limitations on your ability to act on behalf of the Partnership. The Resolutions furthermore require you to provide certain information to the partners on an immediate basis.

The partners are still hopeful that, within the next two weeks, prior to the time that the Resolutions take full effect, you will be able to resolve the issues which have plagued the Partnership apparently right from the beginning. Previously, the partners have offered to resolve matters on the following terms:

- Immediate payment to each of the partners the full amount of their respective investments, together with a ten-percent return on investment.
- The partners have been informed that, simultaneously with the repayment of the investments, as above, Marcin Drozdz will tender his resignation from his role as one of the General Partners.

I understand that this offer still stands. Of course, any final agreement will have to be memorialized in writing and contain standard terms and conditions, including among others, a full and mutual release of claims. In addition, since there is clearly a lack of trust among the various parties, we will have to establish an escrow or appoint a neutral third party to manage the exchange of documents and monies.

If you wish to discuss this matter further, please contact Tsafrir Gerson directly by email at tzafrir.g@gmail.com. The partners have agreed that Mr. Gerson should be the conduit for all further communications with the General Partner.

Please guide yourselves accordingly.


*Daniel B. Spitzer* *
Law Offices of Daniel B. Spitzer
16311 Ventura Boulevard Suite 1200
Encino, California 91436-2152
Telephone 818-990-9700
Facsimile 818-990-9705
Email dspitzer@spitzeresq.com

 * *Certified Specialist – Legal Malpractice Law*
   *State Bar of California Board of Legal Specialization*


This message contains privileged and confidential attorney-client communications or attorney work-product, and is intended only for the use of the individual or entity to which it is addressed.  Unauthorized use, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify me immediately.  Thank you.

<u>**RESOLUTIONS FOR**</u>

<u>**DISSOLUTION OF LIMITED PARTNERSHIP AND**</u>

<u>**REMOVAL OF GENERAL PARTNER**</u>

WHEREAS, the Partners of Distinct Real Estate USA 2, L.P., a Delaware limited partnership ("**the Partnership**") have been unable to obtain basic information concerning the operations and finances of the Partnership, in spite of their repeated requests to the General Partner;

WHEREAS, Distinct Real Estate USA GP 2, Inc., a Delaware corporation ("**the General Partner**") has been unwilling or unable to perform its obligations due to dissension and deadlock among its shareholders, including among other things an inability to obtain financing for the completion of renovations and operation of the Partnership's primary asset, the real property, buildings and improvements thereon located at 2295 Candlewyck Circle, Memphis Tennessee 38114 ("**the Property**"), commonly known as Crane Manor Apartments;

WHEREAS, the General Partner's unwillingness or inability to perform its obligations under Article III of the Agreement of Limited Partnership ("**Operating Agreement**") of the Partnership constitutes a material breach of the Operating Agreement;

WHEREAS, pursuant to paragraphs 4.2 through 4.4 of the Operating Agreement, notice was duly given to all Limited Partners and the General Partner of a meeting to be held on September 27, 2021 at 12:00 p.m. EDT, certain of whom have waived the requirement of advance notice;

WHEREAS, a quorum of the Partners holding a majority of the Interests in the Partnership was present at the meeting of the Partners on September 27, 2021; and

WHEREAS, due to the disarray and dissension among the shareholders of the General Partner, the Partners have determined that, in order to preserve the value of their investment, the Partnership must be dissolved and its assets liquidated, and the General Partner must immediately be stripped of authority to act on behalf of the Partnership and removed as General Partner.

NOW, THEREFORE, the following resolutions are adopted:

1. <u>**Resolution for Dissolution of the Partnership**</u>.

RESOLVED that, pursuant to Article IX of the Agreement of Limited Partnership of the Partnership, including without limitation paragraph 9.2(a) thereof, the Partners, representing a majority of the Interests held by all Partners in the Partnership, hereby vote to dissolve the Partnership.

RESOLVED that this resolution for dissolution of the Partnership shall be effective on and as of 12:01 a.m. on October 12, 2021.

1

RESOLVED that due to the emergent circumstances that have prompted this action by the Partners, the Partners furthermore waive and suspend the requirements for advance notice set forth in paragraph 4.2 of the Operating Agreement.

2. **Resolution for Removal of General Partner**.

RESOLVED that, pursuant to Article III of the Operating Agreement of the Partnership, including without limitation paragraph 3.5(c) thereof, the Partners, representing a majority of the Interests held by all Partners in the Partnership, hereby vote to remove Distinct Real Estate USA GP 2, Inc., a Delaware corporation as the General Partner of the Partnership.

RESOLVED that this resolution for removal of the General Partner shall be effective on and as of 12:01 a.m. on October 12, 2021.

RESOLVED that due to the emergent circumstances that have prompted this action by the Partners, the Partners furthermore vote to waive and suspend the requirements for advance notice and the cure period set forth in paragraph 3.5(c) of the Operating Agreement.

RESOLVED that from the adoption of this resolution for removal of the General Partner until 12:01 a.m. on October 11, 2021, the General Partner shall have no authority to act on behalf of the Partnership, and is instructed not to enter into any contracts, agreements or obligations, or take any action, on behalf of the Partnership or which will have the effect of binding the Partnership. The General Partner is furthermore instructed to make available to the Partners and turn over, immediately, copies of all books and records of the Partnership, including without limitation the following: (a) all rent rolls; (b) all bank statements; (c) all checks; (d) records of all disbursements by the Partnership; (e) any electronic records of the Partnership's finances (for example, Quickbooks); (f) any agreements entered into on behalf of, or binding upon, the Partnership; (g) the names, contact information (telephone, facsimile, email addresses) and Interests held of all Partners.

3. **Resolution for Further Meeting to Elect Successor General Partner**.

RESOLVED that the Partners will meet again at 12:00 noon EDT on October 11, 2021 (a) to elect a successor General Partner pursuant to paragraph 3.5(a) of the Operating Agreement; and (b) to consider the selection of a Liquidating Trustee under paragraph 9.3(a)(i) of the Operating Agreement.

# EXHIBIT 7

<u>**AMENDED RESOLUTIONS FOR**</u>

<u>**REMOVAL OF GENERAL PARTNER**</u>

WHEREAS, the Limited Partners of Distinct Real Estate USA 2, L.P., a Delaware limited partnership ("**the Partnership**") have been unable to obtain basic information concerning the operations and finances of the Partnership, in spite of their repeated requests to the General Partner;

WHEREAS, Distinct Real Estate USA GP 2, Inc., a Delaware corporation ("**the General Partner**") has been unwilling or unable to perform its obligations due to dissension and deadlock among its shareholders, including among other things an inability to obtain financing for the completion of renovations and operation of the Partnership's primary asset, the real property, buildings and improvements thereon located at 2295 Candlewyck Circle, Memphis Tennessee 38114 ("**the Property**"), commonly known as Crane Manor Apartments;

WHEREAS, the General Partner's unwillingness or inability to perform its obligations under Article III of the Agreement of Limited Partnership ("**Operating Agreement**") of the Partnership constitutes a material breach of the Operating Agreement;

WHEREAS, on September 27, 2021 at 12:00 p.m. EDT, a duly-noticed meeting of the Partners took place, pursuant to paragraphs 4.2 through 4.4 of the Operating Agreement, with a quorum of the Partners holding a majority of the Interests in the Partnership present either via Zoom or by proxy;

WHEREAS, at the September 27, 2021 meeting, Partners holding a majority of the Interests in the Partnership voted to dissolve the Partnership and liquidate its assets; to remove the General Partner; and to strip the General Partner of authority to act on behalf of the Partnership immediately,

WHEREAS, pursuant to paragraphs 4.2 through 4.4 of the Operating Agreement, notice was duly given to all Limited Partners and the General Partner of a meeting to be held on October 11, 2021 at 12:00 p.m. EDT, certain of whom waived the requirement of advance notice;

WHEREAS, a quorum of the Partners holding a majority of the Interests in the Partnership was present at the meeting of the Partners on October 11, 2021,

NOW, THEREFORE, the following resolutions are adopted:

1. **Amendment to Resolution for Removal of General Partner**.

    RESOLVED that the resolution for removal of the General Partner adopted on September 27, 2021 is hereby ratified, subject to the amendment stated herein,

    RESOLVED that the resolution for removal of the General Partner adopted on September 27, 2021 shall be effective on and as of 12:01 a.m. on December 28, 2021.

1

RESOLVED that due to the emergent circumstances that have prompted this action by the Partners, the Partners furthermore vote to waive and suspend the requirements for advance notice and the cure period set forth in paragraph 3.5(c) of the Operating Agreement from September 27, 2021 through and including as of 12:01 a.m. on December 28, 2021.

RESOLVED that from the adoption of this amended resolution for removal of the General Partner until 12:01 a.m. on December 28, 2021, the General Partner shall have no authority to act on behalf of the Partnership, and is instructed not to enter into any contracts, agreements or obligations, or take any action, on behalf of the Partnership or which will have the effect of binding the Partnership. The General Partner is furthermore instructed to make available to the Partners and turn over, immediately, copies of all books and records of the Partnership, including without limitation the following: (a) all rent rolls; (b) all bank statements; (c) all checks; (d) records of all disbursements by the Partnership; (e) any electronic records of the Partnership's finances (for example, Quickbooks); (f) any agreements entered into on behalf of, or binding upon, the Partnership; (g) the names, contact information (telephone, facsimile, email addresses) and Interests held of all Partners; and (h) documentation (including any promissory note(s), mortgage, deed of trust or other evidence of indebtedness) relating to a purported $1,200,000 debt of the Partnership.

2. **Resolution for Further Meeting to Elect Successor General Partner**.

RESOLVED that the Partners will meet again at 12:00 noon EDT on December 28, 2021 (a) to elect a successor General Partner pursuant to paragraph 3.5(a) of the Operating Agreement; and (b) to consider the selection of a Liquidating Trustee under paragraph 9.3(a)(i) of the Operating Agreement.

# EXHIBIT 8



# DISTINCT REAL ESTATE USA 2 LP.

**MONTHLY FINACIAL REPORT**

**August 31, 2021**

(Unaudited - Expressed in US Dollars)

**Notice of No Auditor Review**
This monthly report has been prepared by management with no review by external parties.
Specifically, no independent auditor review or audit was conducted on the information included
in this report

**Distinct Real Estate USA 2 LP.**
Monthly Financial Report
Statement of Financial Position
(Unaudited - Expressed in US Dollars)

|  | August 31 2021 |
|---|---|
| **ASSETS** | |
| **Current assets** | |
| Cash and cash equivalents | $ 130,420 |
| Reserve for renovations | 44,012 |
| Due From USA LP | 164,866 |
| Due from related parties | 5,516 |
| Due from USA LP | - |
|  | 344,813 |
| Property under development | 76,927 |
| Rental property - building | 2,364,988 |
| Rental property  - land | 761,000 |
| **Total assets** | $ 3,547,729 |
| **LIABILITIES** | |
| **Current liabilities** | |
| Accounts payable and accrued liabilities | $ 26,255 |
|  | 26,255 |
| **Long-term liabilities** | |
| Note Payable | 1,350,000 |
| **Total liabilities** | 1,376,255 |
| **SHAREHOLDERS' EQUITY** | |
| Contributed Capital | 2,176,530 |
| Deficit | (5,057) |
| **Total shareholders' equity** | 2,171,474 |
| **Total liabilities and shareholders' equity** | $ 3,547,729 |

**Distinct Real Estate USA 2 LP.**
Monthly Financial Report
Statement of Profit/(Loss)
(Unaudited - Expressed in US Dollars)

| | For the Month ended | For the Year-to-date ended |
|---|---|---|
| | August 31, 2021 | August 31, 2021 |
| **Rental and other income** | $ 34,253 | $ 156,418 |
| **Expenses** | | |
| General and administrative | 7,841 | 28,885 |
| Professional fees | 4,405 | 49,120 |
| Property Administration | 7,305 | 16,961 |
| Insurance | - | 21,963 |
| Utilities | 1,013 | 12,211 |
| Wages | 11,261 | 32,335 |
| **Total Expenses** | 31,824 | 161,474 |
| **Net loss** | $ 2,429 | $ (5,057) |

**Distinct Real Estate USA 2 LP.**
Monthly Financial Report
Statement of Cash Flows
(Unaudited - Expressed in US Dollars)

|  | For the year to date ended August 31 |
|---|---|
|  | 2021 |
| Cash provided by (used in): |  |
|  |  |
| **Operating activities** |  |
| Net and comprehensive loss for the period | $ (5,057) |
| Non-cash working capital items |  |
| Renovation Reserve | (44,012) |
| Due from USA LP | (164,866) |
| Other current assets | (5,516) |
| Accounts payable and accrued liabilities | 26,255 |
| **Net cash (used in) operating activities** | **(193,195)** |
|  |  |
| **Investing activities** |  |
| Expenditures on property development | (76,927) |
| Purchase of rental property | (3,125,988) |
| **Net cash (used in) investing activities** | **(3,202,915)** |
|  |  |
| **Financing activities** |  |
| Investor capital contributions | 2,176,530 |
| Note payable | 1,350,000 |
| **Net cash provided by (used in) financing activities** | **3,526,530** |
|  |  |
| **Change in cash and cash equivalents during the period** | **130,420** |
|  |  |
| **Cash and cash equivalents, beginning of the period** | **-** |
|  |  |
| **Cash and cash equivalents, end of the period** | **$ 130,420** |

# EXHIBIT 9

## Daniel B. Spitzer

| | |
|---|---|
| **From:** | Phil Wazonek <phil@distinctiverealty.ca> |
| **Sent:** | Wednesday, October 13, 2021 7:08 AM |
| **To:** | Daniel B. Spitzer; Gord Berger; Gordon Berger; Tsafrir Gerson |
| **Cc:** | Elad Gerzon; Anna Ostrovsky; Ilan Peker; Eduardo Menendez; Mark van Bommel; eran gurvich; mgousseau@mailbox.org; md@marcindrozdz.com |
| **Subject:** | RE: Distinct Real Estate USA 2, L.P., a Delaware limited partnership |
| **Attachments:** | PSA (FullySigned).PDF |

Mr. Spitzer

There seems to be some misunderstanding about the original financing of Crane Manor. To avoid further confusion, I am attaching a copy of the purchase agreement, which discloses an overall purchase price of $3,150,000, payable as to $1,800,000 in cash and an assumption of a previous mortgage to a maximum amount of $1,350,000. *(all dollars USD)*

Marcin Drozdz told Gordon and myself that this was disclosed to Eran Gurvitz before he (or any other investors) invested.

We have instituted litigation to reduce the purchase price on the basis that the outstanding mortgage may be  considerably less than $1,350,000. I am at a loss to understand where anyone could conclude there has been any misrepresentation in this regard.

I am also taking the opportunity to confirm that neither myself nor Gordon Berger nor Marcin Drozdz have taken any fees or salary from either the Canadian or the US limited partnership.


As to the partnership structure let me clarify as follows:

1. Class D units were subscribed by the Canadian limited partnership which is funded by a number of Canadian investors , some of whom are well known to your client.

2. There are American and Canadian resident investors. The Canadian residents invested through the Canadian LP. To be clear, there are two classes of units, two groups of limited partners. One group is represented by the Canadian general partner on behalf of the Canadian partners. That partnership holds the Class D units representing 58% of the equity. The other is the group of investors who are listed in the US partnership agreement, who hold the remaining 42%.

 3. Having a meeting of only the US limited partners, as I have stated and restated, does not include all the limited partners.

 4. In short order we will call a meeting of ALL limited partners and your client to answer all questions.

 5. Given these disclosures we are still mystified at any allegations that there has been any material breach of its obligations that would call for  removal of the General Partner.

6. Regardless, our goal is to refinance the property as quickly as possible. I am in discussion with a number of lenders and am advancing towards a term sheet with one of them.

7. Once we have the term sheet Mr. Berger will be in a position to close with a new group of investors who intend to purchase the units held by the group of investors, including your client.

8. You can appreciate that if litigation is instituted all our prospective lenders will walk away and there will be no opportunity to satisfy your client's requests to be bought out.

9. Consequently we are asking you to defer institution of any legal action for the time being. We cannot say precisely when the financing will fall into place but we have every expectation it will be in the next 90 days.

As I told your client in an email yesterday, we will answer his other  questions in short order. Though I will let you know immediately that Canadian privacy rules prevent me from providing contact information for any of our Canadian  investors without their written consent.

*Phillip Wazonek*
*phil@distinctiverealty.ca*
*Phone: 403-209-0009*
*Cell:   403-819-5449*
*Fax:   403-209-0029*

This e-mail contains information, including property information, which may be confidential or privileged and is subject to copyright. Unless specifically stated, this e-mail does not constitute formal advice. All enclosed property information has been obtained from sources believed to be accurate however verification is the responsibility of the receiving party and due diligence is highly recomended.  If you are not the intended recipient please advise the sender by return e-mail, do not use or disclose the contents and delete the message and any attachments from your system.

**From:** Daniel B. Spitzer <dspitzer@spitzeresq.com>
**Sent:** October 12, 2021 6:07 PM
**To:** Phil Wazonek <phil@distinctiverealty.ca>; Tsafrir Gerson <tzafrir.g@gmail.com>; Gord Berger <gberger555@gmail.com>
**Cc:** Elad Gerzon <elad.gerson@gmail.com>; Anna Ostrovsky <aostrovsky01@gmail.com>; Ilan Peker <pekerilan@gmail.com>; Eduardo Menendez <emenendezavila@gmail.com>; Mark van Bommel <m.vanbommel@vibefx.com>; eran gurvich <erangurvich@yahoo.com>; mgousseau@mailbox.org; md@marcindrozdz.com
**Subject:** RE: Distinct Real Estate USA 2, L.P., a Delaware limited partnership

Mr. Wazonek –

I have received and reviewed your response and find it wholly lacking, both in substance and in candor.

As to the quorum, on the one hand, you have refused to furnish my client and his co-investors with the contact information for all the other investors, including the Class D investors. On the other hand, you now claim that the group of investors who have voted to oust the General Partner due to a material breach and to dissolve the Partnership don't hold a sufficient number of votes to establish a quorum.  I'm afraid you can't have it both ways.

Our information is quite to the contrary. Our collective understanding is that the investors who attended the meeting on September 27, 2021, and passed resolutions dissolving the Partnership and starting the clock running on the ouster of the General Partner, comprised a quorum, defined as "Partners holding a majority of the Interests in the Partnership entitled to vote at any meeting of the Partners." Operating Agreement, para. 4.6.

As to the financial information, what you furnished to the Limited Partners is wholly insufficient. I won't repeat the request for financial information I sent out earlier; suffice it to say that profit-and-loss statements and a balance showing financial activity for the single month of August 2021 doesn't begin to respond to my client's and his co-investors' demands for financial data. Among other things, my client wishes to see what monies have been paid to the General Partner. One item deserves special mention. As I noted in my previous communications, the fact that the Partnership was burdened with a purported $1,350,000 priority obligation was *never* disclosed to any of the Limited Partners prior to their investments, does not appear in any of the promotional materials, and does not even appear as a

2

bona fide lien on the Crane Manors property. It is clear that this fraudulent, material omission took place in connection with the sale of a security and that the promoters and the Partnership bear liability for this fraudulent misconduct.

Based on your response to the demands of my client and his co-investor for information (to which they are clearly entitled) and for curing the material breach of the General Partner (for failure and/or inability to proceed with renovation of the Property), it is clear that you cannot, or will not, perform the functions of a General Partner. It has also become clear that your sole interest lies in furthering your own financial interests, not in acting for the benefit of the Partnership. As a consequence, my client has instructed me to commence legal proceedings forthwith in order to preserve the value of the Partnership and, in connection therewith, to seek damages and restitution from the General Partner for its fraud and breaches of fiduciary duties, among other applicable claims.

If you wish to discuss this matter, you can reach me at the office or by email. Otherwise, the next communication you receive from my office will likely be the service of process, once legal action has been commenced.

Please guide yourselves accordingly.

*Daniel B. Spitzer* \*
Law Offices of Daniel B. Spitzer
16311 Ventura Boulevard Suite 1200
Encino, California 91436-2152
Telephone 818-990-9700
Facsimile 818-990-9705
Email dspitzer@spitzeresq.com

\*  *Certified Specialist – Legal Malpractice Law*
   *State Bar of California Board of Legal Specialization*

This message contains privileged and confidential attorney-client communications or attorney work-product, and is intended only for the use of the individual or entity to which it is addressed.  Unauthorized use, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify me immediately.  Thank you.

---

**From:** Phil Wazonek <phil@distinctiverealty.ca>
**Sent:** Tuesday, October 12, 2021 7:15 AM
**To:** Daniel B. Spitzer <dspitzer@spitzeresq.com>; Tsafrir Gerson <tzafrir.g@gmail.com>; Gord Berger <gberger555@gmail.com>
**Cc:** Elad Gerzon <elad.gerson@gmail.com>; Anna Ostrovsky <aostrovsky01@gmail.com>; Ilan Peker <pekerilan@gmail.com>; Eduardo Menendez <emenendezavila@gmail.com>; Mark van Bommel <m.vanbommel@vibefx.ca>; eran gurvich <erangurvich@yahoo.com>; mgousseau@mailbox.org; md@marcindrozdz.com
**Subject:** RE: Distinct Real Estate USA 2, L.P., a Delaware limited partnership

Mr. Spitzer

Your clients are aware there is a Canadian limited partnership. For your information that partnership, a signatory to the limited partnership agreement, holds Class D limited partnership units representing ~58% of the limited partnership equity and voting interests in the US partnership.

Perhaps you might like to re-read the limited partnership agreement with that pertinent fact in mind.

The Canadian limited partnership has not waived notice of this meeting, has not been properly notified within the required delays,  and so that there not be the slightest degree of doubt; objects to the holding of this meeting, and must consult its constituent partners before taking any decisions on a vote.

A properly constituted meeting of the US limited partnership will be conducted in short order at which time your clients will be entitled both to their say and to their vote.

As to the assertion that information is being withheld from the investors, two information letters were sent to all investors in the Crane Manor project, as noted in below emails, on September 27th and October 7th, 2021.

**From:** Investor Relations <investors@distinctrealestatelp.com>
**Sent:** October 7, 2021 8:46 AM
**To:** Investor Relations <investors@distinctrealestatelp.com>
**Subject:** Crane Manner Financials

Good morning,

We have attached our current updated financial report for Crane Manner.  As we have previously mentioned, things are going very well at Crane, rents are increasing every month and we are in the middle of finalizing a financial package that will allow us to complete the renovations of the remaining units at Crane Manner.

Please note that once we secure financing for Crane Manner, we will be paying out the preferred return to all investors as planned.

If you have any questions, please don't hesitate to contact us.

Thank you,

**From:** Investor Relations <investors@distinctrealestatelp.com>
**Sent:** September 27, 2021 9:04 AM
**To:** Investor Relations <investors@distinctrealestatelp.com>
**Subject:** Whispering Pines Update

Good morning,

Attached please find an update letter on our Whispering Pines project.  You can reply to this email directly with any questions.

Thank you,



Tera Patterson
*Investment Administrator*
Office: 1.833.247.3687

Email: investors@distinctrealestatelp.com
Website: www.distinctrealestatelp.com

The information contained herein is not intended to sell securities or to solicit funds in any jurisdiction. This correspondence and the information contained herein do not constitute an offer or solicitation for the sale of any securities. They are provided for general guidance on matters of interest only. This correspondence and the information contained herein are not intended to provide you with any advice on financial planning, investment, insurance, legal, accounting, tax or similar matters and should not be relied upon for such purposes. Neither Distinct Real Estate LP, Distinct Real Estate USA LP nor any of its employees or agents are financial or tax advisers. You should assess whether you require such advisers and additional information and, where appropriate, seek independent professional advice. Distinct Real Estate LP, Distinct Real Estate USA LP, its subsidiaries and affiliates, are not responsible in any manner for direct, indirect, special or consequential damages however caused arising from your use of this correspondence and the information contained herein

*Phillip Wazonek*
phil@distinctiverealty.ca
Phone: 403-209-0009
Cell:   403-819-5449
Fax:   403-209-0029

This e-mail contains information, including property information, which may be confidential or privileged and is subject to copyright. Unless specifically stated, this e-mail does not constitute formal advice. All enclosed property information has been obtained from sources believed to be accurate however verification is the responsibility of the receiving party and due diligence is highly recommended.  If you are not the intended recipient please advise the sender by return e-mail, do not use or disclose the contents and delete the message and any attachments from your system.

**From:** Daniel B. Spitzer <dspitzer@spitzeresq.com>
**Sent:** October 11, 2021 5:51 PM
**To:** Phil Wazonek <phil@distinctiverealty.ca>
**Cc:** gberger555@gmail.com; md@marcindrozdz.com; pekerilan@gmail.com
**Subject:** Distinct Real Estate USA 2, L.P., a Delaware limited partnership

Mr. Wazonek -

My name is Daniel B. Spitzer and my law office represents Ilan Peker, one of the group of investors who were collectively induced to invest in Distinct Real Estate USA 2, L.P., a Delaware limited partnership ("**Partnership**").

I read with interest your email of October 9, 2021.

Indeed, it brought to mind a Talmudic aphorism. A jar stuffed full of coins will rattle imperceptibly when shaken. By contrast, a jar with a single coin inside will, when shaken, make a huge rattle. The point is that empty-headed statements often sound the loudest, but have little of substance to back them up.

Which brings me back to your email.

The group of investors is confident that the steps taken thus far are within the authority granted them under the the Agreement of Limited Partnership ("**Operating Agreement**") governing the Partnership's affairs. The meetings of the Limited Partners were called pursuant to Sections 4.2 and 4.4 of the Operating Agreement; the vote to remove the General Partner was taken pursuant to Section 3.5 of the Operating Agreement. All appropriate steps have been taken, strictly in accordance with the terms of the Operating Agreement.

In your email, you indicate that a "Canadian limited partnership ... is the majority limited partner of the Partnership." At the time my client invested in the Partnership, he was furnished with a copy of the Operating Agreement containing a Schedule B which enumerates all of the limited partnership interests in the Partnership. Of those enumerated Limited Partners, a clear quorum acted on September 27, 2021 to dissolve the Partnership and to declare that the General Partner has materially breached its obligations, starting a 90-day period during which the General Partner has the ability to cure its numerous breaches which include, among other things, the failure to proceed with renovations of the Property, the failure to disclose to the Limited Partners the full extent of the indebtedness of the Partnership and the failure even to furnish to the Limited Partners, as demanded, contact information for all of the other Limited Partners.

If, however, you are correct, that a Canadian limited partnership indeed holds a majority interest as a Limited Partner in the Partnership, then I am afraid that you, as General Partner, are hoisted on your own petard. This material fact was obviously and palpably withheld from my client, among the other investors. And the vaunted right to remove the General Partner is therefore illusory, since it is controlled by the General Partner, yet another fraudulent misrepresentation.

At the time my client and certain of the other Limited Partners agreed to invest, they were furthermore not informed that the General Partner was unable to proceed with the promised renovations due to its own internal squabbles and dysfunction. I have been furnished with communications from you and Gord Berger begging the Limited Partners to pressure Marcin Drzodz to resign from his position with the General Partner, claiming that his presence makes it impossible to obtain the capital necessary to renovate the Property -- a clear admission that the General Partner is unable to perform one of the key tasks enumerated in the promotional materials furnished to the investors. The investors were also not informed that the Partnership is burdened with an indebtedness of $1,350,000, the nature of which is clouded in mystery. In spite of their repeated demands for complete and transparent financial information as to the operations of the Partnership, the Limited Partners have been furnished with incomplete and unaudited financials for one month only and have never seen a copy of a note or evidence of the $1,350,000 indebtedness.

The response of the General Partner to their demands is simply and categorically unacceptable.

The Resolutions passed by the Limited Partners have stripped the General Partner of authority to enter into long-term commitments or contracts that will burden the Partnership. During the 90-day "cure" period (a misnomer, to be sure, since it's clear the General Partner has no intention of curing anything), the Limited Partners nevertheless expect and demand that the General Partner will take all steps to insure that the normal, day-to-day operations of the Partnership continue to be conducted.

Let me be clear. The Limited Partners have no intention of simply sitting on their hands for 90 days. They have tried to be cordial and accommodating, but they have been met repeatedly with a poke in the eye, the latest of which is your October 9, 2021 email. If the General Partner continues to lie to them and ignore their demands (for, among others, complete financial information, contact information for all Limited Partners and evidence of the $1,350,000 indebtedness), or if the General Partner takes steps which we believe will imperil the financial viability of the Partnership, our next step will be to file suit and seek the appointment of a receiver.

This is not the first in a series of demands. My client and his co-investors are deadly serious about making certian that their investment is protected. They have now put in place the steps necessary to remove the major impediment to the success of this venture, namely, the General Partner. If you and the other directors of the General Partner cannot do the job, then you will have to get out of the way, either voluntarily or not.

I urge you to take all steps necessary to cure the material breaches noted in the September 27, 2021 Resolution and the amendment which is coming before the Limited Partners in a follow-up meeting to be convened shortly.

*Nothing contained in this email is intended, or shall be construed, as a waiver or relinquishment of any right of my clients. Nor shall any statement contained herein be construed as an admission of any fact or matter whatsoever.*

Please guide yourself accordingly.

*Daniel B. Spitzer\**
Law Offices of Daniel B. Spitzer
16311 Ventura Boulevard Suite 1200
Encino, California 91436-2152
Telephone 818-990-9700
Facsimile 818-990-9705
Email dspitzer@spitzeresq.com

*\* Certified Specialist – Legal Malpractice Law*
  *State Bar of California Board of Legal Specialization*

This message contains privileged and confidential attorney-client communications or attorney work-product, and is intended only for the use of the individual or entity to which it is addressed.  Unauthorized use, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify me immediately.  Thank you.

## PURCHASE AND SALE AGREEMENT

THIS AGREEMENT is made this 18th day of January 2021 ("**Effective Date**") between Crane Manor Apartments, LLC, ("**Seller**"), and Distinct Real Estate USA LP, or related assignee ("**Buyer**"). Buyer reserves the right to assign this Agreement to another legal entity at its sole and absolute discretion.

### W I T N E S S E T H:

For good and valuable consideration, the receipt and sufficiency of which are acknowledged by Seller and Buyer, the parties agree:

### ARTICLE ONE
DEFINITIONS

The following terms as used in this Agreement shall have the meanings ascribed to them below:

1.1     "Escrow Agent". Apperson Crump PLC, Attention Mr. Joseph Aldridge is who shall hold the earnest money deposit hereunder pursuant to Section 3.1.

1.2     "Leases". Leases for space in the Project with tenants.

1.3     "Personal Property". All of Seller's right, title, and interest in and to all furniture, fixtures, furnishings, inventory, equipment, vehicle(s), supplies, leases acceptable to Buyer, books, records, accounts, acceptable service contracts, deposits and other proprietary interests regarding the Property and other personal property located on or used in connection with the Property and the Project; all plans, drawings, permits, governmental authorizations, contracts, documents, surveys, site plans, engineering reports, soil and environmental studies, manufacturer warranties and all other tangible and intangible personal property located on, pertaining to or arising out of the ownership or operation of the Real Property and the Project.

1.4     "Project". That certain apartment complex located on the Real Property at 2271 Airways Boulevard, Memphis TN 38114, Memphis, Tennessee, being known as Crane Manor Apartments and more particularly described on Exhibit A, attached. The Project contains 178 units including an office.

1.5     "Property". All of the Real Property and the Personal Property.

1.6     "Real Property". The Real Property located in Shelby County, Tennessee and legally described on Exhibit A.

## ARTICLE TWO
### SALE OF PROPERTY

2.1    Subject to the terms and provisions herein contained, Seller agrees to sell to Buyer and Buyer agrees to purchase the Property from Seller.

## ARTICLE THREE
### PURCHASE PRICE

3.1    Price.  The total purchase price to be paid for the Property shall be Three Million One Hundred and Fifty Thousand and No/100 Dollars ($3,150,000.00) (the "Purchase Price"), payable as follows: Buyer to pay One Million Eight Hundred Thousand and No/100 Dollars ($1,800,000.00) in cash at the time of closing and purchase the property subject to a potential liability not to exceed One Million Three hundred and Fifty ($1,350,000.00) Thousand and No/100 Dollars.

3.2    Deposit.  As a good faith deposit, Buyer shall deposit Fifty Thousand and No/100 Dollars ($50,000) with Apperson Crump PLC Escrow Agent within five (5) business days of the Effective Date.  In the event Buyer fails to deposit such amount with Escrow Agent within the time specified, this Agreement shall be null and void.  The deposit specified herein shall be refundable to Buyer during the Due Diligence Period, as specified in Section 4.1 below.  In the event Buyer does not Terminate the Agreement during the Due Diligence Period, the deposit shall be non-refundable and released to Seller.  The deposit shall be credited toward the Purchase Price at Closing.

## ARTICLE FOUR
### DUE DILIGENCE

4.1    Due Diligence Period.  (the "Due Diligence Period") Buyer has thirty (30) days to complete the due diligence period. This will include all inspections of the property, order and review of any reports and inspection of books and records.

4.2    Access and Coordination.  Seller shall grant access to the Property for Buyer and Buyer's agents and contractors to conduct such investigations as Buyer instructs.  Buyer shall coordinate and inform Seller of any access needed to the Property.

4.3    Indemnification.  Buyer shall indemnify and hold Seller harmless from any injuries or damage resulting from Buyer's inspections, including the actions of Buyer's agents and contractors.

4.4    Documentation.  Seller shall provide operating statements and rent rolls for the Property as well as other documents relating to the Property in Seller's possession as Buyer may request.

4.5    Right to Cancel.  Should Buyer deem the property unacceptable Buyer will give written notice to the Escrow agent on or before the end of the Due Diligence Period as per Section 4. Upon receipt of said notice Escrow Agent will refund the Earnest Money Deposit to

Buyer. If Buyer does not terminate the escrow on or before the end of the Due Diligence Period as per Section 4, Escrow Agent shall release the Earnest Money Deposit to Seller.

## ARTICLE FIVE
### TITLE

5.1     The Real Property shall be conveyed by general warranty deed in Tennessee form subject only to the following:

A.     Real estate taxes for the year in which the closing shall occur which are not yet due and payable.

B.     Zoning and/or restrictions and prohibitions imposed by governmental authorities, none of which shall prevent use of the Real Property as an apartment complex.

C .     Restrictions, reservations and easements recorded in the Public Records of Shelby County, Tennessee, subject to approval by Buyer, none of which shall interfere with the use of the Real Property for its intended purpose or render the title unmarketable.

## ARTICLE SIX
### TITLE INSURANCE

6.1     Title Commitment. Buyer, shall, within two (2) days after execution of this Agreement obtain at Seller's expense, evidence of Seller's title to the Real Property in the form of a title search acceptable for an insurance commitment (the "Title Commitment"). The Title Commitment is to be accompanied by legible copies of all documents referred to therein as exceptions to title and it shall contain the Title Insurer's undertaking to issue to Buyer upon recording of the deed conveying title a title insurance policy in the name of Buyer or Buyer's assigns in the amount of the Purchase Price, excepting only to the matters approved by Buyer. If such title insurance commitment shall disclose any defects in title, Buyer shall so notify Seller in writing within five (5) days after receipt thereof. Seller shall then have ten (10) days thereafter within which to cure or cause such defects to be cured, and the closing shall be extended accordingly if necessary. Any extensions of time given Seller to cure title defects shall extend the closing date by a like number of days. In the event that any such defect cannot be cured by Seller within ten (10) days, Buyer shall have the option of accepting title subject to such defects, and otherwise closing the transaction in accordance with the terms and conditions hereof, or of extending further time to Seller, by mutual consent, not to exceed sixty (60) additional days, to effectuate such cure, or of rescinding this Agreement. If Buyer elects to rescind this Agreement pursuant to this Article Six, the Earnest Money shall be returned to Buyer. Seller agrees to use diligent effort, including bringing of lawsuits, to cure any title defects.

**ARTICLE SEVEN**
REPRESENTATIONS AND WARRANTIES

7.1     Seller hereby represents and warrants that the following will be true and correct as of the closing date, and all of such representations and warranties shall survive closing:

A.     The legal description which is attached to this Agreement as Exhibit A describes the Real Property.

B.     All of the Leases entered into by Seller, financial and operating statements delivered or to be delivered to Buyer are true, correct and complete with no misstatements and with no material omissions.

C.     There are no service contracts, leases other than tenant leases or other contracts of any kind or nature (except as may be listed on Exhibit B or disclosed in the Title Commitment) which will not be binding upon Buyer after the closing date, unless same have been approved by Buyer.

D.     Seller has received no notice of any violations of any portion of the Real Property from any governmental agency or authority and all permits and governmental authorizations which are appropriate or necessary for operation of the Project have been duly issued, are in full force and effect and will be assigned to Buyer at closing, if assignable.

E.     The Property is and shall be, at the time of closing, in full compliance with all applicable governmental and quasi-governmental laws, codes, rules and regulations.

F.     To the best of Seller's knowledge, there is some gas under a part of the Real Property, however, the property was still deemed safe for human habitation and no further actions were recommended. Environmental reports deeming the Property to be safe for human habitation have been provided to the Buyer.

G.     Seller has no knowledge of any pending or contemplated condemnation or eminent domain proceeding or of any moratorium affecting any portion of the Real Property.

H.     There are no third party claims pertaining to or affecting the Property except for rights of tenants arising under the Leases.

I      Seller has received no notice or complaints from any current tenants that any of the units currently occupied by tenants are in violation of lease covenants, nor that there are repairs needed in the units with tenants in possession. Any claims of un-inhabitability, repairs, fixes or maintenance by any tenants prior to the consummation of this sale will be the responsibility of and addressed and completed by Seller and said responsibility will survive closing.

J        Seller has maintained an accurate and current account of all security deposits, all of which are fully funded with no draw down. Such deposits are to be delivered to the Buyer without charge.

L.       Seller is the owner of the Personal Property free and clear of all liens, third party claims and encumbrances.

M.       All utilities including electricity, telephone, water and sanitary sewage in sufficient quantity to service the Real Property and its tenants adequately is and will be available to the Real Property and will be fully hooked up and operable at the time of closing without payment by Buyer or the Real Property of any fees, and all necessary and appropriate approvals for same will have been obtained. The only fees payable by Buyer in connection with such utilities shall be normal usage fees.

## ARTICLE EIGHT
### CLOSING

8.1      Place, Time, Etc.  Subject to the other provisions of this Agreement, closing shall take place at the office of Apperson Crump, 6000 Poplar, Suite 150, Memphis Tennessee 38119 or at such other place as the parties may mutually agree upon.  The Closing Shall take place on or before thirty (30) days after the end of the Due Diligence Period.

8.2      Documents, etc. by Seller.  At closing or prior to, Seller shall deliver the following items to Buyer:

A.       Closing Statement.
B.       Warranty Deed.
C.       Bill of Sale for the Personal Property with warranties of title.
D.       Assignment of Leases with warranty of title.
E.       Notice to tenants of sale.
F.       Seller's Affidavit.
G.       Assignment and delivery of all original permits, licenses, leases, contracts, approvals, plans, specifications, surveys, certifications, warranties, estoppels, and authorizations referred to herein and all items of Personal Property being assigned or conveyed to Buyer.
H.       Any other forms or documents necessary or desirable to complete the transactions herein contemplated.
I.       All tenant security deposits

8.3      Further Documents.  Buyer and Seller each agree to execute such further documents and instruments and to deliver to each other such further materials in their possession at closing (or thereafter if forgotten at closing or if the need did not become apparent until after closing) as may be necessary or appropriate to accomplish the purpose and intent hereof. Buyer

and Seller further agree to cooperate in a 1031 exchange and execute all necessary paperwork without cost to the other party.

## ARTICLE NINE
### CLOSING ADJUSTMENTS AND PRORATIONS

9.1     The following items are to be apportioned at closing in an equitable manner, as of the close of business on the day of the closing ("the Adjustment Date") so that the income and expense items with respect to the period prior to the Adjustment Date will be for Seller's account and the income and expense items with respect to the period on and after the Adjustment Date will be for Buyer's account.

A.      Real estate and personal property taxes shall be apportioned based upon the calendar year for which they are assessed.  If the closing date shall occur before the tax rate or assessment is fixed, the apportionment of such taxes at the closing shall be upon the basis of the tax rate for the next preceding year applied to the latest assessed valuation; provided, however, that readjustment will be made based upon the actual tax amount, when determined. This provision shall survive the closing.

B       Proration items shall include collected Rents and collected Additional Rents, utility bills (except as hereinafter provided), fees and charges for service contracts, and all other operating expenses of the Property.  Any Rents received aft the Closing shall be paid to the Buyer, provided that should a tenant's account be current, and should a payment of delinquent rent be made at such time, the Buyer shall remit the same to the Seller.

B.      Such other apportionments and adjustments as are customarily apportioned upon the transfers of property similar to the Seller's property.

9.2     Liens. All liens are to be paid by Seller at or before closing.  Any termination costs for service contracts or equipment leases not assumed by Buyer shall be paid by Seller.

## ARTICLE TEN
### RISK OF LOSS

10.1    Damage. If the improvements are damaged by fire or other casualty prior to closing, the cost of such restoration shall be an obligation of the Seller and closing shall, at Buyer's option, proceed pursuant to the terms of this Agreement with the cost therefor being escrowed at closing, or closing shall be delayed until thirty (30) days after the restoration is complete. If restoration cannot be completed within thirty (30) days of the closing date set forth herein, Buyer may terminate this Agreement or proceed to close in which event all insurance proceeds shall be delivered to Buyer.

10.2    Taking. In the event there shall be a threatened, pending or completed exercise of the power of eminent domain or deed in lieu thereof of any portion of the Property, Buyer shall have the option to complete closing hereunder and take an assignment of the proceeds paid or to be paid therefore, or to terminate this Agreement.

10.3    Termination. Upon any termination under this Article Ten, Buyer shall be refunded the entire Earnest Money deposit(s) and neither party shall have any further liability to the other.

## ARTICLE ELEVEN
EXPENSES

11.1    Seller's Expenses. Seller shall pay the cost of the Title Search, and Seller's attorney's fees.

11.2    Buyer's Expenses. Buyer shall pay all transfer taxes relative to the conveyance; the cost of recording the warranty deed and Buyer's attorney's fees.

## ARTICLE TWELVE
DEFAULT

12.1    If Buyer fails to perform this Agreement within the time specified, the Earnest Money deposit paid to date by Buyer, together with any interest that may have been earned thereon, shall be retained by or for the account of Seller as full, complete and liquidated damages in full settlement of any and all claims hereunder, whereupon all parties shall be released of all obligations under this Agreement. If Seller shall default in Seller's obligations under this Agreement or fail, neglect or refuse to perform Seller's obligations hereunder, Buyer may elect to terminate this Agreement and obtain a refund of his Earnest Money deposit and/or Buyer may avail herself of any remedy otherwise available hereunder, at law or in equity including specific performance.

## ARTICLE THIRTEEN
BROKERAGE COMMISSION

13.1    Broker. Buyer and Seller represent and warrant to each other that JD Bols & Associates is the only Broker with whom each has dealt in connection with the transaction contemplated by this Agreement. Seller agrees to pay to Broker the commission as per separate agreement between Seller and Broker, upon the closing of the transaction and full payment of the Purchase Price. Seller and Buyer each represent and warrant one to the other, that they have dealt with no other broker, finder or similar individual or entity in connection with this transaction. Seller hereby agrees to hold Buyer free and harmless from all brokerage or similar claims made by any entity claiming through or as a result of dealings with Seller. Buyer hereby agrees to hold Seller free and harmless from all brokerage or similar claims made by any entity claiming through or as a result of dealings with Buyer.

## ARTICLE FOURTEEN
SURVIVAL OF CERTAIN PROVISIONS

14.1     Wherever in this Agreement obligations of Seller or Buyer are stated to survive
closing hereunder, such obligations shall survive closing and delivery of the deed.  Additionally,
all unperformed obligations hereunder shall, unless performance thereof is waived in writing by
the other party, survive closing and delivery of the deed.

## ARTICLE FIFTEEN
NOTICES

15.1     All notices hereunder shall be written and shall be deemed given upon receipt
thereof or, if receipt is refused, upon the date of refusal.  Notices shall be valid if delivered by
any of the following means:  certified mail, return receipt requested; telecopier, with receipt
confirmed; hand delivery or delivery by bonded courier, or overnight or same day delivery
service.

15.2     Notices to Seller shall be sent to Seller at the following address:

    Crane Properties, LLC
    Attn:  Erik Nowacki
    2295 Candlewyck Circle
    Memphis, TN 38114
    With  copy to:
    John B. Philip
    Crislip, Philip & Royal
    5170 Sanderlin Ave., Suite 201
    Memphis, TN. 38117

15.3     Notices to Buyer shall be sent to Buyer at the following address:

Distinct Real Estate USA LP. or Nominee Company
    c/o Apperson Crump PLC,
    6000 Poplar Avenue, Unit 150, Memphis, TN, 38119.
    Attention Mr. Michael A. Fearnley
    mfearnley@appersoncrump.com
    Phone: 1-901-260-5160.

15.4    Any party may change its address or fax number for notices by giving due notice of such change to the other party hereto.

## ARTICLE SIXTEEN
### ESCROW AGENT

16.1    Duties and protections of Escrow Agent. The Escrow Agent shall perform all duties and be afforded all protections contained herein.

## ARTICLE SEVENTEEN
### MISCELLANEOUS

17.1    Binding Effect. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their personal representatives, heirs, successors and assigns.

17.2    Severability. In the event of the invalidity of any provision hereof, same shall be deemed stricken from this Agreement, which shall continue in full force and effect as if the offending provision were never a part hereof.

17.3    Pronouns. Use of pronouns or nouns in any form where they appear in this Agreement shall be read as either masculine, feminine or neuter and either singular or plural wherever the context and facts permit.

17.4    Governing Law. This Agreement and all matters arising hereunder shall be governed by and construed in accordance with Tennessee law.

17.5    Headings and Exhibits. Article, Section and paragraph headings are inserted solely for ease of reference and shall not be construed to enlarge, modify or limit the provisions hereof. References to numbered or lettered Articles, Sections or paragraphs refer to Articles, Sections and paragraphs of this Agreement unless specified to the contrary. References to Exhibits are to the Exhibits attached hereto which are, by this reference, made a part hereof.

17.6    Time of the Essence. Time is of the essence of the provisions of this Agreement.

17.7    Attorneys' Fees. In the event of any litigation arising out of this Agreement, the prevailing party shall be entitled to reimbursement of the costs and expenses thereof from the other party, including reasonable attorneys' fees and including such costs, expenses and fees incurred on appeals of such litigation.

17.8    Construction of Agreement. The parties agree that this Agreement was prepared jointly by each of them and shall be construed on a parity as between the parties. There shall be no canon of construction for or against any party by reason of the physical preparation of this instrument.

17.9    Effect of Words.  Wherever the word "including" appears in this Agreement, it shall be deemed to mean "including, without limitation" if the context permits.

17.10   No Amendment.  No amendment, modification, change or alteration of this Agreement shall be valid or binding unless in writing and signed by all the parties.

17.11   No Agency.  Nothing in this Agreement shall be deemed to create an agency relationship between Seller and Buyer.  The relationship of the parties is strictly that of a seller and a buyer.

17.12   Counterparts.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all of which taken together shall constitute one and the same instrument, and it shall not be necessary in making proof of this Agreement to produce or account for more than one counterpart.

17.13   Tax Free Exchange Option.  Buyer and/or Seller may elect to have this transaction be concluded as an exchange under the provisions of Section 1031 of the Internal Revenue Code of 1986, as amended.  The other party agrees to cooperate to effect such exchange provided such cooperating party shall incur no additional cost with respect to such exchange.


**ENTERED INTO AND EXECUTED THE DATE AND TIME APPEARING BELOW THE RESPECTIVE SIGNATURES.**

SELLER:

**Crane Manor Apartments, LLC**

Erik Nowacki, Manager

1/21/21
Date and time of execution

BUYER:

**Distinct Real Estate USA LLP or Nominee Company.**

Phillip Wazonek, President

January 21st, 2021, 10:00AM MST
Date and time of execution

**EXHIBIT A**

**LEGAL DESCRIPTION**

**EXHIBIT B**
Service Agreements

**EXHIBIT 10**

**Daniel B. Spitzer**

| | |
|---|---|
| **From:** | Anna Ostrovsky <aostrovsky01@gmail.com> |
| **Sent:** | Friday, November 12, 2021 11:03 AM |
| **To:** | Gord Berger |
| **Cc:** | Phil Wazonek; Tsafrir Gerson; Elad Gerson; emenendezavila@gmail.com; Eran Gurvich; Mark van Bommel; mgousseau@mailbox.org; Ilan Peker; Adam Razz; Ari Heitner; Daryl Roitman; Grant Whittaker; Laurie & Ze'ev; my2006@rogers.com; zale newman; Marcin Drozdz; Daniel B. Spitzer |
| **Subject:** | Re: The first draft was only sent out to Eran and his friends without the link. We now have included the link. |

Hi Gord,

We are specifically looking for:

1. The documentation for the $1.35mm liability

2. The documentation for the lawsuit to reduce the $1.35mm liability

3. Any updates to the purchase agreement - the purchase agreement shared with us has an old date and a purchase price different from what was disclosed to us

4.  A copy of the proposed $3mm financing term sheet

5. What is the status of the renovation? How many units have been renovated? How many of the total units are occupied? What is the timeline for completing the renovation

6.  We have additional specific questions including transfer of funds out of Crane Manor to other projects, very high professional fees, etc. but if that is too difficult to address by email, we can wait to examine the books ourselves.

Your willingness to share this information (#1-4 your admin could send) would be a huge huge step to restoring goodwill with your LPs.

Best Regards,
Anna

On Thu, Nov 11, 2021 at 11:01 PM Gord Berger <gberger555@gmail.com> wrote:

Hi Anna

Please send me the information you require and I will take it up

With Phil. We are now preparing for any or all of you come to Memphis to

See what we have accomplished. At the same time you will have access to any and all information you want under 10.2 of the Limited Partner agreement. If these guys were mensches everything would be different, but unfortunately that is not the case.

Warm regards,

Gord

Gordon Berger TEP

416 471 3223.          CELL

416 499 4222          OFFICE.  Ext 228

416 512 6888.           HOME

On Nov 11, 2021, at 7:23 PM, Anna Ostrovsky <aostrovsky01@gmail.com> wrote:


Gord, could you please provide the information we requested.  In previous emails you have suggested
that you are a gentleman and a man with integrity.  This is information relevant directly to our
investment in Crane Manor.  We have requested this information numerous times over numerous
months.   We are not asking you to put together anything special for us -- just to have your admin send
us the documents that already exist.

Thanks so much


On Thu, Nov 11, 2021 at 6:31 PM Gord Berger <gberger555@gmail.com> wrote:


    https://mnpdebt.ca/en/corporate/corporate-engagements/intelife-lp


To all the investors in Distinct Real Estate Projects,

Over the last several months Phil and I have been under attack from the desks of
mainly Eran but most of the time Tsafrir. It is unfortunate that Tsafrir is not a lawyer or
accomplished businessman. His father must have left him money.

He has accused us, alleged that we have done bad things, we kept everybody from
having access to all the information, even when we go to the bathroom. That is clearly
not the job of the General Partner. The job of the general partner is to raise the money
and use it carefully to deliver a worthwhile result for the investors and themselves.

What we find interesting is that Eran and a few of his friends lost over $1million dollars
in a company that Marcin was a one third shareholder and responsible for raising the
money and reporting to the investors.

Marcin never told any of the investors or even me anything that turned out to be true.
At this point it has become true that Marcin and his partners either absconded with or
just blew away millions of dollars. He did share with me, near the end of Intelife, that
they needed some more money and that debt would be paid 19% annually, paid
monthly, as the money would only be needed for a short time. The fact that that
money was invested as secured debt but in fact, once the three clowns were through
with the company, around $14million was gone, and so were the principals. I
personally tried to reach out to the companies who raised money for Marcin, but he
would never tell me on the advice of his lawyers. I have these conversations recorded!
He made it impossible to speak to the Exempt Market Dealers and for good reason.
Phil and I found out, which Eran already knew that Marcin had been involved at a very
senior shareholder with at least the last three companies he was involved in that all
became insolvent and, of course, all the investors lost their money.

What is interesting is that even though Eran and a few of his friends lost over $1million
dollars, it didn't stop him in reaching out to some of his other friends or enemies and

talked them into investing with Marcin in Distinct projects even though he was suing the Shareholder's of Intelife. How could that be you ask, ask Eran.

The first thing he did was make sure that while we raised money, as he couldn't except for Eran and his gullible friends, he made sure he took a significant amount of it, which he didn't disclose to me, who was raising most of the money. Eran basically financed the law-suit against Marcin and his friends and yet still brought his friends into this deal via Marcin even though he had lost over 1 million dollars. I don't get it but may you do.

As we all know, Marcin has left a river of bleeding investors for years and continues to do that.

It was good luck for you, the investor, that Phil and I were there protecting your money.

We have included the link for you to read how the three principles in Intelife screwed everyone by mismanagement. and financially rewarding themselves until there was no money left.

The reason that Marcin has gone to Youtube is to get money out of unsuspecting investors like you were.

Nobody else will go near him. So why are we telling you this. I am addressing this mainly to Tsafrir, Ilan, Elad, and and others. Have you ever asked yourself why this attack is happening. Given that Eran brought you into this investment knowing full well that he was in the midst of suing Marcin, maybe your anger should be targeted to the culprit who put your money at risk. If you examine the dates of the initiation of the lawsuit, you will notice that Eran was at cross purposes with Marcin prior to asking you to invest. The reason that Eran has been so outright embarrassed is that he put all his belief in Marcin and then all of you did also.

Phil and I believe that the game now is to give Marcin more money probably on a weekly basis so he can travel and buy food, take over Crane and possibly Whispering Pines. I'm sure he has convinced all of you that Phil doesn't know what he is doing and Marcin is an expert. The only thing that Marcin is an expert in is losing money for himself and his investors. He is a pro at that.

I am happy to give you access to the companies who have raised money for Marcin's unsuccessful ventures.

They will share with you what they think of him. His crappy reputation stretches far and wide. If he has promised to pay you all back if you take over our projects or new ones in Florida, good luck. Say bye bye to your hard earned money. I actually liked Eran very much but he got sucked into Marcin's divide and conquer plan which turned out to be very successful for Marcin and very unfortunate for Eran and his group.

I am now sharing other deals that became apparent to me once I was able to find contacts that ultimately have shared these names with me, all gone now;

3

1.Tandem Properties

2. a company called Weslease

3. and of course, the best example of what Marcin is capable of, Intelife.

We have taken the time to write this to all of you not because we want to get even with Marcin, but we feel sorry for the path some irrational investors are leading you. As of this point, you will no longer be able to say you didn't know, as we have been trying to share the truth with all of you for a very long time.

Act accordingly,

Gordon Berger

Managing Director

Distinct Real Estate Limited

gberger555@gmail.com


416 471 3223   cell
Gberger555@gmail.com

21 Tregellis Rd, M3H 1K3, Toronto, Ontario

*Remember, sooner is better than later or never!  Life happens and things change in the blink of an eye and so can your insurability.*

E&O.E

This copyrighted message, and any attachments, is intended only for the addressee, and may contain privileged or confidential information.  If this has been received in error, please delete immediately.



# EXHIBIT 11

## Daniel B. Spitzer

| | |
|---|---|
| **From:** | Anna Ostrovsky <aostrovsky01@gmail.com> |
| **Sent:** | Saturday, November 13, 2021 10:19 AM |
| **To:** | Daniel B. Spitzer; Tzafrir.g; Ilan Peker; Elad Gerson |
| **Subject:** | Fwd: Hi Anna |

Hi Gord,
Thanks for your email.  I think the summary of it is that you WON'T share the information that is rightfully due to us and that is very simple to share.  I would respectfully ask that you refrain from name calling and accusations. I am not interested at all.  I am only interested my financial recovery here and not in the backstories of any particular manager or GP.  I am not going to involve myself in any of that.


Best regards
Anna


Begin forwarded message:

> **From:** Gord Berger <gberger555@gmail.com>
> **Date:** November 12, 2021 at 10:36:29 PM EST
> **To:** Anna Ostrovsky <aostrovsky01@gmail.com>
> **Cc:** Phil Wazonek <phil@distinctiverealty.ca>
> **Subject: Hi Anna**


First of all Shabbat Shalom,
As you know, Shabbat is coming within minutes. I have not time at present to respond to you other than to say I wish you weren't part of this "squad" group. The kinds of things you are basically asking for has been addressed in the meeting of November 4th.
You are interested in the lis pennants (non-registered mortgage". As we are working our way through the process with our lawyers( yours and ours), we do not have a settlement at this point in time.
2. As covered already, when we purchased the property we contemplated paying $3,150.000 OR LESS> If we do not win the lawsuit we end up exactly where we were prepared to be when we purchased the property.
3. You guys keep on asking about the target price in the marketing material as created by Marcin of $3.8million dollars. Why are you guys concerned as we only bought it for $3,150,000. If you want to pay us a premium of $650,000 for buying it at a much lower price, send us a cheque and interest. How can even have the nerve to complain about that. or #2. I don't get it. The squad is looking to make trouble. We have done everything in the interest of the investors. We actually can't wait to get rid of the guys. They are a pain in the ass.
4. We should all of you the loan document from the lender in the amount of $3million dollars. We can't afford to give you access to the lender as all our hard work could go down the drain, which would hurt everyone concerned. If you were the GP you would do the same thing, as we are protecting all the investors money.
5, We covered the fact, that without financial, it was impossible to start the renovations of Crane Manor.
It was actually an awesome thing as the rents have gone up unbelievably and because we didn't finish any suites, we will take advantage of the market lift. We have also been waiting for the price of wood

etc. to come down and it has started already. There was a time that the entire supply chain was broken but it seems to be coming back slowly.

6. You are complaining about professional fees. What right do you have to say that as all of you don't have a clue what the lawyers here are charging the company and what they have done. This is a very cheap shot.

You don't even know what lawyers charge in Memphis. This is what really upsets me. That statement is meant to say that we are paying usurious fees without having a clue. Give me a break!

7. I am very willing to have you or any other investor come to sunny Memphis and check the books.

I want to make a point that Phil and I have taken zero dollars since I was a equal shareholder to the GP. The projects owe us a very significant amount of money which we can take anytime plus fees for our covenant with which we could not get a lender to finance our renovations. So to say that we took money out of Crane, if we did, it is our money and not yours. You can't expect us to work day in and day out for no money. You wouldn't either. So if you want us to bill the company for what is owed to us, just let me know.

So in summary, I know you have been set up to send the above to us and be the front man. I feel sorry for you as I assume you are a wonderful person as I can tell from your messages but you don't have to do the work for these scoundrels. Tsafrir and Eran have mislead all of you enough. We have provided Marcin's background so you can see the truth. And if you need more third party proof that he is not what you think, reach out to me and I am happy to provide a litany of history about Marcin who you think will lead you into the new land but what you will find out is he will lead your hard-earned money into hell where the rest of his investors are living now.

Anybody who has ever met Marcin would probably want to hang him in the town square so all could see his last breath,  but that wouldn't bring back their money. If you have time on Sunday, please give me a call and we can meet and talk. I would like that.  My phone number is below. I am a gentleman but they aren't. Search out Eran on google, you may be shocked, I was.

Gord

Gordon Berger TEP

416 471 3223.          CELL
416 499 4222          OFFICE.  Ext 228
416 512 6888.           HOME

# EXHIBIT 12

## ACTION BY CONSENT IN LIEU OF MEETING

## TO PERMIT COPYING OF PARTNERSHIP BOOKS,

## RECORDS AND FINANCIAL STATEMENTS

WHEREAS, according to paragraph 2.4 of the Agreement of Limited Partnership ("**Operating Agreement**") of Distinct Real Estate USA 2, L.P., a Delaware limited partnership ("**Partnership**") was established for the primary purpose of purchasing, renovating, renting, holding or selling the Partnership's primary asset, the real property, buildings and improvements thereon located at 2295 Candlewyck Circle, Memphis Tennessee 38114 ("**the Property**"), commonly known as Crane Manor Apartments;

WHEREAS, the Limited Partners of the Partnership have become concerned that the Partnership's General Partner, Distinct Real Estate USA GP 2, Inc., a Delaware corporation ("**the General Partner**"), has withheld material information concerning the finances of the Partnership from the Limited Partners (including, among other things, an undisclosed lien claim of $1,350,000 against the Property, an undisclosed lawsuit filed on behalf of the Partnership to challenge the lien claim and allegations that the General Partner has diverted funds from the Partnership to another project involving the General Partner), and is either unwilling or unable to perform its obligations for management and operation of the Property, due to internal dissension and deadlock among the General Partner's own shareholders, which the Limited Partners have previously declared, at a duly-constituted meeting of the Limited Partners on September 27, 2021, to be a material breach of the Operating Agreement;

WHEREAS, the Limited Partners of the Partnership have been unable to obtain basic information concerning the operations and finances of the Partnership, in spite of their repeated requests to the General Partner;

WHEREAS, certain of the Limited Partners have given notice to the General Partner of their intent to examine and copy the books, records and financial statements of the Partnership under paragraph 10.1 of the Agreement of Limited Partnership ("**Operating Agreement**") of the Partnership, which provides as follows:

      10.1   **Books, Records and Financial Statements**. At all times during the continuance of the Partnership, the Partnership shall maintain, at its principal office, separate books of account for the Partnership that shall show a true and accurate record of all costs and expenses incurred, all charges made, all credits made and received and all income derived in connection with the operation of the Partnership business in accordance with generally accepted accounting principles consistently applied, and, to the extent inconsistent therewith, in accordance with this Agreement. Such books of account, together with an executed copy of this Agreement, the

Partnership Register, a certified copy of the Certificate and all other documentation maintained by the Partnership and relevant to a Partner's review of the accuracy and correctness of the Partnership's books, records and accounts shall at all times be maintained at the principal office of the Partnership. ***Upon at least five (5) Business Days prior written notice to the General Partners, a Limited Partner or its representative shall be permitted to examine books of account, the executed copy of this Agreement, the names of all Partners and a certified copy of the Certificate, at such time as may be mutually convenient to the General Partner and such Limited Partner. Each Limited Partner shall bear all expenses incurred in any examination made for such Limited Partner's account and shall keep all information obtained during such inspection confidential.***

(Emphasis added.);

WHEREAS, the General Partner has taken the position, both at a meeting of the Partnership convened by the General Partner on November 4, 2021, and in writing thereafter, that it will ***not*** permit copying or scanning of the books, records, and financial statements of the Partnership by any Limited Partner who duly gives notice of an inspection and examination pursuant to paragraph 10.1 of the Operating Agreement, in spite of the fact that the Operating Agreement is silent on the issue; and

WHEREAS, nearly all (if not all) of the Limited Partners reside outside Memphis, Tennessee and therefore find it inconvenient to visit the Partnership office located at 6000 Poplar Avenue, Memphis Tennessee for the purpose of examining the books, records and financial statements of the Partnership and seeking advisement from their respective financial advisors, accountants and attorneys;

NOW, THEREFORE, in accordance with the provisions of paragraph 4.2 of the Operating Agreement, the following resolutions are enacted and actions are taken by consent of the Limited Partners, in lieu of a meeting:

### Authorization of Limited Partners to Copy Books, Records and Financial Statements of the Partnership.

RESOLVED that, subject to the provisions of paragraph 10.1 of the Operating Agreement of the Partnership, any Limited Partner or its authorized representative shall, as part of the examination of the books, records, and financial statements provided for in said paragraph, be permitted to copy or scan the Partnership's documents and things enumerated therein.

RESOLVED that the General Partner is instructed by the Limited Partners to
act and conduct itself in accordance with the provisions of the above resolution,
which shall be included as an official act in the books and records of the Partnership.


_____          _Eduardo  Menendez_          _November  15, 2021_

Signature of Limited Partner              Printed Name of Limited Partner          Date

RESOLVED that the General Partner is instructed by the Limited Partners to act and conduct itself in accordance with the provisions of the above resolution, which shall be included as an official act in the books and records of the Partnership.

_____          Eran Gurvich /Ant          Nov 11, 2021

Signature of Limited Partner          Printed Name of Limited Partner          Date

RESOLVED that the General Partner is instructed by the Limited Partners to act and conduct itself in accordance with the provisions of the above resolution, which shall be included as an official act in the books and records of the Partnership.

_Ilan Peker_                          Ilan Peker                          11/11/2021
Signature of Limited Partner      Printed Name of Limited Partner      Date

RESOLVED that the General Partner is instructed by the Limited Partners to act and conduct itself in accordance with the provisions of the above resolution, which shall be included as an official act in the books and records of the Partnership.

| | | |
|---|---|---|
| Signature of Limited Partner | Mark van Bommel<br>Printed Name of Limited Partner | November 11, 2021<br>Date |

RESOLVED that the General Partner is instructed by the Limited Partners to act and conduct itself in accordance with the provisions of the above resolution, which shall be included as an official act in the books and records of the Partnership.

| | TSAFRIR GERSON | 10/11/2021 |
|---|---|---|
| Signature of Limited Partner | Printed Name of Limited Partner | Date |